IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

JC INTERNATIONAL FINANCE LIMITED, PROMINENCE TRUST LIMITED, SOUTHWIND MEDIA HOLDINGS LIMITED, FENTON CAPITAL INC., MIDTERM SUCCESS LIMITED, ANGEL PRIDE HOLDINGS LIMITED, FORTUNEGATE HOLDINGS PHILIPPINES INC., GOLDENWAY JAPAN CO., LTD., GOLDENWAY PRECIOUS METALS LIMITED, GOLDENWAY FINANCIAL HOLDINGS LIMITED, GOLDENWAY INVESTMENTS HOLDINGS LIMITED, INTERNATIONAL ENTERTAINMENT COMPANY, DISCOVERY KEY INVESTMENTS LIMITED, ASIAN CREATIVE CAPITAL LIMITED, HO WONG MENG, HONG WAI CHENG;

*Plaintiffs,*

v.

CHRISTIAN LAMARCO and SHADYSIDE PARTNERS, LLC d/b/a CULPER RESEARCH,

*Defendants.*

HAO TANG;

*Plaintiff,*

v.

SHADYSIDE PARTNERS, LLC (*d/b/a* CULPER RESEARCH) and CHRISTIAN LAMARCO,

*Defendants.*

CIVIL ACTION NO.: 1:26-cv-04930-JMF

**DEFENDANTS' OMNIBUS MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFFS' COMPLAINTS IN CONSOLIDATED ACTION**

# TABLE OF CONTENTS


PRELIMINARY STATEMENT ....... 1

FACTUAL BACKGROUND ....... 6

A. Hao Tang and the Report ....... 6

B. Specific Statements in the Report Tang Challenges ....... 7

1. Ties to Money Laundering and Fraud ....... 7

2. Tang's Network and Connections Have Ties to Human Trafficking ....... 9

3. Tang's Connections Have Ties to the CCP ....... 11

C. The Graphic Challenged by the Entity Plaintiffs ....... 13

PROCEDURAL HISTORY ....... 15

LEGAL STANDARD ....... 15

ARGUMENT ....... 16

I. Plaintiffs Have Not Adequately Pled Defamation ....... 16

A. The Challenged Statements Are Opinion ....... 17

1. The Context of Culper's Statements Demonstrates That They Are Protected Opinion ....... 19

2. The Specific Statements Set Forth in the Complaints Are Not Actionable ....... 22

a. None of Tang's Specific Challenged Statements are Actionable as Defamation ....... 22

b. The Graphic Challenged by the Entity Plaintiffs is Not Defamatory ....... 29

B. The Challenged Statements are Not Actionable Because They Are Not Alleged to be False ....... 35

C. Plaintiffs Have Not Plausibly Alleged that Culper Published the Statements with Actual Malice ....... 36

CONCLUSION ....... 41

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*1st Amendment Praetorian v. N.Y. Times Co.*,
2025 WL 949575 (S.D.N.Y. Mar. 28, 2025) ....................36, 37

*Adler v. Solar Power, Inc.*,
2018 WL 1626162 (S.D.N.Y. Mar. 30, 2018) ....................29

*Air Wis. Airlines Corp. v. Hoeper*,
571 U.S. 237 (2014)....................17

*Aronson v. Wiersma*,
65 N.Y.2d 592 (1985) ....................31

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....................15

*Baiul v. Disson*,
607 F. App'x 18 (2d Cir. 2015) ....................38

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)....................15

*Bellavia Blatt & Crossett, P.C. v. Kel & Partners LLC*,
151 F. Supp. 3d 287 (E.D.N.Y. 2015), *aff'd*, 670 F. App'x 731 (2d Cir. 2016)....................19, 21

*Biro v. Conde Nast*,
807 F.3d 541 (2d Cir. 2015)....................15, 38

*Biro v. Conde Nast*,
963 F. Supp. 2d 255 (S.D.N.Y. 2013), *aff'd*, 807 F.3d 541 (2d Cir. 2015); 622
F. App'x 67 (2d Cir. 2015) ....................15, 37, 39

*Bloom v. A360 Media LLC*,
735 F. Supp. 3d 466 (S.D.N.Y. 2024)....................15, 39

*Bobulinksi v. Tarlov*,
758 F. Supp. 3d 166 (S.D.N.Y. 2024)....................36

*Brian v. Richardson*,
87 N.Y.2d 46 (1995) ....................17, 19

*Cassava Sciences, Inc. v. Bredt*,
2024 WL 1347362 (S.D.N.Y. Mar. 28, 2024) ....................19, 21, 38, 39

*Cassava Sciences., Inc. v. Bredt*,
2024 WL 555484 (S.D.N.Y. Jan. 3, 2024) ....................18

*Consortium for Indep. Journalism, Inc. v. United States*,
2025 WL 919504 (S.D.N.Y. Mar. 26, 2025), *appeal dismissed*, 25-1376 (2d Cir. July 21, 2025) .................... *passim*

*Cortes v. Twenty-First Century Fox Am., Inc.*,
285 F. Supp. 3d 629 (S.D.N.Y. 2018)....................17, 27, 30, 36

*Dfinity Found. v. N.Y. Times Co.*,
702 F. Supp. 3d 167 (S.D.N.Y. 2023), *aff'd*, No 23-7838, 2024 WL 3565762 (2d Cir. July 29, 2024) .................... *passim*

*Dfinity Found. v. N.Y. Times Co.*,
2024 WL 3565762 (2d Cir. July 29, 2024)....................37

*In re DraftKings Inc. Sec. Litig.*,
650 F. Supp. 3d 120 (S.D.N.Y. 2023)....................20

*Egiazaryan v. Zalmayev*,
880 F. Supp. 2d 494 (S.D.N.Y. 2012)....................25

*Eros Int'l PLC v. Mangrove Partners*,
140 N.Y.S.3d 518 (1st Dep't 2021) ....................18

*Eros Int'l. PLC v. Mangrove Partners*,
2019 WL 1129196 (Sup. Ct. N.Y. Cnty. Mar. 8, 2019), *aff'd*, 140 N.Y.S.3d 518 (1st Dep't 2021) ....................20, 21

*Fradkoff v. Winston*,
2025 WL 1735476 (S.D.N.Y. June 23, 2025) ....................29, 37, 38

*Galasso v. Saltzman*,
42 A.D.3d 310 (1st Dep't 2007) ....................29

*Golan v. Daily News, L.P.*,
77 Misc.3d 258 (Sup. Ct. N.Y. Cnty. 2022), *aff'd*, 214 A.D.3d 558 (1st Dep't 2023) ....................31

*Graham v. UMG Recordings, Inc.*,
806 F. Supp. 3d 454 (S.D.N.Y. 2025)....................16

*Gross v. N.Y. Times Co.*,
82 N.Y.2d 146 (1993) ....................17, 29

*Gunduz v. N.Y. Post Co., Inc.*,
188 A.D.2d 294 (1st Dep't 1992) ....................32

*Hakimi v. Guidant Global*,
2023 WL 8005321 (S.D.N.Y. Nov. 17, 2023) ....................15

*Harte-Hanks Communications, Inc. v. Connaughton*,
491 U.S. 657 (1989) ....................38, 39

*Henry v. Fox News Network LLC*,
629 F. Supp. 3d 136 (S.D.N.Y. 2022) .................... *passim*

*Immuno AG v. Moor-Jankowski*,
77 N.Y.2d 235 (1991) ....................19

*Jacob v. Lorenz*,
626 F. Supp. 3d 672 (S.D.N.Y. 2022) ....................38

*Masson v. New Yorker Magazine, Inc.*,
501 U.S. 496 (1991) ....................17

*MiMedx Grp., Inc. v. Sparrow Fund Mgmt. LP*,
2018 WL 4735717 (S.D.N.Y. Sept. 29, 2018) ....................39

*Nanoviricides, Inc. v. Seeking Alpha, Inc.*,
2014 WL 2930753 (Sup. Ct. N.Y. Cnty. June 26, 2014) ....................20

*Parks v. Steinbrenner*,
131 A.D.2d 60 (1st Dep't 1987) ....................18, 19, 25, 27

*Prince v. Intercept*,
634 F. Supp. 3d 114 (S.D.N.Y. 2022) ....................37

*Rapaport v. Barstool Sports Inc.*,
2024 WL 88636 (2d Cir. Jan. 9, 2024) ....................18

*Reeves v. Assoc. Newspapers, Ltd.*,
232 A.D.3d 10 (1st Dep't 2024) ....................32

*Silvercorp Metals Inc. v. Anthion Mgmt. LLC*,
36 Misc.3d 1231 (A), (Sup. Ct. N.Y. Cnty. Aug. 12, 2012) ....................18, 20

*St. Amant v. Thompson*,
390 U.S. 727 (1968) ....................37, 39

*Steinhilber v. Alphonse*,
68 N.Y.2d 283 (1986) ....................17, 18

*SuperCom, Ltd. v. Sabby Volatility Warrant Master Fund Ltd.*,
2022 WL 493600 (S.D.N.Y. Feb. 17, 2022) ....................16

*Sweeney v. Prisoners' Legal Servs. of N.Y., Inc.*,
84 N.Y.2d 786 (1995) .......... 39

*Tannerite Sports, LLC v. NBCUniversal News Grp.*,
864 F.3d 236 (2d Cir. 2017) .......... *passim*

*Udell v. NYP Holdings, Inc.*,
169 A.D.3d 954 (2d Dep't 2019) .......... 32

*Winklevoss v. Steinberg*,
170 A.D.3d 618 (1st Dep't 2019) .......... 37

*Yangtze River Port and Logistics Ltd. v. Hindenburg Research*,
2020 WL 905770 (Sup. Ct. N.Y. Cnty. Feb. 25, 2020) .......... 20, 21, 22

**Statutes**

N.Y. Civ. Rights Law § 76-a .......... 36, 37

**Other Authorities**

Federal Rule of Civil Procedure 12(b)(6) .......... 1, 15

Defendants Shadyside Partners, LLC d/b/a Culper Research and Christian Lamarco (collectively, "**Culper**") hereby respectfully file this omnibus memorandum of law in support of their Motion to Dismiss the Complaint filed by Plaintiff Hao Tang ("**Tang**") and, separately, the Complaint filed by Plaintiffs JC International Finance Limited, Prominence Trust Limited, Southwind Media Holdings Limited, Fenton Capital Inc., Midterm Success Limited, Angel Pride Holdings Limited, FortuneGate Holdings Philippines Inc., Goldenway Japan Co., Ltd., Goldenway Precious Metals Limited, Goldenway Financial Holdings Limited, Goldenway Investments Holdings Limited, International Entertainment Company, Discovery Key Investments Limited, Asian Creative Capital Limited, Ho Wong Meng, and Hong Wai Cheng (collectively, "**Entity Plaintiffs**" and, with Tang, "**Plaintiffs**"), pursuant to Federal Rule of Civil Procedure 12(b)(6).

## PRELIMINARY STATEMENT

Culper Research is an activist short-seller that conducts extensive research into publicly traded companies, then publishes its views, based on that fully-disclosed research, via reports on its website. Culper's views are often critical—but that does not make them any less protected under the First Amendment. Neither does the fact that Culper is "short" the companies on which it opines. Culper's short positions, whenever they exist, are prominently disclosed in the first sentences of each report, giving readers the opportunity to evaluate the content of the report with that disclosure in mind.

On June 12, 2025, Culper published a report (the "**Report**")[1] about non-party AppLovin Corporation ("**AppLovin**"). The premise of the Report was simple: AppLovin, in conjunction with its then-attempt to acquire TikTok's ex-China business, made repeated representations that the company had **zero** Chinese ownership. Culper, in the Report, challenged those representations.

[1] The Report was attached as Exhibit A of the Entity Plaintiffs' Complaint. *See* ECF No. 1-1. References to the "Report" are referring to that Exhibit.

Specifically, the Report found that Plaintiff Hao Tang, a Chinese national, has been a large AppLovin shareholder, owning as much as 28% of the company ahead of its 2021 IPO, and continued to own at least 9.8% of the Company—or then worth over $11 billion—at the time of the Report. The Report also opined that AppLovin's disclosures regarding Hao Tang's continued ownership of the company were "vague if not deliberately obfuscated" and further found that Hao Tang had—then-unbeknownst to AppLovin investors—entered into various ***undisclosed*** margin loan agreements and share forward transactions against his shareholdings in the company. Report at 2.

In turn, the Report then enumerated, based on extensively disclosed public facts, the numerous connections between Tang's network and affiliates and their "direct and indirect" ties to unsavory enterprises, both within and outside of China—ties that were especially relevant to AppLovin shareholders in light of Tang's massive stake in the company (despite AppLovin's claims to have "cleared out" its Chinese investors) and Tang's undisclosed loans secured by his stake in the company. As a result of these disclosures, the Report concluded with the opinion that, "AppLovin's covert Chinese ownership and operations raise not only concerns for shareholders, but for national security and data security." Report at 2.

This consolidated defamation action concerns claims raised by two different sets of plaintiffs in connection with the Report. Tellingly, AppLovin—the target of the Report—has not raised a challenge. Instead, Tang and a series of his affiliated entities have brought defamation claims against Defendants.

In his suit (the "**Tang Complaint**"), Tang does not dispute his relationship to AppLovin or deny the existence of a single one of his "ties" or "connections" to the various individuals or entities that Culper identified in the Report. Tang instead simply complains that, despite in fact

conceding his connections, he has not *personally* engaged in any criminal activity. But that is a straw man of Tang's own making; the Report never accused ***Tang*** of having directly engaged in any criminal activity. Indeed, the Report clearly stated its view that it is Tang's "extensive direct and ***indirect ties*** to Chinese espionage, CCP state-sponsored propaganda, human trafficking, and money laundering operations" that are of concern. Report at 4 (emphasis added); *see also id.* at 13 ("In what follows, we detail—using entirely public sources—Hao Tang's ***numerous connections*** tie to [*sic*] Chinese espionage, propaganda, data harvesting, human trafficking, money laundering, murder-for-hire, and other such unsavory operations." (emphasis added)); *id.* at 29 ("Tang's network is involved in money laundering, human trafficking, illegal gambling, and data-harvesting."). Tang's argument challenges statements the Report never made. That is not actionable defamation.

Nor are the Report's opinions about Tang's *network's* ties to nefarious activities actionable as defamation. The challenged statements:

- are contained in a short-seller report with a disclosed bias;
- are preceded by language making clear that the Report was characterizing Culper's "***beliefs***" and "***opinions***";
- are replete with countless qualifiers and other rhetorical signals of opinion; and
- are accompanied, in painstaking detail, by the disclosed factual basis for each conclusion drawn, as the Report sets forth (and often hyperlinked or embedded) each of the sources on which Culper grounded its opinions.

In this light, the Report could only be understood by a reader as Culper's *opinions* about Tang based on his myriad ties to such nefarious conduct, and these statements of pure opinion are constitutionally protected. Most importantly, ***Tang does not allege that any of the disclosed***

***underlying facts are false***. Indeed, he readily concedes that he and his affiliates are connected to these entities or individuals, and that those entities or individuals were tied to unsavory conduct—which is fatal to his defamation claim. That Culper opined—as a result of the mountain of Tang's undisputed ties—that Tang is a "bad actor," is opinion—not defamation. In the alternative, Tang failed to allege that any of the challenged statements are false, as required to plead a defamation claim.

Separate from Tang, the entities and individuals in his network (the "**Entity Plaintiffs**") bring their own defamation action (the "**Entity Complaint**"). Their claims have zero merit. Like Tang, the Entity Plaintiffs do not challenge any of the facts listed in the Report, nor do they challenge any specific statement in the Report. Rather, their defamation claim is limited to a graphic on page 13 of the Report (the "**Graphic**"). The Graphic is described by Culper as a "visual summary" of "views" expressed in the Report, identifying "Hao Tang's numerous connections" to the "unsavory operations." Report at 13. The Graphic visually summarizes the breadth of Tang's network and ties, via arrows, the individuals, entities, and corporate addresses to other specific individuals/entities, and ultimately, to the "unsavory operations." The Graphic uses six arrows to connect six specific entities to certain immediately adjacent activities, companies, or individuals. These connections are all supported by the sources in the Report, and the Entity Plaintiffs do not allege any of these connections are false.

To manufacture a claim, the Entity Plaintiffs grossly misread the Graphic and treat it in isolation, insisting that it somehow accuses ***each*** of the individual Entity Plaintiffs of having directly engaged in ***all*** the activities depicted in the Graphic. They are simply wrong, and grievously so. The Graphic is fully disclosed as a "visual summary of a few of [Culper's] most salient views." Report at 13. Further, the Graphic separately connects six of the Entity Plaintiffs

to activities, companies, or conduct set forth in carefully siloed columns. The law requires the Court to consider the context of any purported defamation, which means, at a minimum, reading the summary alongside the Report itself. The Report, in turn, clearly discusses each of the Entity Plaintiffs separately, ties them to certain activities, companies, or individuals. Notably, the Entity Plaintiffs do not dispute the substance of a single one of the connections that Culper has actually identified—or any of the sources that Culper cites. They only complain about inappropriate implications that could only be drawn from their own severe misreading of the Graphic and by blatantly ignoring the context of the Report. This is fatal to their defamation claim.

All of Plaintiffs' claims fail for an additional, independent reason: they fail to allege that Defendants published *each* challenged statement with knowledge of its falsity or with reckless disregard as to the truth of the statement. The "actual malice" pleading requirement is steep, and deliberately so—it ensures that speakers like Culper can opine freely on matters of public interest, like public companies concealing connections to China despite public claims to the contrary, at the potential expense of national security and public company shareholders. None of the Plaintiffs make a single allegation that would demonstrate that Culper actually entertained any doubt about the accuracy of the challenged statements. To the contrary, Culper's repeated disclosure of the facts underlying its opinions, none of which are disputed, makes clear that it truly and reasonably believed in its statements.

Both Complaints fall back on a tired refrain: Culper is a short-seller, and therefore Culper's report must be defamatory. New York and Second Circuit courts have routinely rejected this type of reductionism and have consistently dismissed complaints just like these, where the reports set forth opinions supported by disclosed facts or where the challenged statements are not alleged to

be false—even if the author stands to profit from a decline in the share price. For all the reasons set forth herein, the Court should dismiss both Complaints with prejudice.

## FACTUAL BACKGROUND

### A. Hao Tang and the Report

Hao Tang is a prominent businessman who was born and raised in China. Tang Compl. ¶ 15. He founded and established the Goldenway group of companies[2], and his notable investments include a massive stake in non-party AppLovin. *Id.* at ¶¶ 16, 19.

Defendant Shadyside Partners, LLC (d.b.a. Culper Research) is an activist short-seller. It profits by taking short positions—or betting against—those companies that it believes to be misleading investors or otherwise engaged in corporate misconduct. *See* Tang Compl. ¶ 2; Entity Compl. ¶ 22. Often, Culper publishes its opinions on such companies in public reports—all of which contain extensive and thorough citations on which Culper has formed the basis of its opinions. Defendant Lamarco is Culper's owner. Tang Compl. ¶ 2. One such company was AppLovin, an American company that—at the time of the Report—had been attempting to acquire TikTok's ex-China business. Report at 2. As part of that effort, AppLovin had appealed to ideals of "national security" and "data security" and, as detailed in the Report, explicitly denied having ***any Chinese ownership*** or any operations in China. *Id.*

Culper first published a report on AppLovin in February 2025 (the "**February Report**"). The February Report detailed other concerns with AppLovin that are not at issue in this consolidated action.

[2] Goldenway's various subsidiaries include (i) Goldenway Precious Metals Limited (HK), (ii) Goldenway Global Investments (UK) Limited, (iii) Goldtop Success Limited (HK), and (iv) Goldenway Financial Holdings Limited (HK). Report at 14 n.26.

On June 12, 2025, Culper published a second report (the Report) about AppLovin, disclosing that it was short AppLovin stock because, among other reasons, it believed AppLovin had misrepresented the scope of its ties to China. *See* Report at 2.

Specifically, the Report stated that Culper "believe[d] AppLovin has been backed since at least 2017 by Chinese national Hao Tang, who—through a web of offshore shell companies and aided by AppLovin's vague if not deliberately obfuscated disclosures—controlled up to 28% of AppLovin Class A shares ahead of the Company's 2021 IPO, and continues to control at least 9.8% of Class A shares." Report at 2. Over the course of nearly 30 pages, the Report then disclosed, in great detail, facts (including hyperlinks to official reports, embedded photos, and other primary sources) that supported the Report's opinion that Tang had "numerous ties"—both direct and indirect—"to the CCP, money laundering, illegal gambling, and human trafficking operations." *Id*. On the basis of these extensive disclosed facts, the Report opined that Tang was a "bad actor," *id*. at 4, and "AppLovin's covert Chinese ownership and operations raise not only concerns for shareholders, but for national security and data security." *Id*. at 2.

**B. Specific Statements in the Report Tang Challenges**

***1. Ties to Money Laundering and Fraud***

Tang challenges the Report's conclusion that Tang held "numerous ties to … money laundering." Tang Compl. at ¶ 28. Yet as laid out in painstaking detail in the Report—and as Tang expressly concedes—Tang and his network indeed hold numerous "connections" and "ties" to entities affiliated with money laundering. *Id.* ¶ 29.

The Report detailed Tang's role as founder of Goldenway, Inc., and the broader Goldenway group of companies. The Report suggested that Tang owned 95% of Goldenway, Inc., as set forth in the SEC filings, "suggesting that he remained in control of the company." Report at 14 (citing

and linking to December 2012 Form 10-K and other SEC Documents). Tang does not dispute his founding of Goldenway nor his continued control of Goldenway.

The Report then disclosed Goldenway's (***not Tang's***) multiple connections to money laundering and fraud—all detailed through hyperlinks to primary sources. First, that various victims and media outlets had reported that Goldenway, via its affiliate GWFX Global, operated a fraudulent Forex platform. Report at 15 (linking and quoting articles). In disclosing this, the Report took care to make clear it was only recounting what was "***alleged***," what GWFX (not Tang) was "***accused***" of, and what "Malaysian authorities ***identified***." *Id.* (emphasis added). The Report further disclosed that victims of the alleged fraud who had attempted to seek redress were "***reportedly***" "beaten to the point of needing hospitalization." *Id.* (emphasis added) (quoting, linking, and embedding a screenshot from the source). Tang does not dispute the accuracy of any of these disclosures.

The Report further recounted that an employee of Goldenway's UK arm—a "whistleblower"—accused the company (***not Tang***) of money laundering and fraud, and claimed before a UK Employment Tribunal that he was wrongfully terminated after raising these concerns with the UK's Financial Conduct Authority ("FCA") for raising the allegations. Report at 14. The Report repeatedly reiterated that it was reciting what the whistleblower "alleged" and even included a screenshot from the UK Employment Tribunal's Judgment, which detailed the substance of the whistleblower's allegations. *Id.* at 14. The Report then disclosed that the whistleblower's claims were "validat[ed]" by the UK Employment Tribunal, which ruled in the whistleblower's favor and awarded him £560,000—finding that the whistleblower was improperly fired for making the accusations. *Id.* at 14-15 (citing and linking to UK Tribunal Judgment). Tang

does not dispute the existence of this whistleblower suit, the allegations made, or the UK Employment Tribunal's ruling.

The Report further disclosed that the FCA imposed restrictions on Goldenway in 2017 in connection with money laundering concerns. Report at 14 (citing and linking to FCA Notice). Specifically, it restricted Goldenway from appointing a particular Money Laundering Reporting Officer, finding him unqualified for the position. *See* FCA Notice at ¶ 2; Tang Compl. ¶ 33. This is consistent with the disclosed allegations of the whistleblower, who alleged he was fired after alerting the FCA that Goldenway had sought to appoint new directors to facilitate money laundering activities. UK Tribunal Judgment at ¶ 72. Tang does not dispute these facts about Goldenway.

The Report also indicated that the whistleblower documents "alleged that Goldenway made fraudulent intercompany loans to Goldenway Japan Co (GWJ), also known as FXTF Holdings." Report at 15; *see also* UK Tribunal Judgment at ¶ 49(f). The Report further detailed—using entirely public sources—that Goldenway Japan Co.'s (a.k.a. FXTF Holdings) "affiliate cryptocurrency trading platform, BitTrade Co., Ltd." was sold to Huobi Global; that in "in April 2019, Huobi Japan was raided by Japanese authorities, citing oversight, customer protection, and money laundering concerns," and that Goldenway's manager Ng Yat Fan remained named on FXTF's Singapore filings. Report at 15 (citing corporate filings and embedding screenshot). Tang does not dispute any of these disclosed facts—each of which indeed "connect" Goldenway to money laundering and form the basis of Culper's resulting views.

### *2. Tang's Network and Connections Have Ties to Human Trafficking*

Next, Tang challenges the Report's opinion that Tang held "numerous ties to… human trafficking operations." Tang Compl. ¶¶ 39, 41, 44. Specifically, the Report disclosed Tang's ties to JC International Finance ("**JC International**"). The Report detailed that "JC was previously

known as Goldenway Finance Limited;" that "Tang-affiliated Lewis Ho list[ed] himself as being a director of JC;" and that "Goldenway Investments Holdings (China) Limited is also listed as a shareholder of JC International." Report at 19 & n.38 (citing and linking to Ho's LinkedIn page). Tang does not dispute any of these several links.

The Report then disclosed (based on a hyperlinked article in Chinese media) that JC International (***not Tang***) lent millions of dollars to Huang Youlong, and that, according to separate reporting, Youlong was involved in an infamous human trafficking and forced labor hub, KK Park. Report at 4, 19 (citing and linking to various articles). Once again, Tang does not dispute the accuracy of any one of these disclosed facts.

In addition, the Report discussed Tang's "links" to the FortuneGate casino network. As the Report lays out, Tang's entities—Prominence Trust and Angel Pride—named Hong Wai Cheng as signatory. Report at 8 (citing and linking to SEC Filing). In turn, Cheng was *also* named as Director of International Entertainment Corporation ("**IEC**"), which was funded in part by Goldenway. *Id.* Cheng served on the IEC board alongside Goldenway Group's COO Melvin Zhang. *Id.* In other words, Hao Tang was connected, via multiple vectors, to Cheng. In turn, Cheng was Executive Chairman and CEO of FortuneGate Holdings Philippines ("**FHP**"). While Cheng was CEO, FHP's Chairman was Liduan Wang—an individual who has been repeatedly tied to Chinese espionage, human trafficking and murder-for-hire. *See id.* at 21-23 (citing and linking to sources). Further, FortuneGate's 2020 annual report named its shareholders as including StarCap Management Inc. and FortuneGate Holdings Philippines Inc.—entities for which another known Tang associate Ho Wong Meng is named as Director and CEO, respectively. Report at 21-22 & n.43. (citing and linking to corporate documents and reports). Tang does not dispute these disclosed facts, nor Liduan Wang's own ties to illicit activity.

As detailed in the Report, based on multiple hyperlinked sources, Wang's prior company was shuttered following allegations that it relied on de facto slave labor. Report at 21-22 (citing and linking to articles). The Report, citing various articles, also detailed Wang's ties to the Nine Dynasty Casino junket, which was used to pay for the murder of Chinese steel magnate Anson Que. Report at 23-24 (citing and linking to news articles). And finally, on the basis of cited articles, the Report further revealed that Wang's granddaughter had been arrested for running her own human trafficking ring, which reportedly relied on kidnapping, illegal detention, torture and sex trafficking. Report at 24 (citing and linking to articles). Tang again does not dispute the accuracy of any of these disclosed facts.

Based on all of these disclosed facts, Culper opined that Tang is connected to human trafficking.

### *3. Tang's Connections Have Ties to the CCP*

Finally, Tang challenges the Report's view that Tang had ties through his network to the CCP, Chinese intelligence, and CCP propaganda outlets. Tang Compl. ¶¶ 48, 50. The Report methodically detailed the facts and sources underlying this opinion.

First, the Report—as discussed above—recounts that a whistleblower alleged that Goldenway (***not Tang***) attempted to secure a work visa for a Chinese spy. Report at 14; UK Tribunal Judgment at 23. Tang does not dispute that this allegation was made.

The Report also detailed, with embedded photos and hyperlinks, its finding that "Goldenway Operated the Jet on which Now Disappeared CCP Journalist Fu Xiaotian was Last Seen." Report at 16. The Report stated that "Fu Xiaotian, a Chinese state media journalist," who had reportedly fallen subject to a CCP investigation after developing a relationship with a high-level CCP official, had disappeared from public view shortly after posing in front of a Gulfstream 650 aircraft that both FAA records and aircraft purchase records (each of which were hyperlinked

in the Report) revealed to be owned by Tang's Goldenway Investments Holding Limited. *Id.* (citing and linking to various articles, as well as FAA and purchase records). Tang does not dispute these facts, and instead only alleges that he "does not know Qin or Fu" and that the documents do not "establish that the CCP had any role in Fu's purported flight on the jet in question, nor do they offer any evidence that Tang was involved in coordinating or approving the flight." Tang Compl. ¶ 52. But again, these are claims that the Report never makes—instead, it makes a speculative conjecture, based on the numerous disclosed facts, ***including the undisputed fact that Goldenway operated the jet on which a now disappeared CCP journalist was last seen boarding***, that the evidence "***suggests*** to us that Tang retains high-level connections within the CCP." Report at 16.

The Report further disclosed the connections between another Tang-affiliated entity—Southwind Media ("**Southwind**")—and the CCP. The Report noted that "Southwind Media appears to be a private holding company also controlled or otherwise affiliated with Hao Tang" while the very same sentence details the basis for that view—that "Tang appears as a director in Southwind's Hong Kong filings; Southwind's British Virgin Islands filings list an address that overlaps with other Tang entities; Southwind's Japanese subsidiary is named as the parent company of Goldenway Japan, another Tang entity." Report at 17 & n.30-34 (citing media reports and Southwind's corporate filings and website). The Report further provides multiple disclosed facts of "additional confirmation," including that Hong Kong filings also name Hao Tang as a director of entities that share addresses with Southwind; that a signatory for Tang's entities—namely Midterm Success, Asian Creative Capital, and Discovery Key investments—also appears as a director of Southwind's Joye Media, and that the earlier media reports had also connected Orient Hontai—the entity via which Tang originally invested in AppLovin—to Southwind. *See id.*

In addition, the Report includes an embedded screenshot of Southwind's website, which listed its "investment portfolio," including Mediapro. *Id*. at 17. As disclosed in the Report, based on hyperlinked news sources, Southwind, promptly after acquiring Mediapro, ousted its CEO and signed an agreement with China Media Group—which a hyperlinked media article, embedded into the Report, referred to as "the propaganda arm of the Communist Party." Report at 17-18 (citing various articles and reports). Tang does not dispute a single one of these connections to Southwind, Mediapro, or Mediapro's relationship with China Media Group.

Moreover, the Report disclosed Tang's connections to Chinese companies like RedNote—the CCP-censored alternative to TikTok—and HongShan, which was accused by the United States House of Representatives of funneling U.S. capital into the CCP's military modernization. Report at 18-19 (finding that "Montclair Trustees (Hong Kong) Limited is the owner of Fenton Capital Inc. and the trustee of the Fenton Trust, of which Hao Tang is "the sole" beneficiary.") (citing corporate filings, news articles, and Congressional letter). Tang does not dispute his connection, via Goldenway, to RedNote.

Finally, in light of the Report's disclosure of the connections between Tang and Liduan Wang, detailed above, the Report noted that Wang is a Chinese businessman who has been repeatedly tied to Chinese espionage. Report at 21-22 (citing various articles and corporate filings).

Tang does not challenge any of these disclosed facts. And based on all these disclosed facts, *in toto*, the Report concluded that Tang had ties to the CCP.

### C. The Graphic Challenged by the Entity Plaintiffs

The Entity Plaintiffs do not challenge any written statements in the Report nor do they contest any of its disclosed facts or opinions. They instead only challenge parts of the following summary Graphic:

### Hao Tang's Ties to CCP, Money Laundering, Human Trafficking, and Data Harvesting Operations

So who is Hao Tang – AppLovin's longtime Chinese backer tied to Angel Pride, Midterm Success, *and* Discovery Key? **In what follows, we detail – using entirely public sources – Hao Tang's numerous connections tie to Chinese espionage, propaganda, data harvesting, human trafficking, money laundering, murder-for-hire, and other such unsavory operations.** The below is a visual summary of a few of our most salient views.




The Graphic, on its face, makes clear that it is a "visual summary" of the "views" expressed elsewhere in the Report. It represented the specific connections between certain entities/individuals and activities that were fully disclosed in the Report. The arrows make this clear. In other words, the entities on the fourth level down (Goldenway, Southwind, etc.) each have a vertical arrow leading to text in a red box. Each of those entities is intended to be linked to only the text in the red box immediately below it in the same column under the vertical arrow.

The Entity Plaintiffs propose a risible reading of the Graphic, complaining that it somehow directly accuses ***each*** of them of having engaged in ***all*** the "unsavory operations" described in the Graphic. The Entity Plaintiffs make this claim while at the same time acknowledging that no such accusation was ever made clear in the body of the Report. Entity Compl. ¶ 30 (conceding their reading is "expressly contradict[ed]" by the Report); *see also id.* ¶¶ 31-41. On its face, the Graphic provides a visual representation of connections to the activities, companies, or individuals directly linked by vertical arrow, and the context—including the full text of the Report—rendered the Entity Plaintiffs' reading absurd.

## PROCEDURAL HISTORY

On June 10, 2026, the sixteen Entity Plaintiffs commenced their action, asserting a single claim for libel *per se* based solely on the Graphic. Entity Compl. ¶¶ 42-53. On June 12, 2026, Tang filed a separate action asserting a single claim for defamation *per se* arising from specific statements in the Report. Tang Compl. ¶¶ 65-80. On July 2, 2026, the Court ordered the actions consolidated. ECF No. 14.

## LEGAL STANDARD

To survive a motion to dismiss, a complaint must contain "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Plaintiffs must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Biro v. Conde Nast*, 807 F.3d 541, 544 (2d Cir. 2015) (quoting *Iqbal*, 556 U.S. at 678). Plaintiff must show "more than a sheer possibility that a defendant has acted unlawfully" and may not rely on "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678. "If plaintiff has 'not nudged [her] claims across the line from conceivable to plausible, [her] complaint must be dismissed.'" *Bloom v. A360 Media LLC*, 735 F. Supp. 3d 466, 471 (S.D.N.Y. 2024) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

"[B]ecause a defamation suit may be as chilling to the exercise of First Amendment freedoms as fear of the outcome of the lawsuit itself, courts should, where possible, resolve defamation actions at the pleading stage." *Hakimi v. Guidant Global*, 2023 WL 8005321, at *7 (S.D.N.Y. Nov. 17, 2023) (cleaned up). Thus, Rule 12(b)(6) "not only protects against the costs of meritless litigation, but provides assurance to those exercising their First Amendment rights that doing so will not needlessly become prohibitively expensive." *Biro v. Conde Nast*, 963 F. Supp. 2d 255, 279 (S.D.N.Y. 2013), *aff'd*, 807 F.3d 541 (2d Cir. 2015); 622 F. App'x 67 (2d Cir. 2015).

"[C]ourts in this district have repeatedly concluded that there is 'particular value in resolving defamation claims at the pleading stage, so as not to protract litigation through discovery and trial and thereby chill the exercise of constitutionally protected freedoms.'" *SuperCom, Ltd. v. Sabby Volatility Warrant Master Fund Ltd.*, 2022 WL 493600, at *4 (S.D.N.Y. Feb. 17, 2022) (citation omitted).

## ARGUMENT

### I. PLAINTIFFS HAVE NOT ADEQUATELY PLED DEFAMATION

To state a claim for defamation, a plaintiff must establish five elements: (1) a defamatory factual statement concerning the plaintiff; (2) publication to a third party; (3) fault; (4) falsity of the defamatory statement; and (5) special damages or per se actionability. *Henry v. Fox News Network LLC*, 629 F. Supp. 3d 136, 144 (S.D.N.Y. 2022).

The first element of a defamation claim is a defamatory statement of *fact*. *Graham v. UMG Recordings, Inc.*, 806 F. Supp. 3d 454, 467 (S.D.N.Y. 2025). "[T]he New York Constitution provides for absolute protection of opinions." *Id.* (citation omitted). Whether a statement is fact or opinion is a question of law for the Court. *Dfinity Found. v. N.Y. Times Co.*, 702 F. Supp. 3d 167, 174 (S.D.N.Y. 2023), *aff'd*, No 23-7838, 2024 WL 3565762 (2d Cir. July 29, 2024). As such, it is a question "appropriately raised at the motion to dismiss stage." *Consortium for Indep. Journalism, Inc. v. United States*, 2025 WL 919504, at *16 (S.D.N.Y. Mar. 26, 2025), *appeal dismissed*, 25-1376 (2d Cir. July 21, 2025).

Moreover, a defamation plaintiff must plead the falsity of a statement; falsity is not presumed. *Tannerite Sports, LLC v. NBCUniversal News Grp.*, 864 F.3d 236, 243-44, 247 (2d Cir. 2017). "Conclusory allegations that the statements were 'false' are insufficient to survive a motion to dismiss because a plaintiff is required 'to plead facts that, if proven, would allow a reasonable person to consider the statement false.'" *Henry*, 629 F. Supp. 3d at 146 (dismissing

defamation claim for failure to plausibly allege falsity) (quoting *Tannerite*, 864 F.3d at 247); *Cortes v. Twenty-First Century Fox Am., Inc.*, 285 F. Supp. 3d 629, 642 (S.D.N.Y. 2018) (same). "[M]inor inaccuracies" do not render a statement false; even where a statement contains inaccuracies, it "do[es] not amount to falsity so long as 'the substance, the gist, the sting, of the libelous charge be justified.'" *Air Wis. Airlines Corp. v. Hoeper*, 571 U.S. 237, 247 (2014) (quoting *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 517 (1991)).

**A. The Challenged Statements Are Opinion**

The statements that Plaintiffs challenge in this case are protected opinion and not actionable. "Whether a statement constitutes a protected opinion or actionable fact depends on 'the content of the communication as a whole, its tone and apparent purpose.'" *Dfinity*, 702 F. Supp. 3d at 174. In distinguishing between fact and protected opinion for purposes of a defamation claim, courts must consider the context of the statements. *Id*. This "context" factor includes not only "the immediate context in which the disputed words appear," but also "the larger context in which the statements were published, including the nature of the particular forum." *Brian v. Richardson*, 87 N.Y.2d 46, 51 (1995).

Courts also consider a communication's "setting" to identify "any applicable customs or conventions which might signal to readers or listeners that what is being read or heard is likely to be opinion, not fact." *Steinhilber v. Alphonse*, 68 N.Y.2d 283, 292 (1986) (cleaned up). "The plaintiff bears the burden of establishing that in the context of the entire communication a disputed statement is not protected opinion." *Consortium of Indep. Journalism*, 2025 WL 919504, at *16 (cleaned up).

New York courts have long held that statements of "pure opinion"—*i.e.*, a statement "accompanied by a recitation of the facts upon which it is based"—cannot trigger liability.

Steinhilber, 68 N.Y.2d at 289; Gross v. N.Y. Times Co., 82 N.Y.2d 146, 153-54 (1993) ("[A] proffered hypothesis that is offered after a full recitation of the facts on which it is based is readily understood by the audience as conjecture."). Indeed, in determining whether a statement is fact or opinion, courts "recognize and utilize the important distinction between a statement of opinion that *implies a basis in facts which are not disclosed* to the reader or listener and a statement of opinion that is *accompanied by a recitation of the facts on which it is based* or one that does not imply the existence of undisclosed underlying facts." Consortium for Indep. Journalism, 2025 WL 919504, at *16 (cleaned up) (emphases included). "[T]he latter is not actionable because a statement of opinion offered after a recitation of the facts on which it is based is likely to be understood by the audience as conjecture." *Id*.

In line with this precedent, courts routinely dismiss defamation claims in connection with investment analysis reports where the facts supporting the conclusions reached are fully disclosed. *See, e.g.*, Cassava Sciences., Inc. v. Bredt, 2024 WL 555484, at *10 (S.D.N.Y. Jan. 3, 2024) (recommending dismissal of defamation claims against short-sellers as opinions where statements were accompanied by a recitation of the facts on which they were based), *report and recommendation adopted*, 2024 WL 1347362 (S.D.N.Y. Mar. 28, 2024); Eros Int'l PLC v. Mangrove Partners, 140 N.Y.S.3d 518, 519 (1st Dep't 2021) (shortseller's "statements were accompanied by a recitation of facts on which they were based and therefore were nonactionable opinion"); Silvercorp Metals Inc. v. Anthion Mgmt. LLC, 36 Misc.3d 1231(A), at *9-11 (Sup. Ct. N.Y. Cnty. Aug. 12, 2012) (shortseller's statements were non-actionable opinion where underlying facts were disclosed with hyperlinks provided).

Indeed, even opinions that are outright "erroneous" are still constitutionally protected so long as they were "accompanied by the facts upon which they are based." Rapaport v. Barstool

*Sports Inc.*, 2024 WL 88636, at *4 (2d Cir. Jan. 9, 2024); *see also* *Parks v. Steinbrenner*, 131 A.D.2d 60, 66 (1st Dep't 1987) ("That one may dispute the conclusions drawn from the specified facts is not, however, the test. So long as the opinion is accompanied by a recitation of the facts upon which it is based it is deemed a 'pure opinion' and is afforded complete immunity even though the facts do not support the opinion.").

### *1. The Context of Culper's Statements Demonstrates That They Are Protected Opinion*

Here, a review of the context of the Report makes clear that a reader would understand Culper was offering its opinions.

First, as Culper repeatedly disclosed, the very "purpose" of its Report was to offer its inherently subjective opinion on AppLovin, particularly as it disclosed in the very first sentence that it had a bias as a *short seller*. *See* *Immuno AG v. Moor-Jankowski*, 77 N.Y.2d 235, 254 (1991) (noting the communication's apparent purpose is a relevant factor in the analysis as to "whether the reasonable reader would have believed that the challenged statements were conveying facts about the libel plaintiff"). Where an author reveals that its writing has an agenda or a bias, this signals to the reader that the statements cannot be taken as fact but rather as expressions of the author's opinion. *Brian*, 87 N.Y.2d at 53 (the "immediate context in which the challenged statements were made," including author's disclosure that "he was not a disinterested observer," "supports the conclusion that the specific accusations of which plaintiff complains could not have been understood by a reasonable reader as assertions of fact that were proffered for their accuracy"); *Bellavia Blatt & Crossett, P.C. v. Kel & Partners LLC*, 151 F. Supp. 3d 287, 296 (E.D.N.Y. 2015) ("[W]here circumstances surrounding an allegedly defamatory statement indicate that the person making the statement has a special interest in the matter, courts have routinely held

that a reasonable observer would understand such a statement to be one of opinion, rather than fact."), *aff'd*, 670 F. App'x 731 (Mem) (2d Cir. 2016).

Culper made clear at the very beginning of the Report that it was "short AppLovin," and that it was only offering its "opinions" and "belie[fs]" in connection with that decision. Report at 1-3. As courts have recognized, short sellers have "an economic interest in driving down the company's stock price." *In re DraftKings Inc. Sec. Litig.*, 650 F. Supp. 3d 120, 154 (S.D.N.Y. 2023).

Indeed, courts routinely find that disclosure of a short position in this type of investment analysis is an indicator to readers of opinion. *See Eros Int'l. PLC v. Mangrove Partners*, 2019 WL 1129196, at *8 n.6 (Sup. Ct. N.Y. Cnty. Mar. 8, 2019) (where short position disclosed, "[c]ourts have traditionally viewed an author's announced self-interest as evidence that the author's statements likely constitute opinions, not facts"), *aff'd*, 191 A.D.3d 465 (1st Dep't 2021); *Silvercorp Metals Inc.*, 36 Misc.3d 1231(A), at *10 (disclosure of short position in plaintiff's stock demonstrates ulterior motive "indicat[ing] to the reader that the author is expressing his opinion"); *Yangtze River Port and Logistics Ltd. v. Hindenburg Research*, 2020 WL 905770, at *8 (Sup. Ct. N.Y. Cnty. Feb. 25, 2020) (short-seller's statements were protected "pure opinion" where seller's motive was disclaimed); *Nanoviricides, Inc. v. Seeking Alpha, Inc.*, 2014 WL 2930753, at *5 (Sup. Ct. N.Y. Cnty. June 26, 2014) (finding "the alleged defamatory statements identified in the petition constitute protected opinion and are not actionable as a matter of law").

Second, Culper also made clear that it was offering its "opinions" and "belie[fs]." Report at 1-3. Culper repeatedly cautioned readers ***against*** treating its opinions as accurate, insisting that its statements and opinions should not be relied on, could not be guaranteed, might "prove to be substantially inaccurate" and could "change without notice." *Id.* at 1. These clear disclaimers are

textbook indicia of opinion. *Silvercorp Metals Inc.*, 36 Misc.3d 1231(A), at *2 (author's disclaimer "that the stated 'opinions' could change, demonstrates that it was an expression of opinion."); *Yangtze River Port*, 2020 WL 905770, at *8 (court finding disclaimers as indicators of opinion).

Finally, the "structure and tone" of the Report, which begins with an expression of opinion and includes multiple indicia of opinion, hedges, qualifiers, and disclaimers throughout, further confirms that the Reports' conclusions are Culper's opinions. The Report opens with its opinionated thesis statement, expressing what "[w]e ***believe***." Report at 2, 4. The Report then includes a summary of its beliefs, which it so-titles as its "Summary of Culper Research ***Opinions***." *Id.* at 3 (emphasis modified). And in detailing those self-described "[***o***]***pinions***" (*id.*), Culper repeatedly reminds its audience that it is only offering just that—opinions. The Report includes a raft of qualifiers, making clear that Culper is only recounting its "***opinions***" (*id.* at 1, 3), "***views***" (*id.* at 3, 6, 12, 13, 29), "***suspicions***" (*id.* at 2), "***beliefs***" (*id.* at 1, 3, 4, 6, 7, 13) or what "***seems***" (*id.* at 4, 6, 21, 25, 27) or "***appears***" (*id.* at 4, 7, 12, 16, 17, 18, 19, 25, 27) to be "***plausible***" or "***suggested***" (*id.* at 3, 4, 5, 9, 10, 13, 14, 16, 28, 29) based on third-party "***allegations***" (*id.* at 2, 14, 15, 17, 19, 22, 26, 27, 28) or the "***apparent***" (*id.* at 22) public record. These qualifiers made clear that Culper was offering its opinions based on the disclosed facts. *See Cassava Sciences, Inc. v. Bredt*, 2024 WL 1347362, at *1 (S.D.N.Y. Mar. 28, 2024) ("[T]his statement signals it is an opinion by using three different qualifiers: 'appears to be,' 'allegedly,' and 'appear to be.'"); *Bellavia Blatt*, 151 F. Supp. 3d at 293-94 ("[T]he use of 'appeared to be,' 'might well be,' 'could well happen,' and 'should be' ... signal presumptions and predictions rather than facts." As defendant's statement was "full of" such "qualifiers," it "ma[d]e clear that [defendant's] statement [was] one of opinion.") (citation omitted); *Eros Int'l*, 2019 WL 1129196 at *8 (statements were protected opinion where "language of conjecture pervade[d]" the reports and phrases like "[w]e

believe" and "[i]n our opinion" were interwoven throughout); *Yangtze River Port*, 2020 WL 905770, at *8 (terms like "we believe" and "we think" made clear statements were opinion).

All of this context makes clear that a reader would have reasonably understood the Report to be providing opinions based on disclosed facts, and the Report therefore is absolutely protected under both the New York Constitution and the First Amendment.

### *2. The Specific Statements Set Forth in the Complaints Are Not Actionable*

Analyzing the specific statements Plaintiffs challenge further confirms that they are not actionable defamation. Every one of the challenged statements was accompanied by thorough disclosures of the facts upon which they were based—and Plaintiffs do not allege that any of these facts are false. Thus, the opinions are afforded absolute constitutional protection.

#### a. None of Tang's Specific Challenged Statements are Actionable as Defamation

- **Ties to Money Laundering (Tang Compl. ¶¶ 67, 70-71)**

Tang complains about statements where Culper expressed its "belie[f]" that Tang, through his "network" and "connections," had "extensive direct and indirect ties" to money laundering and fraud. Tang Compl. ¶ 28. Tang ***concedes*** the very facts underlying this view: that there were indeed "commercial connections between entities once affiliated with Tang and individuals who were later accused of misconduct." *Id.* ¶ 29. That concession alone is fatal to Tang's claim of defamation. To salvage his claim, Tang argues only that the Report unfairly accuses *Tang* himself of this conduct. *See id.* But, the Report says no such thing. The Report only opined that Tang is a "bad actor" based on Tang's "extensive" ties (Report at 4)—and Tang himself concedes both that those ties exist, and that they have been accused of certain misconduct. *See* Tang Compl. ¶ 68.

Tang also argues that it is somehow improper to "equate Goldenway with Tang," *id.* at ¶30—but, again, the Report did no such thing. Instead, the Report made clear its view that extensively cited public documents "***suggest that*** [Tang] remained in control" of Goldenway. Report at 14 (citing and linking to Form 10-K). Tang does not dispute these facts, nor that Goldenway remains, per the Report's unambiguous language, one of his "primary investment and operating vehicles." *Id.* at 14-15. He conveniently claims only that by sometime in 2024, he had become a "passive investor" in Goldenway UK, *see* Tang Compl. at ¶ 31—notably just *one* of Goldenway's *numerous* subsidiary/affiliate companies. In any event, this claim, even if true, does not negate Tang's myriad previous and ongoing relationships with Goldenway, each of which are set forth in detail in the Report.

Critically, Tang does not allege that the grounds for Culper's opinion about Goldenway's money laundering connections were false—*i.e.*, he does not dispute the Report's disclosure that Goldenway was "***alleged***," "***accused***," and "***identified***" by "Malaysian authorities" to have run a fraudulent forex platform, and "reportedly" beat its victims to the point of hospitalization. Report at 15 (emphasis added) (citing and linking articles).

Tang finds a way to misconstrue and mischaracterize the Report when it challenges Culper's disclosure that a whistleblower, after reporting suspected money laundering and fraud to the FCA, was improperly terminated by Goldenway. *See* Tang Compl. ¶ 30. But Tang grossly mischaracterizes the disclosure and complains that it suggests (based on misreading) that the referenced 'validation' meant an employment tribunal had ruled on matters of money laundering and espionage—which is plainly not what "employment" tribunals do. *Id.* at ¶ 35. This allegation is simply based on Tang's own misreading of the Report. The Report included a prominent hyperlink to the UK Employment Tribunal's judgment, *see* Report at 14, which sets forth on the

first page its ruling that "[t]he [whistleblower's] complaint of unfair dismissal is well-founded. The claimant was unfairly dismissed." *See* UK Tribunal Judgment at ¶ 1. Tang's tortured reading, which implies that an ***employment tribunal*** opined on whether Goldenway had engaged in money laundering and espionage, is entirely inconsistent with the function of an employment tribunal, and is akin to suggesting that the Department of Energy would be concerned about whether someone had paid their parking tickets.

Moreover, the Report repeatedly made clear that it was only detailing what the whistleblower "***alleged***," and included a screenshot from the UK Employment Tribunal's Judgment, which recounted what the whistleblower "***says***" and "***alleged***." Report at 14-15 (emphasis added). Though not central to the claim, the UK Employment Tribunal Judgment—linked in the Report—also found that "the claimant was reasonable in believing his disclosure [related to alleged money laundering] was substantially true." UK Tribunal Judgment at ¶ 92; *see also id.* at ¶ 105 ("It was also reasonable for the claimant to believe that this disclosure [related to alleged Chinese espionage] was substantially true."). Even if Tang is unhappy with the accusations made by the whistleblower, Culper's accurate recitation of those accusations cannot be actionable.

Lastly, Tang complains about the Report's disclosure that the UK's FCA had imposed restrictions on Goldenway following money laundering-related concerns. *See* Report at 14 (citing FCA Notice). Specifically, Tang claims that the Report suggested a connection between such restrictions and the whistleblower's allegations. Tang Compl. ¶¶ 70-71. But there is a connection between the two. In 2017, the FCA restricted Goldenway from appointing a particular Money Laundering Reporting Officer, finding him unqualified for the position. *See* FCA Notice at ¶ 2. Such circumstances plainly relate to the allegations raised by the whistleblower, who claimed he was fired because he tried to alert the FCA of Goldenway's attempts to appoint new directors who

would facilitate its money laundering activities. UK Tribunal Judgment at ¶¶ 68-74. That the whistleblower's allegations and the FCA Notice occurred five years apart and concerned different individuals, *see* Tang Compl. ¶ 33, is irrelevant. The Report cited and linked to both incidents and describes the author's suggestion of their relatedness, which is protected opinion, or, at the very least, substantially true. *Egiazaryan v. Zalmayev*, 880 F. Supp. 2d 494, 508 (S.D.N.Y. 2012) (dismissing statements where the "gist or substance" of the statement is substantially true). More importantly, Tang does not dispute the existence of each of these disclosed facts relating to Goldenway—the FCA Notice and the whistleblower claims—even if they are only considered in isolation.

Ultimately, whether Tang disagrees with the Report's view that Tang's connections have ties to money laundering, this view is accompanied by the disclosed facts and is therefore classic protected opinion. *Dfinity*, 702 F. Supp. 3d at 172, 176 (dismissing statements that plaintiff was "connected" to nefarious activity because such opinion was "based on [defendant's] analysis of disclosed and publicly available sources. In substance, [plaintiff] challenges the inferences drawn from the facts cited in the [defendant's] Report, rather than the facts themselves … Such statements routinely are held to be non-actionable opinion."); *Consortium for Indep. Journalism*, 2025 WL 919504, at *16-18; *Parks*, 131 A.D.2d at 66.

- **Tang's Connections Have Ties to the CCP (Tang Compl. ¶ 75)**

Next, Tang complains about statements where Culper expressed its "belie[f]" that Tang had ties to those involved with the CCP, CCP intelligence, and CCP propaganda outlets. Tang Compl. ¶¶ 48, 50.

These statements are similarly not actionable. The Report methodically detailed every fact underlying its opinion that Tang had ties to the CCP—and Tang does not dispute a single one of

them. Indeed, Tang concedes that he maintains these "associations," but self-servingly calls them "innocuous." Tang Compl. ¶ 49. Innocuous or not, Tang's concession that the associations exist is fatal to his defamation claim.

Nor does Tang dispute the disclosed facts that support the Report's opinion about these associations: that Tang held numerous ties to Southwind (each of these ties being enumerated in detail in the Report), that Southwind acquired a majority stake in Mediapro and that thereafter, Mediapro signed an agreement with China Media Group, considered the propaganda arm of the CCP. Report at 4, 17-18 (citing and linking articles). Tang does not mention—let alone attempt to dispute—these disclosed facts in his Complaint at all.

Further, Tang also does not even attempt to challenge the Report's additional disclosures of his connections to the CCP's TikTok alternative RedNote, nor does he attempt to contest his connections to HongShan, which was accused by the United States House of Representatives of funneling U.S. capital into the CCP's military modernization. *Id.* at 18-19 (citing and linking to Congressional letter). Indeed, Tang does not mention these disclosed facts at all in his Complaint, each of which also underlay the Report's resulting views. Nor does Tang dispute his multiple connections to FortuneGate—a Philippines casino, which, in turn, the Report connected (via multiple linked sources) to Chinese espionage via the casino operator's chairman, Liduan Wang. *Id.* at 21-22 (citing and linking sources). And finally, Tang does not dispute the Report's findings—based on publicly available and hyperlinked FAA and purchase records—that Goldenway owned the aircraft in front of which a CCP state media host was last photographed prior to her disappearance. *Id.* at 16.

Instead, Tang only suggests that Culper offered no "evidence" that he was personally "involved in coordinating or approving the flight," Tang Compl. ¶ 52—a suggestion that (implausible as it is) is entirely irrelevant to the undisputed fact that Goldenway owned the jet.

Because Tang does not allege that these disclosed facts were false, the ***suggestion*** that the Report makes from them—"***suggesting*** he retains high level CCP connections," *see* Report at 16—is not actionable as defamation. *Tannerite*, 864 F.3d at 247; *Henry*, 629 F. Supp. 3d at 146; *Cortes*, 285 F. Supp. 3d at 641-42.

Ultimately, Tang complains that these conceded associations do not support a finding that he himself was involved in any wrongdoing. Tang Compl. ¶ 52. But again, Culper never accused Tang of criminal wrongdoing—it only ***suggested***, based on publicly disclosed facts, that Tang had ties to the CCP. Tang's defamation claim fails in light of these allegations. *Dfinity*, 702 F. Supp. 3d at 176; *Parks*, 131 A.D.2d at 66.

- **Tang's Connections Have Ties to Human Trafficking (Tang Compl. ¶ 72)**

Next, Tang complains about Culper's statements that expressed its "belie[f]" that Tang had ties to those involved in human trafficking. Tang Compl. ¶¶ 39, 41, 44. Once again, each of Tang's ties to the individuals and/or entities engaged in such activities was fully and accurately disclosed, with accompanying links, quotations and citations. Culper's statements were pure, constitutionally-protected opinion.

Here too, Tang does not dispute the underlying facts. Indeed, Tang concedes that the Report "identified two individuals with whom Goldenway entities may have done business who were after-the-fact accused of criminal misconduct." Tang Compl. ¶ 40. Moreover, Tang does not dispute that JC International—a Plaintiff in this case (and formerly called Goldenway Finance)—was tied to Goldenway and Tang's network (Report at 4, 8)—and lent millions of

dollars to Huang Youlong, who was accused of involvement in human trafficking. Report at 4, 19 (citing and linking sources). Nor does Tang dispute his ties to FortuneGate (Report at 21-22 (citing and linking sources))[3]—the Philippines casino operated by FHP, whose Chairman Liduan Wang has various ties to human trafficking and murder-for-hire. Report at 21-24 (citing and linking sources).

Tang misleadingly suggests that Culper "falsely assert[ed] that Tang is involved in human trafficking and murder-for-hire" and that Culper told its readers that "Tang himself had a role in" such activities. Tang Compl. ¶¶ 39, 42. But, again, Culper did no such thing. Culper only expressed its "belie[f]" (Report at 4) and views that Tang holds "ties" to human trafficking based on the connections that were thoroughly disclosed in the Report, and none of which Tang ever disputed.

Similarly, Tang tries to argue yet another strawman, insisting that Tang and Liduan Wang's shared ties to FortuneGate do not establish that Tang was involved in Wang's illegal activities. *Id.* ¶¶ 46-47. But the Report never said otherwise. It only stated that "Tang and his associates" are "tied to FortuneGate," which is "tied" to "Wang, who in turn has been linked to" "human trafficking operations." *Id.* ¶ 44 (quoting Report at 21). None of this is disputed by Tang, nor could it be. Culper's citations to the public record are accurate. And the conclusions drawn from those disclosed facts are pure, protected opinion.

[3] Specifically, the Report identifies several ties between Tang's network and FortuneGate: (1) FortuneGate and Goldenway-affiliated entities share officers, including FortuneGate's CEO Ho Wong Meng; (2) FortuneGate has ties to Tang through various other entities/individuals; and (3) FortuneGate was once announced to be a "part of" Goldenway, although a correction for that claim was later issued. Report at 8, 21-22 (citing and linking sources). Although Tang does challenge this third basis (discussed *infra*), he does not otherwise challenge the general statement that he and his network are tied to FortuneGate. *Cf.* Tang Compl. ¶ 45.

- **Statements Calling Tang a "Bad Actor" (Tang Compl. ¶¶ 28, 39, 72)**

Finally, Tang complains about Culper's clearly opinionated conclusion: that based on Tang's "extensive" ties, "***we believe***[s] Hao Tang is a bad actor," Report at 4, whose background, "***[i]n our view***, disqualifies AppLovin's pursuit of TikTok's ex-China business." *Id.* at 29 (emphasis added). Such clearly indefinite and unverifiable conjecture supported by ample disclosed facts is classic opinion that is protected by the First Amendment. *Fradkoff v. Winston*, 2025 WL 1735476, at *8 (S.D.N.Y. June 23, 2025) ("Accusations of criminality could be regarded as mere hypothesis and therefore not actionable if the facts on which they are based are fully and accurately set forth and it is clear to the reasonable reader or listener that the accusation is merely a personal surmise built upon those facts." (quoting *Gross*, 623 N.E.2d at 1169)); *Adler v. Solar Power, Inc.*, 2018 WL 1626162, at *10 (S.D.N.Y. Mar. 30, 2018) ("[C]haracterizing Plaintiff as a bad person is a statement of opinion, not susceptible to either a precise definition or classification as either true or false."); *see also* *Galasso v. Saltzman*, 42 A.D.3d 310, 311 (1st Dep't 2007) (allegedly defamatory statements that plaintiff was "no good" and a "criminal" "constitute[d] opinion and are not actionable as a matter of law."). Culper offered such opinions only after fully disclosing thirty pages' worth of well-sourced facts detailing numerous ties between Tang and Tang's network, and the aforementioned activities—none of which are plausibly alleged to be false. Culper's opinions cannot give rise to a claim for defamation.

b. The Graphic Challenged by the Entity Plaintiffs is Not Defamatory

The Entity Plaintiffs' allegations, which rely solely on the Graphic, suffer from the same infirmities.

The Entity Plaintiffs do not challenge any actual written statements in the Report. Instead, they attempt to plead defamation based solely on the Graphic:

**Hao Tang's Ties to CCP, Money Laundering, Human Trafficking, and Data Harvesting Operations**

So who is Hao Tang – AppLovin's longtime Chinese backer tied to Angel Pride, Midterm Success, *and* Discovery Key? **<u>In what follows, we detail – using entirely public sources – Hao Tang's numerous connections tie to Chinese espionage, propaganda, data harvesting, human trafficking, money laundering, murder-for-hire, and other such unsavory operations.</u>** The below is a visual summary of a few of our most salient views.




Culper made clear that the Graphic was a "visual summary" of the Report, representing, with arrows, the specific connections described in the Report. Report at 13. The Graphic accurately depicted, via an arrow, a connection between an entity/individual and an immediately adjacent entity/individual or immediately adjacent activity. None of those immediately adjacent connections are disputed here—thus, the Entity Plaintiffs have failed to allege the requisite falsity element of a defamation claim. *See Henry*, 629 F. Supp. 3d at 148; *Cortes*, 285 F. Supp. 3d at 642.

(1) A Defamation Claim Attributing the Entire Graphic to All Entity Plaintiffs is Contrary to the Facts and the Law

To support their specious claim, the Entity Plaintiffs present an absurd reading of the Graphic that defies the rest of the Report and basic logic: they argue that they have ***all*** been accused of ***all*** of the "bad" activities detailed in the Graphic (which they list as money laundering, forex fraud, disappearances, human trafficking, POGO raids, and 14K triad). *See* Entity Compl. at ¶ 43. But that is not the case. The Graphic drew connections between individuals/entities and immediately adjacent individuals/entities, with arrows. The Graphic ***never*** accused all of the individuals/entities of all the depicted activities.

The Entity Plaintiffs suggest that their reading makes sense because the bad acts "are not grouped into distinct boxes [within the red rectangular box]." *Id.* ¶ 29. But that interpretation would require ignoring the entire Report and the clear ***vertical arrows*** that connect only specific entities in the fourth row of the Graphic to specific entries in the red box. For example, only Goldenway is linked via vertical arrow to "CCP Espionage," "Money Laundering," "Forex Fraud," and then "Disappearances." *See* Report at 13. And only Southwind Media is linked via vertical arrow to "Mediapro CCP" and then "Propaganda Deal." *Id*. The same limitation applies to the other four entities on the fourth rung of the Graphic, each of which has a vertical arrow linking that entity to different activities in the bottom-most red box. *See id.* A court will not allow a "strained and artificial" read of a statement to support a claim for defamation. *See Dfinity*, 702 F. Supp. 3d at 175 n.35 (quoting *Aronson v. Wiersma*, 65 N.Y.2d 592, 594 (1985)).

To the extent there is any confusion on this (and there is none), it is obviated by the Report itself. The Graphic only purports to operate as a "visual summary" of the Report's "views," *see* Report at 13—thus, in interpreting the Graphic, the Report's contents must be consulted. *Golan v. Daily News, L.P.*, 77 Misc.3d 258, 271 (Sup. Ct. N.Y. Cnty. 2022) ("When looking at a headline

the rule is generally that both the headline and the item to which it is attached are to be considered as one document in determining the effect of an article." (cleaned up)), *aff'd*, 214 A.D.3d 558 (1st Dep't 2023); *Udell v. NYP Holdings, Inc.*, 169 A.D.3d 954, 957 (2d Dep't 2019) ("[T]he headline of the article, *when read and evaluated in conjunction with the text it precedes*, was a fair index of the article." (emphasis added)). As described above, the Report set forth in detail the grounds for associating each entity with the associated "bad acts," and the Graphic, consistent with all of that analysis, directly linked each entity to its associated "bad act" with a vertical arrow. The Entity Plaintiffs concede this; they explicitly acknowledge that their (mis)reading of the Graphic is entirely unmoored from the report and "expressly contradict[ed]" by it. Entity Compl. ¶ 30. Thus, to the extent the Entity Plaintiffs' interpretation of the Graphic requires disregard of the Report itself, it is an implausible reading that cannot support a defamation claim.

The Graphic is a "fair index of the truthful matter contained in the related news article," and is therefore not actionable. *Gunduz v. N.Y. Post Co., Inc.*, 188 A.D.2d 294, 294 (1st Dep't 1992); *see also* *Reeves v. Assoc. Newspapers, Ltd.*, 232 A.D.3d 10, 15 (1st Dep't 2024). Therefore, a defamation claim by *all* the Entity Plaintiffs on the grounds that the Graphic somehow accuses *all* of them of *all* the conduct and connections in the red rectangular box is implausible and cannot survive a motion to dismiss.

(2) The Specific Claims Raised by Specific Entity Plaintiffs are Not Defamatory

Only a few of the sixteen Entity Plaintiffs raise specific challenges to the Graphic—but none of these are actionable.

First, JC International complains that the Graphic's link between it and human trafficking was "non-existent and absurd." Entity Compl. ¶¶ 34-35, 46(b). But the Graphic did not tie JC International to human trafficking. It only depicted: JC Int'l Finance → Huang Youlong → She

Ziajing → KK Park → Human Trafficking. This sequential chain is a concise and accurate summary of what was disclosed in the Report: JC International lent millions of dollars to Huang Youlong (as set forth in a hyperlinked Chinese media article), whose cousin/business partner is She Ziajing (as described in a hyperlinked and embedded text of a Vietnamese media report), who ran KK Park, a human trafficking ring. Report at 4, 19-20 (citing and linking sources). Tellingly, JC International does not allege that any of the disclosed facts set forth in this sequential chain are false; it therefore cannot maintain a claim that the Graphic is defamatory by drawing arrows in the manner that it did. *Tannerite*, 864 F.3d at 245 ("[A] plaintiff in New York courts generally must identify how the defendant's statement was false to survive a motion to dismiss."). To the extent JC International argues that it has no connection to "bad acts" placed in *other* parts of the red rectangle, not underneath JC International, those were not intended to be connected to JC International and cannot support a defamation claim by JC International.

Second, IEC complains about its placement in the Graphic, insisting that it has "no connection" to any of the activities depicted in the red rectangle at the bottom of the Graphic. Entity Compl. ¶ 37. But the Graphic did not specifically accuse IEC of anything. It only depicts: IEC → HK Casinos → Cheng Family → 14K Triad. This chain accurately summarized the contents of the Report. As Culper disclosed (and as Plaintiffs do not dispute), IEC was indeed connected to FortuneGate's casino network through the Cheng Family, as Hong Wai Cheng served as both IEC's Director and FortuneGate's former CEO. Report at 8 (citing and linking sources). The Report similarly disclosed the connection between FortuneGate and the triads, as FortuneGate's former Chairman, Liduan Wang, is linked to She Zhijiang, who in turn is associated with former Chinese triad leader "Broken Tooth." Report at 4, 19-20 (citing and linking sources). None of these facts are disputed or pled to be false. This is fatal to IEC's defamation claim.

Lastly, Ho Wong Meng and FortuneGate make a limited challenge to their placement in the Graphic. But they too fail to plead the falsity of any of the facts underlying such placement. The Graphic depicted: Ho Wong Meng → FortuneGate → Liduan Wang → POGO Raids → Human Trafficking. This accurately summarizes the Report. As disclosed by Culper and undisputed by Plaintiffs, Ho Wong Meng served as CEO of FortuneGate Holdings Philippines ("FHP"), which operated the FortuneGate casino, and FHP's Chairman was Liduan Wang. Report at 4, 8, 22. The connections between Liduan Wang and Philippine Offshore Gaming Operations ("**POGO**") raids/human trafficking were similarly disclosed in the Report and wholly undisputed. *Id.* at 4, 21-24 (detailing various allegations and raids against Wang and his entities for suspected POGO operations and human trafficking) (citing and linking sources).

Critically, Meng and FortuneGate do not claim that there is "no connection" in this regard (the way they argue that there is "no connection" to the remaining acts and activities in the red box); instead, they concede some level of connection but argue that it was "remote." Entity Compl. ¶ 38. The Graphic never said otherwise—indeed, it only visually represented this connection, even if remote. It therefore cannot form the basis of a defamation claim. Likewise, the Entity Complaint sets forth that there is "no connection between Discovery Key to any of the Bad Acts." *Id.* ¶ 31. There is no dispute—the Graphic did not represent such a connection, but rather it only referred to connection between Discovery Key and a shared corporate address at 18/F Three Exchange Square, HK. *See* Report at 17 n.30.

Other Entity Plaintiffs make claims that require distorting the Graphic to suggest it accused all of them of all the activities depicted in the chart, or activities to which the Graphic does not connect them via arrow. In doing so, Plaintiffs—like Tang—construct strawmen and complain of statements Culper never actually made. For example, Southwind ***does not dispute*** its connections

to Mediapro and "propaganda arm"—the only two entries beneath it in the Graphic. Instead, it argues only that the Report "says nothing else about Southwind [other than connecting it to Mediapro and a "propaganda arm"], much less anything about the Bad Acts." Entity Compl. at ¶ 32; *see also id.* at ¶ 46(b). But the Graphic did not connect Southwind to any other entries in the rectangular box! So Southwind has no actionable claim.

The same is true for Fenton Capital, which acknowledges (without challenge) its placement in the Graphic linking it to RedNote. *Id.* ¶ 33. Fenton complains only that the Graphic "links Fenton Capital to all Bad Acts, and not only to RedNote." *Id*. But that is an inappropriate reading of the Graphic and is not supportable. Similarly, JC International complains that it has "no stated connection whatsoever with any other Bad Acts such as 'Money Laundering' or 'Forex Fraud,'" *Id.* ¶¶ 36, 46(b)—but the Graphic did not purport to connect JC International to these activities. And finally, Goldenway argues that the Graphic falsely accuses it of "human trafficking," "POGO Raids," and "14K Triad," s*ee id.* at ¶ 46(c)—but the Graphic did not do so. Indeed, Goldenway was only connected to four specific activities listed directly below it on the Graphic, ***and Goldenway does not allege that any such connections are false or defamatory***. The Entity Plaintiffs' complete disregard for the Graphic's structure is not grounds for a defamation claim.

### B. The Challenged Statements are Not Actionable Because They Are Not Alleged to be False

Separately, even if the challenged statements were considered statements of fact, which, respectfully, they should not, they could only be actionable if Plaintiffs plausibly alleged them to be false. *See Tannerite*, 864 F.3d at 247 ("Because falsity is an element of New York's defamation tort . . . the complaint in this case must plead facts that, if proven, would establish that the defendant's statements were not substantially true."). The burden is on Plaintiffs, who must specifically and sufficiently allege falsity; conclusory pleading is not enough. *Henry*, 629 F. Supp.

3d at 146 (dismissing defamation claim where plaintiff only alleged falsity in conclusory terms. Plaintiffs must "plead facts that, if proven, would allow a reasonable person to consider the statement false."); *Cortes*, 285 F. Supp. 3d at 642 (same). Indeed, so long as a statement is "substantially true"—*i.e.*, where it "would not have a different effect on the mind of the reader from that which the pleaded truth would have produced"—it cannot be defamatory. *Tannerite*, 864 F.3d at 242-43 (cleaned up).

Plaintiffs have not plausibly alleged the falsity of any of the challenged statements. To the contrary, as set forth in detail herein, Plaintiffs concede the connections that the Report draws between Tang and his affiliated entities, and then the connections between those entities or individuals to certain conduct or activities. Absent allegations of falsity, the defamation claims must be dismissed. *See Consortium for Indep. Journalism*, 2025 WL 919504, at *18.

### C. Plaintiffs Have Not Plausibly Alleged that Culper Published the Statements with Actual Malice

Plaintiffs' claims also fail for another, independent reason: they have not plausibly alleged actual malice.

Under New York law, a plaintiff alleging defamation in connection with statements made "in a place open to the public or a public forum in connection with an issue of public interest" is subject to an additional requirement that the statement was made with actual malice. N.Y. Civ. Rights Law § 76-a(1)(a)(1), (2). "Public interest" is "construed broadly, and shall mean any subject other than a purely private matter." *Id.* § 76-a(1)(d). When Section 76-a applies, courts have required, at the pleadings stage, that a plaintiff "alleges facts that, if accepted as true, would sufficiently allege actual malice." *See 1st Amendment Praetorian v. N.Y. Times Co.*, 2025 WL 949575, at *8 (S.D.N.Y. Mar. 28, 2025) (dismissing complaint for failure to plead actual malice as required by Section 76-a); *Bobulinksi v. Tarlov*, 758 F. Supp. 3d 166, 179-80 (S.D.N.Y. 2024)

(same); *Prince v. Intercept*, 634 F. Supp. 3d 114, 139 (S.D.N.Y. 2022) (same). The Report—which implicated matters of international relations and national security by discussing alleged connections between a high-profile publicly traded company, its significant shareholders, and the CCP—clearly concerns matters of "public interest."[4]

The actual malice standard imposes a steep pleading hurdle which Plaintiffs cannot clear. Plaintiffs needed to plausibly allege that Culper published each allegedly defamatory statement "with knowledge of its falsity or with reckless disregard of whether it was false." N.Y. Civ. Rights Law § 76-a(2); *Fradkoff*, 2025 WL 1735476, at *8. This is a subjective standard—it requires Plaintiffs to plead that Culper "actually entertained serious doubts about the veracity" of its statements. *Dfinity*, 702 F. Supp. 3d at 176; *1st Amendment Praetorian*, 2025 WL 949575, at *10 (plaintiff must "allege facts that, if proven true, show that the [defendant] actually possessed a high degree of awareness of the statements' probable falsity." (cleaned up). This is a "difficult standard to meet, and quite purposefully so" as "neither the defense of truth nor the standard of ordinary care" adequately "protect[s] against self-censorship and thus adequately implement First Amendment policies." *Biro*, 963 F. Supp. 2d at 277 (citing *St. Amant v. Thompson*, 390 U.S. 727, 731-32 (1968)); *see also Dfinity*, 2024 WL 3565762, at *1 ("The hurdles to plausibly pleading actual malice . . . are significant given the First Amendment interests at stake in defamation cases." (cleaned up)).

---

[4] Tang's claims are subject to an actual malice standard because he is a limited purpose public figure, as the founder of the Goldenway Group, founder and director of Tier One Investment Management, and a significant investor in numerous companies, including AppLovin. *See* Tang Compl. at ¶¶ 16-19. The alleged defamatory statements concern Tang's role as a prominent investor and his purported relationship with AppLovin, a publicly-traded company, that was subject to public and investor interest. *See Winklevoss v. Steinberg*, 170 A.D.3d 618, 618 (1st Dep't 2019) (holding that plaintiff-investors were limited purpose public figures because "they have attracted public attention to themselves as investors in start-ups, have voluntarily injected themselves into the world of investing, and have sought to establish their reputation as authorities in the field.").

Moreover, Plaintiffs must plead actual malice for ***each*** allegedly defamatory statement. *Baiul v. Disson*, 607 F. App'x 18, 20-21 (2d Cir. 2015) (plaintiff "must provide evidence sufficient to permit . . . that [defendant] made *each* of the challenged statements with actual malice." (emphasis added)); *Cassava Sciences*, 2024 WL 1347362, at *23 ("[Plaintiff] must plead that *each* allegedly defamatory statement was made with actual malice." (emphasis added)); *Jacob v. Lorenz*, 626 F. Supp. 3d 672, 693-94 (S.D.N.Y. 2022) ("[T]he complaint does not sufficiently allege actual malice as to *each* of the remaining statements. Accordingly, the motion to dismiss is granted." (emphasis added)). Plaintiffs have come nowhere close to meeting this demanding standard.

In attempting to plead actual malice, Plaintiffs first rely on threadbare, conclusory allegations. They allege, without further explanation, that Culper "knew," *see* Entity Compl. ¶¶ 7, 47, or "must have known" its statements were false, Tang Compl. ¶ 6—even though all of the undisputed facts justifying Culper's statements were included and cited to in the Report. But even setting aside the facial absurdity of Plaintiffs' claims, these types of blanket allegations of "had to have known" are simply insufficient as a matter of law to meet the high pleading bar for actual malice. Conclusory allegations do not suffice to plead actual malice. *Fradkoff*, 2025 WL 1735476, at *8 (dismissing complaint for failure to allege actual malice: "allegations are largely conclusory and unsupported by specific facts that suggest that Defendants possessed a high degree of awareness of the statement's probable falsity." (cleaned up)); *see also Biro*, 807 F.3d at 546-47.

Next, Plaintiffs attempt to plead actual malice by suggesting that Culper had a profit motive to defame them. Tang Compl. ¶¶ 4, 6; Entity Compl. ¶ 26. But courts routinely reject purported profit motives as substitutes for actual malice pleading. Indeed, the Supreme Court has made clear that a profit motive does not establish actual malice. *Harte-Hanks Communications, Inc. v.*

*Connaughton*, 491 U.S. 657, 667 (1989) ("[T]he fact that the defendant published the defamatory material in order to increase its profits" cannot "prove actual malice."). This has been routinely reaffirmed in this very District in the short-seller context. *Cassava*, 2024 WL 1347362, at *25 (short-seller's supposed "profit motive" "does not lead the Court to infer that they did not subjectively believe those critiques"); *MiMedx Grp., Inc. v. Sparrow Fund Mgmt. LP*, 2018 WL 4735717, at *12 (S.D.N.Y. Sept. 29, 2018) (short-seller's "purported financial motive" "does not support a finding of actual malice").

The Entity Plaintiffs also insist, with practically no specificity, that Culper—which supported each opinion with reams of painstaking citations—supposedly conducted an inadequate investigation. Entity Compl. ¶ 52. But even if this were true (and, on the contrary, it is disproved by the obvious thoroughness of the sources for the opinions revealed in the Report), it simply cannot establish actual malice as a matter of law. *Bloom*, 735 F. Supp. 3d at 474 ("[I]t is well-established" that "a failure to investigate" "is insufficient to show actual malice." (citing *Connaughton*, 491 U.S. at 688)); *see also* *Sweeney v. Prisoners' Legal Servs. of N.Y., Inc.*, 84 N.Y.2d 786, 793 (1995) ("[T]he failure to investigate" "is not enough to prove actual malice even if a prudent person would have investigated before publishing the statement." (citing *St. Amant*, 390 U.S. at 733)).

Lastly, Tang attempts to plead actual malice by pointing to Culper's purported refusal to retract its Report. Tang Compl. ¶¶ 55-60. But these self-serving allegations fail to qualify as well-pled actual malice allegations. Culper's alleged refusal to issue a retraction occurred *after* the statements in the Report were made—thus, it says nothing as to Culper's state of mind *at the time of publication*; it therefore has no bearing on the question of actual malice. *Biro*, 963 F. Supp. 2d at 281 (because "a failure to retract occurs, by definition, *after* publication, meaning that its

probative value as to a defendant's state of mind at the time of publication is dubious at best," a "defendant's decision not to retract" does not necessarily establish actual malice). Moreover, the Tang Complaint tellingly fails to disclose which facts from the Report were purportedly false, nor does it set forth how Culper could have or should have known of such alleged falsity at the time the Report was published. Finally, Tang attempts to rely on the allegation that *another* outlet chose to retract its statements about Tang. *See* Tang Compl. at ¶¶ 61-63. But, by Tang's own account, the other outlet's statements were not the same as those in the Report, *id.* at ¶ 61, and, in any event, this says nothing about Culper's subjective state of mind when it published its Report.

Plaintiffs' attempts to plead actual malice are glaringly deficient. Far from establishing that Culper "actually entertained serious doubts about the veracity" of each of the statements about which the Plaintiffs complain, it is clear from the face of the well-sourced Report that Culper had good reason to form its expressed opinions. *Dfinity*, 702 F. Supp. 3d at 176 (no actual malice where defendants "named their publicly available sources and included links to those sources throughout the Report"). Plaintiffs have offered nothing to suggest that Culper "had reason to doubt the accuracy of th[e] public sources" it relied on, *id.*—indeed, Plaintiffs themselves do not even dispute the facts in Culper's sources. Plaintiffs' failure to sufficiently plead actual malice provides a separate, independent ground necessitating dismissal of this action.

## <u>CONCLUSION</u>

For the foregoing reasons, this Court should grant the Motion and dismiss all Plaintiffs' claims in this consolidated action for failure to state a claim.

Dated: August 20, 2026

Respectfully submitted,

COZEN O'CONNOR

By: *<u>/s/ Michael B. de Leeuw</u>*

Michael B. de Leeuw
Tamar S. Wise
mdeleeuw@cozen.com
twise@cozen.com
3 WTC, 175 Greenwich Street, 55th Floor
New York, New York 10007
Telephone: (212) 908-1331
Fax: (646) 461-2090

*Attorney for Defendants*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that, on August 20, 2026 I caused the foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all parties of record, including, but not limited to:

Benjamin A. Fleming
Hogan Lovells Cadwalader US LLP
390 Madison Avenue
New York, NY 10017
Benjamin.fleming@hlc.com
212-918-3000

Lisa M. Coutu
Winston Taylor LLP
200 Park Avenue
New York, NY 10007
Lisa.coutu@winstontaylor.com
212-294-6639

Dated: August 20, 2026

*/s/ Michael B. de Leeuw*
Michael B. de Leeuw

**CERTIFICATION REGARDING WORD COUNT**

I, Michael B. de Leeuw, an attorney at the law firm Cozen O'Connor, counsel for Defendants Shadyside Partners, LLC and Christian Lamarco in the above-captioned consolidated action, certify pursuant to Local Rule 7.1(c) that the Memorandum of Law submitted in support of Defendants' Omnibus Motion to Dismiss Plaintiffs' Complaints in Consolidated Action, not including the case caption, cover page, table of contents, table of authorities, signature block, or certifications, contains 12,344 words, and thus complies with the word count set forth in the Court's Order at ECF No. 20.

Dated: August 20, 2026

*/s/ Michael B. de Leeuw*
Michael B. de Leeuw