**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| WONG MENG HO, HONG WAI CHENG, FORTUNEGATE HOLDINGS PHILIPPINES INC., and INTERNATIONAL ENTERTAINMENT CORPORATION,<br>*Plaintiffs*,<br>v.<br>CHRISTIAN LAMARCO and SHADYSIDE PARTNERS, LLC d/b/a CULPER RESEARCH,<br>*Defendants*. | Case No. 1:26-cv-04930-JMF<br><br>**CONSOLIDATED AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL** |
| HAO TANG,<br>*Plaintiff*,<br>v.<br>SHADYSIDE PARTNERS, LLC d/b/a CULPER RESEARCH and CHRISTIAN LAMARCO,<br>*Defendants*. | |

Plaintiffs Hao Tang ("Tang"), Wong Meng Ho ("Ho"), Hong Wai Cheng ("Cheng"), FortuneGate Holdings Philippines Inc. ("FHP"), and International Entertainment Corporation ("IEC") (collectively, "Plaintiffs"), by and through their undersigned attorneys, bring this Consolidated Amended Complaint against Defendants Christian Lamarco ("Lamarco") and Shadyside Partners, LLC d/b/a Culper Research ("Shadyside" or "Culper," and together with Lamarco, "Defendants"), and allege as follows based on personal knowledge as to their own acts and upon information and belief as to all other matters:

## INTRODUCTION

1. Defendant Christian Lamarco is a short seller who publishes under the institutional-sounding name "Culper Research." His business model is simple and destructive: pick a public company, bet that its stock price will fall, and then publish accusations sensational enough to make sure that it does. The accusations do not need to withstand scrutiny; they need only move the market enough for Lamarco to cash out. This case is about what Lamarco did to Plaintiffs: five parties who had nothing to do with the company he bet against—a passive minority investor, two unrelated businesses, and two board members of those unrelated businesses—whom Lamarco falsely accused of human trafficking, money laundering, involvement in organized crime and disappearances, and murder-for-hire, all to make a quick profit.

2. Through Culper, which is merely the d/b/a of Lamarco's entity Shadyside Partners, LLC, he publishes self-described "research" on publicly traded companies that purports to expose the truth and ferret out secrets. According to Culper's website, its name "pays homage to the Culper Spy Ring, tasked during the American Revolution by General Washington to report on the movements of British forces."[1] Culper uses the first-person plural "we" throughout its reports to imply a large-scale institutional research operation, and claims that it "take[s] an exhaustive, investigative approach to investment research."[2]

3. But that is not the reality. In truth, Culper is just a one-man operation run by Lamarco out of a rental apartment in New York. It was founded barely two years after he graduated from a small Pennsylvania college with no substantial prior work experience, and it has no other known offices or employees. On information and belief, its only other known "associate" is a fake

---

[1] *About Us*, Culper Research, available at: https://culperresearch.com/about-us/ (last accessed Sept. 9, 2026).
[2] *Id.*

persona that Lamarco uses as an alias. Culper has no identified research staff, internal editorial controls, or independent fact-checking operation.

4. The charade has a purpose: credibility is the product Lamarco sells. Each Culper report assures readers that "[t]o the best of our ability and belief, all information contained herein is accurate and reliable."[3] But on the same page, Lamarco admits that he may hold positions that increase in value if readers act on the accusations, and that he is "likely to immediately transact" in the securities discussed after publication.[4] In other words, if the campaign works, Lamarco makes money.

5. Lamarco's "short-and-distort" model is unusually destructive.[5] While conventional short sellers focus on future performance, Lamarco trades on accusations of *past* misconduct. According to him, Culper "expos[es] past lies and deception" because doing so "tends to be compelling to investors."[6] He also claims that "bad actors tend to remain bad actors," so Culper places "a heavy emphasis on the backgrounds of the key individuals" associated with its target, supposedly "exposing their misdeeds or misdirection."[7]

6. That approach explains how private individuals and unrelated businesses become collateral victims of Culper's campaigns. Lamarco does not confine himself to analyzing a target

---

[3] *See, e.g.*, Culper Research, *AppLovin (APP): Behind the Red Curtain – CCP Intelligence, Human Trafficking, Money Laundering; Undisclosed Stock Pledges; Secret Chinese e-Commerce Deals*, at 1 (June 12, 2025), available at: https://culperresearch.com/wp-content/uploads/2025/10/Culper_APP_6-12-2025.pdf.

[4] *Id.*

[5] *See, e.g.*, Press Release, U.S. DEPARTMENT OF JUSTICE, *Activist Short Seller Convicted for $21M Stock Market Manipulation Scheme* (June 2, 2026), available at: https://www.justice.gov/opa/pr/activist-short-seller-convicted-21m-stock-market-manipulation-scheme.

[6] INSIGHTIA (DILIGENT), *IN-DEPTH: Q&A with Culper Research* (Jan. 25, 2023), available at: https://web.archive.org/web/20230529061714/https://www.insightia.com/in-depth-qa-with-culper-research/.

[7] *Id.*

company's finances, products, or strategy. He searches the backgrounds and historical relationships of people somewhere in the company's orbit, baselessly labels them "bad actors," and broadcasts explosive accusations to move the market.[8] Unlike publicly traded companies, the individuals targeted by Lamarco often lack established market-disclosure channels through which to correct the record. The numerous resulting defamation claims that have been brought against Lamarco are just a cost of doing business.[9]

7. At great expense to the innocent victims he targets, Lamarco's short-and-distort campaigns succeed. In 2022, an activist-investing analytics firm ranked Culper the year's top-performing activist short seller.[10] After dozens of these campaigns, Lamarco knows exactly how quickly inflammatory accusations travel through financial media, how sharply they move markets, and how much damage they leave behind. Lamarco promotes each report to tens of thousands of social-media followers, and he publicly celebrates the destruction that follows: Culper's motto is "*ecce vicit leo*"[11]—"behold, the lion has conquered"—and in a March 2024 post, Culper depicted itself as a smiling Grim Reaper going door to door to eliminate companies.[12]

---

[8] *Id.*
[9] *See, e.g.*, *LifeMD, Inc. v. Lamarco*, No. 21 Civ. 1273 (W.D. Pa.); *Gorilla Tech. Grp. Inc. v. Lamarco*, No. 25 Civ. 3142 (S.D.N.Y.); *Tecnoglass, Inc. v. Lamarco*, No. 25 Civ. 7450 (S.D.N.Y.); *Tecnoglass Holdings Inc. v. Lamarco*, No. 26 Civ. 6986 (S.D.N.Y.).
[10] BREAKOUT POINT, *Activist Short Selling in 2022* (Dec. 31, 2022), https://breakoutpoint.com/blog/2022/12/activist-short-selling-in-2022/.
[11] @CulperResearch, X (last visited Sept. 9, 2026), https://x.com/CulperResearch.
[12] @CulperResearch, X (Mar. 20, 2024, 4:38 PM), https://x.com/CulperResearch/status/1770550401412018452.




8. On June 12, 2025, Lamarco set his sights on AppLovin Corporation. Lamarco admitted that he held a short position in AppLovin and stood to profit if its share price declined.[13] To make this happen, he published a 30-page report (the "Report") (attached as Exhibit A) on Culper's website and simultaneously promoted it to nearly 40,000 followers on X, announcing: "We are short AppLovin $APP."[14]

9. But the Report was not really about AppLovin's business, management, or operations. To get the headline he wanted, Lamarco turned from the publicly traded company to a private individual: Plaintiff Hao Tang. Lamarco's deliberate decision to focus on Tang, whose Chinese name and low public profile made him an easy mark, reveals a malicious sleight-of-hand. After all, Lamarco was not shorting stock in Tang; he was shorting shares of AppLovin. Yet he made Tang the centerpiece of the Report.

---

[13] *See* Culper Report at 2 ("We are short AppLovin."); *id.* at 1 (stating that Culper and its affiliates may hold positions and are "likely to immediately transact" after publication).
[14] @CulperResearch, X (June 12, 2025, 11:09 AM), https://x.com/CulperResearch/status/1933179875352805710.

10. Lamarco's stated method is to scrutinize "the backgrounds of the key individuals" at his targets.[15] But Tang is not a "key individual" at AppLovin by any stretch. He holds a passive minority investment as one of the company's more than 2,500 shareholders. He has never met its CEO, senior management, or board members; is not an officer, director, employee, advisor or representative; and has absolutely no role in AppLovin's day-to-day operations. Lamarco targeted him anyway. The strategy was simple: connect AppLovin to Tang, then somehow connect Tang to purported crimes, while hoping that Tang's Chinese name and relative obscurity would make the accusations harder for readers to verify and easier to pass off as informed analysis.

11. This case is not the typical short-seller dispute over conclusions about a public company or its officers drawn from publicly available information or regulatory filings and disclosures. And Plaintiffs here are not seeking to recover for harm done to AppLovin's reputation or share price. This case is about a defamatory hit piece on Tang—a private individual—that uses false statements, intentionally misleading implications, and superficial associations to construct a wholly fictitious criminal "network" around Tang and impute serious criminal and other misconduct to him and the other Plaintiffs, all of whom are collateral damage in Lamarco's "short and distort" scheme. None of the sources cited for those accusations say that Tang participated in, knew of, or benefited from the alleged misconduct; most do not even mention him at all.

12. To scribble in the missing links his sources lacked, Lamarco relied on derogatory stereotypes centered on Tang's purported connections to China. He titled the Report *AppLovin (APP): Behind the Red Curtain—CCP Intelligence, Human Trafficking, Money Laundering; Undisclosed Stock Pledges; Secret Chinese e-Commerce Deals*,[16] repeatedly labeling Tang a

---

[15] INSIGHTIA, *supra* note 6.
[16] As used in the title of the Report and throughout this Complaint, "CCP" refers to the Chinese Communist Party.

"Chinese national," invoking the "China Hustle," and treating ordinary relationships with Chinese individuals and companies as evidence of Chinese-state influence and criminality.[17] Through those attenuated connections and racially coded stereotypes, the Report uses Tang's ethnicity to imply criminal ties that its sources do not establish.

13. As the Report's title and structure reveal, Lamarco sought to manufacture clickbait with a preselected, sensational storyline—that Tang and the people and companies around him are criminals or members of a Chinese criminal network—and then searched for associations he could shoehorn into that narrative. Rather than test whether any source connected any Plaintiff to any wrongdoing, he treated ordinary ethnic, geographic, and business relationships as confirmation of his conclusion, often without regard to what those sources actually said or whether they were reliable.

14. The result was not objective financial analysis. It was a litany of false and defamatory criminal accusations. The Report brands Tang a "bad actor" with "extensive direct and indirect ties" to Chinese espionage, state-sponsored propaganda, human trafficking, and money laundering.[18] It asserts that Tang's "numerous connections" tie him to "murder-for-hire," links him to the disappearances of two prominent Chinese figures, and concludes, without qualification, that "Tang's network is involved in money laundering, human trafficking, illegal gambling and data-harvesting."[19] Those accusations rest on innuendo and misrepresentation, not on the "sources" Lamarco cites. Unlike a financial thesis based on facts that readers can evaluate for themselves, the Report's accusations depend on missing links supplied only by Lamarco's own imagination.

---

[17] Report at 2-3, 14.
[18] *Id.* at 4.
[19] *Id.* at 13, 29.

15. The Report also levels similar accusations of criminal conduct at two businesses, Plaintiffs International Entertainment Corporation ("IEC") and FortuneGate Holdings Philippines Inc. ("FHP").[20] Like Tang, these foreign entities have no involvement in AppLovin.

16. The centerpiece of those accusations is a central graphic that purports to summarize the Report's "findings." The graphic places Tang in a bright-red box and draws lines to FHP, IEC, and other people and companies.

17. Beneath FHP, the graphic displays "Human Trafficking" and "POGO Raids"—a reference to law-enforcement raids on Philippine offshore gaming operators ("POGOs"), an industry the Philippine government banned because of its association with prostitution, human trafficking, kidnapping, and money laundering. Beneath IEC, it displays "HK Casinos," "Cheng Family," and "14K Triad." Above FHP and IEC are Ho and Cheng—current and former FHP and IEC executives who also have no involvement in AppLovin. Arrows in the graphic connect Ho to both FHP and IEC, and Cheng to IEC.




[20] *Id.* at 8.

18. Lamarco explicitly calls the graphic "a visual summary of a few of our most salient views."[21] The message is hard to miss, and a reasonable reader would understand the graphic to convey Culper's own conclusions: that FHP and Ho are involved in illegal POGO operations and human trafficking and that IEC, Ho, and Cheng are connected to the 14K Triad and, through that connection, to organized crime, including drug and human trafficking. The body of the Report supplies no factual basis for any of these accusations. At most, the cited sources trace attenuated chains through former officers, separate companies, and unrelated third parties. Had the graphic disclosed those intermediate links, a reasonable reader would have understood the resulting associations as remote. By eliminating these degrees of separation, Defendants intentionally created a stronger—and false—inculpatory association between Plaintiffs and serious crimes.

19. The Report follows the same formula throughout. It starts with an entity once associated with one or more Plaintiffs, then follows an increasingly attenuated chain of relatives, acquaintances, borrowers, former directors, service providers, or shared addresses until it reaches someone accused of wrongdoing. It then treats those accusations as though they apply to the Plaintiffs, even though the intervening "links" provide no credible basis for doing so.

20. Lamarco's own language reveals the weakness of those purported connections. The Report describes its intermediate links with qualifiers such as "appears," "reportedly," "speculation," "associated with," and "by extension." But when Lamarco states his conclusions about Plaintiffs, the qualifiers disappear. Remote associations become "extensive" and "direct," allegations against third parties become established facts, and Plaintiffs become members of a network "involved" in crime.

---

[21] *Id.* at 13.

21. This is no mere disagreement over interpretation. Lamarco claimed to have conducted "exhaustive" research and personally selected and reviewed the cited sources. He therefore knew their limitations. His repeated use of qualifiers shows that he recognized how attenuated the connections were. Yet in the Report's title, headings, graphic, summary, and conclusion, he stripped away those qualifiers and presented speculation and attenuated associations as factual conclusions about Plaintiffs. Where a cited source merely repeated an allegation, speculation, or secondary report, Defendants disclosed no effort to verify its reliability before adopting it as proof against Plaintiffs.

22. Lamarco could do so because he controls every stage of publication. He alone selected the sources, wrote the Report, chose its headline and graphics, determined its timing, published it on Culper's website, and promoted it through social media—all without any identified editing or independent fact-checking process. He also sought no comment from any Plaintiff before publication.

23. In short: Lamarco controlled every word readers saw; stood to profit from his accusations; knew that his method could falsely implicate identifiable people and businesses; knew that the Report's cited sources consisted largely of qualified allegations, speculation, and remote associations rather than verified evidence of wrongdoing by Plaintiffs; and nevertheless stripped away those limitations and deliberately departed from sources he claimed to review. That recurring formula, used throughout the Report, supports a strong inference that he knew his accusations were false or recklessly disregarded their truth.

24. Tang, for his part, repeatedly identified the Report's errors and demanded a correction. In December 2025, he requested that Defendants remove the false accusations. On January 8, 2026, Tang sent an eight-page letter identifying specific defamatory statements and

explaining how the Report distorted its sources. He sent a third demand on January 22, 2026. Lamarco refused to correct or retract any challenged statement.

25. Lamarco's refusal to correct the Report stands in sharp contrast to the actions of CapitalWatch, a separate short seller that withdrew similar accusations against Tang. CapitalWatch retracted its report, acknowledged that its "[d]escriptions asserting direct connections" to Tang were inaccurate and "failed to meet [its] publication standards," and publicly apologized for the distress and potential reputational harm it had caused.[22] Lamarco did none of those things. Instead, he left the Report and its related promotional posts online.

26. The harm here extends far beyond any effect on AppLovin's stock price. Defendants' outrageous accusations go to Plaintiffs' honesty, integrity, and fitness to conduct business. Defendants published those accusations in a forum where banks, investors, regulators, and prospective counterparties would foreseeably encounter them when evaluating Plaintiffs' integrity and risk. The accusations are therefore defamatory per se, and their continuing availability compounds the harm whenever they surface in a search or diligence review or appear in another publication.

27. Tang's reputation and credibility are essential to his work and to his relationships with financial institutions and counterparties around the world. The Report damaged both, impaired his ability to conduct business in the United States and abroad, and cost him valuable business opportunities, including contributing to the loss of or restricted access to banking services. FHP and IEC have likewise suffered harm to their business reputations, goodwill, and commercial relationships, as have Ho and Cheng.

[22] Lola Murti, *AppLovin's stock pops 14% after short seller CapitalWatch apologizes, retracts report on shareholder*, CNBC (Feb. 9, 2026), https://www.cnbc.com/2026/02/09/short-seller-capitalwatch-retraction-applovin-hao-tang.html.

28. Plaintiffs bring this action to vindicate their reputations against baseless accusations Defendants knew were false: that Plaintiffs engaged in human trafficking, money laundering, organized crime, disappearances, and murder-for-hire. Plaintiffs do not challenge Defendants' right to criticize AppLovin's business strategy or management, or to publish a negative thesis on its stock. This case concerns something narrower and more serious: to make their bet pay, Defendants falsely accused Plaintiffs—none of whom play any role in AppLovin's business or its management—of grave crimes their own sources do not support. Plaintiffs seek to expose the truth behind Lamarco's short-and-distort campaign and recover damages for the substantial reputational and commercial harm it caused.

## PARTIES

29. Plaintiff Hao Tang is a citizen of Cyprus whose primary residence is in the Hong Kong Special Administrative Region. Tang is a businessman and investor.

30. Plaintiff Wong Meng Ho is a citizen of Malaysia who is domiciled in Hong Kong. At the time the Report was published, Ho served as the chairman, chief executive officer, and an executive director of IEC and had also served as chief executive officer of FHP.

31. Plaintiff Hong Wai Cheng is a citizen of the United Kingdom who is domiciled in Hong Kong. At the time the Report was published, Cheng served as an independent non-executive director and chairman of the audit committee of IEC and had previously served as executive chairman and chief executive officer of FHP.

32. Plaintiff FortuneGate Holdings Philippines Inc. is incorporated under the laws of the Philippines and has its principal place of business in the Philippines. FHP has operated as a casino-management company.

33. Plaintiff International Entertainment Corporation is incorporated under the laws of the Cayman Islands and has its principal place of business in Hong Kong.

34. Defendant Christian Matthew Lamarco is a citizen of New York. At all relevant times, Lamarco authored, approved, published, and promoted the Report; controlled the Culper website and @CulperResearch social media account; and acted personally and on behalf of Shadyside.

35. Defendant Shadyside Partners, LLC is a Delaware limited liability company "based in New York City" that does business as Culper Research.[23] Upon information and belief, Lamarco is Shadyside's sole member. Shadyside is therefore a citizen of New York for purposes of diversity jurisdiction.

## JURISDICTION AND VENUE

36. This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a)(2). Each Plaintiff is a citizen or subject of a foreign state, as alleged above. Lamarco is a citizen of New York. Shadyside is also a citizen of New York because its sole member, Lamarco, is a citizen of New York. Each Plaintiff seeks damages exceeding $75,000, exclusive of interest and costs.

37. This Court has personal jurisdiction over Lamarco because he is domiciled in New York. This Court has personal jurisdiction over Shadyside because Shadyside is headquartered in New York, operates Culper from New York, and researched, authored, published, and promoted the Report from New York. Plaintiffs' claims arise directly from that conduct.

38. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (2) because both Defendants reside in this District for venue purposes and a substantial part of the events giving rise to Plaintiffs' claims—including the Report's authorship, publication, and promotion—occurred here.

[23] *About Us*, Culper Research, available at: https://culperresearch.com/about-us/ (last accessed Sept. 9, 2026).

## DEMAND FOR JURY TRIAL

39. Plaintiffs demand a trial by jury of all issues so triable.

## FACTUAL ALLEGATIONS

### A. Culper Research: A One-Man Research Operation Built to Appear Institutional

40. Defendant Christian Lamarco is a thirty-something short seller who operates under the brand Culper Research, a one-man shop run out of a rental apartment in New York, New York.

41. On information and belief, Lamarco graduated from Grove City College, a small Christian liberal arts college in Pennsylvania, in 2017. Upon graduation, he joined GrizzlyRock Capital, a long-only value fund founded by another Grove City College alumnus, where he worked as an analyst for two years. Lamarco has never worked at an investment bank, brokerage, or established research firm, and has no training or professional experience in forensic accounting, investigative journalism, or law enforcement—the disciplines his "investigative" reports purport to draw on.

42. In 2019, at the age of 24, and with only two years of experience at a long-only investment firm, Lamarco founded Shadyside, the Delaware entity through which he operates his one-man short-selling business, Culper Research.

43. On information and belief, Shadyside has no employees besides Lamarco and no physical office. Culper's website tells readers the firm is "based in New York City."

44. Shadyside is not registered with the SEC or any state as an investment adviser and has filed no Form ADV. It is not a FINRA member or registered broker-dealer. Lamarco likewise does not appear in IAPD or BrokerCheck as a registered investment adviser representative or broker. Culper thus publishes market-moving "investment research" while sitting entirely

outside the regulatory framework that governs legitimate research providers—free of the compliance obligations and agency oversight that apply to registered firms.

45. Nor has Lamarco adopted any of the internal controls that legitimate research organizations impose on themselves. On information and belief, Culper has no research staff, no editor, no independent fact-checker, and no legal or compliance review. Lamarco alone selects the target, conducts the "investigation," chooses the sources, writes the report, drafts the headlines, designs the graphics, decides the timing, publishes the report on a website he controls, and promotes it through a social-media account he controls.

46. The Culper Research brand was created by Lamarco to disguise all of this: that the entire company consists of one person with no substantial short-selling research experience, no discernible investigative resources, no special training, no regulatory oversight, and no internal editorial controls. To this end, each report issued under the Culper Research brand contains a statement on the first page assuring readers that what they are reading is factual and can be relied upon: "To the best of our ability and belief, all information contained herein is accurate and reliable."[24] That assurance is undercut by a second disclosure: that Lamarco and his associates hold positions in the securities he writes about, and that readers "should assume that following publication of any research, we are likely to immediately transact in these securities."[25]

47. Lamarco's operation is unconventional. Most short sellers analyze the fundamentals of public companies—past performance, projected results, capitalization, signs of overvaluation. Lamarco does not have the background or expertise to perform this analysis. He instead trades on accusations, frequently about private individuals, and he has said so himself: Culper focuses on "exposing past lies and deception" because doing so "tends to be compelling to

[24] *See, e.g.*, Report at 1.
[25] *Id.*

investors."[26] And because "bad actors tend to remain bad actors," Culper places "a heavy emphasis on the backgrounds of the key individuals" associated with its targets, supposedly "exposing their misdeeds or misdirection."[27] The results can be much more destructive than with typical short-seller reports, since the individuals Lamarco targets frequently have limited or no ability to rebut the allegations against them.

48. The mechanics follow from the pitch. Lamarco publishes sensational accusations of criminal and fraudulent conduct on social media to drive down the target's share price, then collects a quick profit before the accusations can be debunked or the target can respond. The initial drop is where Lamarco makes his money; the truth arrives only after he has cashed out and moved on to the next target. His business does not depend on being right—only on being loud.

49. Even when his allegations are not outright false, Lamarco frequently adds a misleading spin to publicly available information to support his desired result. For example, on information and belief, Lamarco uses a fake address and the alias "Jeff Bourland" to file FOIA requests with the SEC concerning companies he is targeting. Because such companies are occasionally the subject of regulatory scrutiny, the SEC frequently denies his requests, citing boilerplate provisions protecting records related to active law enforcement investigations. Culper Research then tweets screenshots of the letters with the requester's name redacted, accompanied by

---

[26] INSIGHTIA, *supra* note 6.
[27] *Id.*

vague commentary suggesting the target company is engaged in some sort of wrongdoing, as shown below.


Culper
@CulperResearch

FOIA requests suggest CytoDyn $CYDY is under an active SEC investigation opened between May and September 2020:

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
STATION PLACE
100 F STREET, NE
WASHINGTON, DC 20549-2465

Office of FOIA Services

May 27, 2020

[redacted]

Re: Freedom of Information Act (FOIA), 5 U.S.C. § 552
Request No. [redacted]

Dear [redacted]

This letter is in response to your request, dated May 9, 2020 and received in this office on May 11, 2020, for a copy of an order directing investigation or similar document to confirm the existence of ongoing investigative activity of issuer Cytodyn (CYDY) or its affiliates.

Based on the information you provided in your letter, we conducted a thorough search of the SEC's various systems of records, but did not locate or identify any information responsive to your request.

50. Lamarco is well aware from his own litigation history that his method—converting attenuated associations into accusations of fraud and crime—can and does falsely implicate identifiable people and businesses. A review of the defamation actions brought against him exposes a recurring pattern: he releases a report riddled with false and unsupported claims, causes the target company's stock to decline, closes out his short position for a profit, and then quietly resolves the resulting defamation claims as another cost of doing business.

51. For example, in April 2023, Lamarco issued a complete retraction of one of his reports and settled after being sued for defamation in federal court. *See LifeMD, Inc. v. Lamarco*, No. 21 Civ. 1273 (W.D. Pa. 2021). Following that settlement, the report and all related tweets were permanently removed from the internet.

52. In a separate case, *Gorilla Technology Group, Inc. v. Lamarco*, No. 25 Civ. 3142 (S.D.N.Y. 2025), Lamarco reached a confidential settlement with Gorilla after it sued him for

defamation. The complaint there alleged that Lamarco deliberately lied in one of his short-seller reports, falsely claiming the plaintiff sold "fake" products. That action was still pending when Lamarco published the Report at issue here.

53. In September 2025, Lamarco was sued again for falsely claiming—much as he has here—that two businessmen had connections with organized crime, including the Sinaloa drug cartel. *Tecnoglass, Inc. v. Lamarco*, No. 25 Civ. 7450 (S.D.N.Y. 2025). That case was voluntarily dismissed less than three months after it was filed. On August 17, 2026, a new defamation action was filed by the injured businessmen against Lamarco and Shadyside based on the same report. *Tecnoglass Holdings Inc. v. Lamarco*, No. 26 Civ. 6986 (S.D.N.Y. Aug. 17, 2026).

**B. <u>Lamarco Repeats the Same Pattern Against Plaintiffs</u>**

54. The Report at issue here followed the same pattern. On June 12, 2025, Lamarco published a 30-page report titled *AppLovin (APP): Behind the Red Curtain—CCP Intelligence, Human Trafficking, Money Laundering; Undisclosed Stock Pledges; Secret Chinese e-Commerce Deals*.

55. Defendants published the Report on Culper's website and simultaneously promoted it through the @CulperResearch account on X, which had nearly 40,000 followers when Plaintiffs filed their original complaints. The promotional post announced: "We are short AppLovin $APP."[28]

56. The Report's disclaimer confirmed that Defendants held a position designed to increase in value if AppLovin's stock price fell and that Defendants were "likely to immediately transact" after publication.[29] Lamarco's short position on AppLovin shows only that he expected—

---

[28] @CulperResearch, X (June 12, 2025, 11:09 AM), https://x.com/CulperResearch/status/1933179875352805710.
[29] Report at 1.

and stood to profit from—a decline in AppLovin's stock price before Plaintiffs and AppLovin could investigate or respond, not that he believed or even attempted to certify the accusations he published about Plaintiffs.

57. Although AppLovin was the market target, Defendants devoted many of the Report's most inflammatory statements to Plaintiff Tang and companies they placed within his supposed "network." They repeatedly called Tang a "Chinese national," described AppLovin as having "covert Chinese ownership," invoked the "China Hustle," and paired those references with accusations of espionage, human trafficking, money laundering, organized crime, disappearances, and murder-for-hire.[30] In context, those references did more than try to describe Tang's nationality: they invited readers to treat his Chinese name and ordinary relationships with Chinese people and companies as evidence of CCP allegiance, espionage, and criminality.

58. Defendants presented those accusations as Culper's factual findings. They claimed to use an "exhaustive, investigative approach," assured readers that "all information contained herein is accurate and reliable," and stated that the accusations rested on "entirely public sources" that they had reviewed.[31]

59. But a simple Google search of publicly available information reveals that Defendants ignored sources and facts that were inconsistent with their predetermined, defamatory narrative. Six weeks before the Report, Le Monde and the International Consortium of Investigative Journalists ("ICIJ") published related articles as part of an investigation into China's abuse of Interpol.[32] The articles reported that a French court had denied China's request to extradite

---

[30] *Id.* at 2-3, 14.
[31] *About Us*, Culper Research, available at: https://culperresearch.com/about-us/ (last accessed Sept. 9, 2026); Report at 1, 13.
[32] Simon Leplâtre & ICIJ, *Interpol: A Tool in China's Arsenal of Transnational Repression*, LE MONDE (Apr. 29, 2025), https://www.lemonde.fr/en/international/article/2025/04/29/interpol-a-tool-in-china-s-arsenal-of-transnational-repression_6740746_4.html; Scilla Alecci & ICIJ,

Tang, questioned the authenticity of the underlying arrest warrant, and recounted Tang's allegation that Chinese authorities sought the red notice after he refused to turn over a portion of his profits to a provincial public-security official. In other words, the articles disprove Lamarco's wholly fictitious, factually unsupported claim that Tang is a CCP instrument or operative. Of course, the Report nowhere acknowledged those articles, belying Defendants' claimed "exhaustive" review of public sources concerning Tang.

60. The Report conveyed its accusations through its title, summary, bold headings, body text, central graphic, and unqualified conclusions—all components that reinforced one another in the aggregate. Defendants used qualifiers such as "appears," "reportedly," "speculation," and "associated with" while describing intermediate links, but removed those qualifiers when stating their conclusions about Plaintiffs. Elsewhere, they used headings, graphics, sequencing, and juxtaposition to convey the same conclusions. For example, the body stated that Tang "appears to have lent money" to a person "reportedly involved" with KK Park, while the bold heading declared without qualification that "Hao Tang Lent Millions" to an investor in the "'KK Park' human-trafficking operation."[33]

61. Defendants' occasional qualifiers do not transform their accusations into protected opinion. Read in context, the accusations concern verifiable conduct and were presented as findings of Defendants' purportedly "exhaustive" investigation. At a minimum, they imply that Defendants possessed additional, undisclosed facts substantiating their conclusions. As alleged below, they did not.

---

*Chinese Authorities Exploited Interpol and Strong-Armed One of the World's Richest Men to Pursue a Target*, ICIJ (Apr. 29, 2025), https://www.icij.org/investigations/china-targets/interpol-red-notice-police-warrant-jack-ma/.

[33] Report at 19.

62. The Report contains a series of specific false statements and implications about Plaintiffs. It accuses Tang of involvement in serious criminal and intelligence operations, connects Plaintiff FHP to POGO crimes and human trafficking, and ties IEC to the 14K Triad. Each defamatory statement is addressed below.

***Defamatory Statement No. 1: Defendants Accuse Tang of Involvement in Money Laundering and Human-Trafficking Operations***

63. On page 2 of the Report, Defendants state in bolded, underlined terms:

> **[O]ur research reveals Hao Tang's numerous ties to the CCP, money laundering, illegal gambling, and human trafficking operations.**

64. This accusation is false. Tang has not participated in, financed, directed, aided, or knowingly associated himself with money laundering, illegal gambling, or human trafficking. The associations Defendants cite do not establish that Tang knew of, participated in, benefited from, or had any involvement in such conduct.

65. The Report does not identify a single instance in which Tang participated in, supported, had any direct or incidental involvement in, or had knowledge of any money laundering, illegal gambling, or human trafficking operation. The Report does nothing more than identify remote or incidental associations between Tang and third parties, and then identify connections between those third parties and alleged wrongdoing.

***Defamatory Statement No. 2: Defendants Call Tang a "Bad Actor" with "Extensive Direct and Indirect Ties" to Human Trafficking, Money Laundering, and "Nefarious Activity"***

66. On page 4, the Report uses the bold heading "Hao Tang Holds Numerous Ties to Chinese Intelligence, CCP Propaganda Outlets, Human Trafficking, and Money Laundering Operations." Immediately below, Defendants state:

> **We believe Hao Tang is a bad actor with extensive direct and indirect ties to Chinese espionage, CCP state-sponsored propaganda, human trafficking, and money laundering operations. Indeed, seemingly every piece of Hao Tang's empire we peeled back revealed either CCP interests or nefarious activity.**

67. The phrases "we believe" and "seemingly" do not temper the accusation, but rather underscore it with conviction. Read in context, they introduce Defendants' claimed investigative finding that Tang had "extensive" ties, including "direct" ties to human trafficking and money laundering operations. Whether those ties exist or not—and they do not—is a purely factual matter that is capable of being proven true or false.

68. Defendants' claim that their research uncovered "extensive direct" ties between Tang and criminal conduct—when the Report identifies only attenuated and tangential connections through third parties—implied that Defendants possess concrete undisclosed facts establishing those "direct" ties. They do not because there are none. Defendants identified no evidence that Tang engaged in money laundering or human trafficking, agreed to assist anyone who did, knew of the alleged crimes, or received any proceeds from them.

***Defamatory Statement No. 3: Defendants State That Tang's Connections Tie Him to Human Trafficking, Money Laundering, Murder-for-Hire, and "Other Such Unsavory Operations"***

69. On page 13, Defendants introduce the section containing their central graphic by stating:

> **So who is Hao Tang – AppLovin's longtime Chinese backer tied to Angel Pride, Midterm Success, and Discovery Key? In what follows, we detail—using entirely public sources—Hao Tang's numerous connections tie to Chinese espionage, propaganda, data harvesting, human trafficking, money laundering, murder-for-hire, and other such unsavory operations.**

70. Defendants presented that sentence as the conclusion of their investigation that Tang's connections tied him to human trafficking, money laundering, and murder-for-hire.

71. This conclusion is false, and Defendants' cited sources do not support it. These "sources" identify, at most, historical corporate relationships and allegations against people several steps removed from Tang. They provide no evidence that Tang knew of, agreed with, assisted, financed, directed, participated in, or benefited from the alleged crimes. Meanwhile, publicly available sources confirm that Tang is a target of the CCP, not an agent of it.[34]

72. Defendants' only disclosed basis for accusing Tang of "numerous connections" that "tie to . . . murder-for-hire" is a single passage, addressed in Defamatory Statement No. 8, *infra*, whose "paid murder" characterization Defendants invented; the cited reporting made no such allegation. This single passage is a fabricated connection, several steps removed from Tang, and Defendants' entire foundation for their "murder-for-hire" accusation. A reasonable reader would conclude that Defendants knew of other connections they had not disclosed. There are none.

---

[34] Leplâtre, *supra* note 32*;* Alecci, *supra* note 32.

***Defamatory Statement No. 4: The Report's Central Graphic Accuses FHP and Ho of Human Trafficking and IEC, Ho, and Cheng of Organized-Crime Ties***

73. Immediately after accusing Tang of ties to those crimes, Defendants present what they call "a visual summary of a few of our most salient views."




*Report at 13.*

74. The graphic places Tang in a bright-red box near its center. In a separate column, a line descends from "FortuneGate," which the Report elsewhere links to "FHP," to "Liduan Wang," "POGO Raids," and "Human Trafficking." Another line descends directly from IEC to "HK Casinos," "Cheng Family," and "14K Triad." As described above, additional lines connect Ho to FHP and IEC, and Cheng to IEC. The alleged wrongdoing appears in red type within a red-bordered row at the bottom.

75. Defendants did not present the graphic as a neutral organizational chart. They expressly adopted it as a summary of Culper's own most important, unqualified conclusions. The graphic placed each person and entity in a separate box but grouped the alleged wrongdoing in a single, red-bordered band, using lines and vertical placement without distinguishing allegations concerning only remote third parties. That asymmetrical design directed readers to treat the adjacent crimes as attributes of the connected network. More specifically, its lines, placement, red highlighting, and surrounding text told readers that Ho and FHP were connected to POGO crimes

and human trafficking; that Ho, Cheng and IEC were connected to the 14K Triad; and that those people and entities were components of the criminal "network" the Report attributed to Tang. Those editorial choices supply affirmative evidence that Defendants intended for readers to understand that each Plaintiff was connected to the respective crimes shown in the graphic.

76. These are very serious allegations. "POGO" denotes an industry the Philippine government banned after its president tied it to "financial scamming, money laundering, prostitution, human trafficking, kidnapping, brutal torture, even murder."[35] And the 14K Triad is a criminal organization the U.S. Treasury has sanctioned as "one of the largest Chinese organized criminal organizations in the world," responsible for "drug trafficking . . . human trafficking, and a range of other criminal activities."[36] By depicting FHP and Ho as connected to POGO crimes, and IEC, Ho, and Cheng as connected to the 14K Triad, the graphic effectively accuses them of participating in forced labor, violent organized crime, and human trafficking.

77. The Report provides no factual basis for these accusations. Its FHP-related allegations rest on Liduan Wang's former service as FHP's chairman and then move outward to separate companies, Wang's relatives, and POGO operations associated with those third parties.[37] The body of the Report attributes the alleged POGO and trafficking conduct to those third parties, not to FHP.[38] The Report does not identify any basis to support the asserted relationship between IEC (or its executives) and the 14K Triad; indeed, the body of the Report never even states that such a relationship exists. The graphic therefore materially departs from and contradicts the text it

---

[35] Julie M. Aurelio, *Marcos Bans Pogo, Cites 'Disorder' It Caused PH*, PHILIPPINE DAILY INQUIRER (July 23, 2024), https://newsinfo.inquirer.net/1964063/marcos-bans-pogo-cites-disorder-it-caused-ph.
[36] Press Release, U.S. DEP'T OF THE TREASURY, *Treasury Sanctions Corrupt Actors in Africa and Asia* (Dec. 9, 2020), https://home.treasury.gov/news/press-releases/sm1206.
[37] Report at 21-24.
[38] *Id.*

purports to summarize. It further indicates to the reader that Defendants are in possession of undisclosed facts supporting these accusations.

78. FHP and Ho did not participate in or knowingly support the POGO crimes or human trafficking described in the Report. IEC, Ho, and Cheng have no connection to the 14K Triad. Nor does the Report identify evidence that Tang participated in or knowingly supported any of the crimes displayed in the graphic. The graphic's contrary accusations are false.

***Defamatory Statement No. 5: Defendants Link Tang to the Disappearances of Fu Xiaotian and Qin Gang***

79. On page 16, Defendants use the bold headline:

> **Goldenway Operated the Jet on which Now Disappeared CCP Journalist Fu Xiaotian was Last Seen**

80. Immediately below, they state:

> **Hao Tang also appears to be linked to the 2023 disappearance of former CCP state journalist Fu Xiaotian and State Councilor Qin Gang, suggesting he retains high-level CCP connections.**

81. This, too, is false and not supported by any of the sources Defendants supposedly relied on.

82. Defendants base this accusation on photographs Fu posted of herself standing in front of an aircraft scheduled to fly from Los Angeles to Beijing and on records that Defendants claimed identified Goldenway Investments Holdings Limited as the aircraft's operator.

83. Those facts do not establish that Fu boarded or traveled on the aircraft, that the aircraft was where she was last seen, or that the flight facilitated her disappearance. They likewise do not connect Qin—who does not appear in the photograph—to the aircraft; establish that he boarded or traveled on the aircraft; or link it to his disappearance. Even more so, they do not show that Tang owned or controlled the aircraft; selected or knew its passengers; scheduled, dispatched,

coordinated, or approved the flight; knew Fu or Qin; knew the aircraft's destination; or knew anything about Fu's and Qin's respective disappearances.

84. While the Report does not expressly accuse Tang of kidnapping or killing anyone, that is its unmistakable implication: that Tang participated in, facilitated, or possessed undisclosed knowledge concerning the disappearances. And the Report's own language and presentation demonstrate that Defendants intended and endorsed that implication. *First*, Defendants told readers the aircraft's registration "obscur[ed] its ownership" and boasted that they had "uncovered" the records revealing a Goldenway entity as its operator—a misleading framing that presents the jet's true ownership as deliberately concealed, and Tang as the concealed party. *Second*, Defendants had already told readers that Tang's "numerous connections tie to . . . murder-for-hire," priming them to understand Fu and Qin's disappearances as part of a violent pattern.[39] *Third*, Defendants' central graphic draws a line from Goldenway—which the Report brands "Hao Tang's Goldenway Group"—directly to "Disappearances," in red type, at the bottom of what Defendants called a summary of their "most salient views."[40]

85. Defendants' use of "appears" and "suggesting" does not erase the accusation. The headline, the concealment charge, the murder-for-hire framing, and the graphic together conveyed that Tang was involved in the disappearances. That implication is false. Tang had nothing to do with either disappearance.

***Defamatory Statement No. 6: Defendants State That Tang Lent Millions to an Investor in a Human-Trafficking Hub***

86. On page 19, Defendants use the bold headline:

> **Hao Tang Lent Millions to Huang Youlong, an Investor in Myanmar's Infamous "KK Park" Human Trafficking Hub Raided in February 2025**

---

[39] Report at 13.
[40] *Id.*

87. Immediately below, they state:

> **Hao Tang also appears to have lent money to Huang Youlong, who was reportedly involved with the infamous "KK Park" human trafficking operation in Myanmar.**

88. The Report then states that Huang and his former wife failed to repay a debt to JC International Finance Limited, that Huang became the subject of later "speculation" concerning KK Park, that Huang's cousin helped run the park, and that the cousin was associated with a former triad leader.

89. The loan source concerns a debt Huang allegedly failed to repay. It says nothing about KK Park, human trafficking, Huang's cousin, or any triad. Defendants assembled each later step from separate sources concerning different people and events. Because Defendants cited and purported to review each of those sources, they knew that no source supplied the missing links; their decision to combine the sources and strip the qualifications from the headline was deliberate or, at minimum, reflected reckless disregard for whether the accusation against Tang was true. The phrases "appears to have" and "reportedly" immediately below the headline do not transform its categorical assertions into opinion. Whether Tang made the loan and whether Huang was involved with KK Park are verifiable facts. At minimum, the presentation implied that Defendants possessed undisclosed facts establishing those links. They do not.

90. The predicate assertion about Tang is also false. Public records show that Goldenway had disposed of Goldenway Finance and its money-lending license before the alleged loan. The acquiring third party later changed the company's name to JC International Finance. Tang did not make, approve, or know of the loan—or any other loan connecting Huang to KK Park.

91. By placing Tang's name in the headline and linking the alleged loan to a human-trafficking hub, Defendants told readers that Tang knowingly financed or associated with that operation. He did not.

***Defamatory Statement No. 7: Defendants Accuse FHP of Espionage, Money Laundering, and Human Trafficking***

92. On page 21, Defendants use the bold headline:

> **Hao Tang's Ties to FortuneGate: Linked to CCP Espionage, Money Laundering, and Human Trafficking Operations**

93. They then state:

> **Hao Tang and his associates are also tied to FortuneGate (aka Frontier Capital Group), a Philippines casino operator tied to Chinese national Liduan Wang, who in turn has been linked to multiple Chinese espionage and human trafficking operations.**

94. The Report itself acknowledges that Frontier Capital Group corrected an earlier announcement and publicly identified FHP as an independent casino operator majority owned by Tech Innovation Management Limited. Lamarco dismisses that correction as an effort to "distance Goldenway" but identifies no evidence that the correction was false. The Report claims that Tang and his associates are tied to FHP, then uses Wang's former service as FHP's chairman as the bridge between FHP and criminal accusations concerning Wang and other third parties.

95. The espionage accusation rests on an accident of geography. The Report's only disclosed support is that Wang "owns Avia International Club, a nightclub located above the Yatai Spa," and that the spa—not Wang's nightclub—"is being monitored for connections to the similarly-named Yatai International Holding Group," which is "owned by self-confessed Chinese spy She Zhijiang."[41] That is the entire purported connection: Wang owns a nightclub; the nightclub sits above a spa; the spa is "being monitored" for possible connections to a company

[41] *Id.* at 24.

with a similar name; and that company is owned by a spy. A reasonable reader, told of "multiple" espionage links to FHP, would conclude that Defendants knew of others they had not disclosed.

96. The human-trafficking and money-laundering accusations are no better supported. They rest on accusations concerning companies separate from FHP and Wang, Wang's relatives and acquaintances, and POGO operations associated with those third parties. The Report identifies no evidence that FHP owned, managed, or profited from any POGO operation; participated in or knew of human trafficking or money laundering; or had any connection to the raids and abuses it describes—and none that Tang controlled FHP, directed Wang, or knew of any of the alleged misconduct.

97. FHP did not participate in, finance, direct, aid, or knowingly associate itself with espionage, money laundering, or human trafficking. Tang likewise did not participate in, finance, direct, aid, or knowingly associate himself with any such conduct, and he did not control FHP, direct Wang, or know of any alleged misconduct by Wang or the third parties discussed in the Report. Defendants' statements and implications are false. By placing those third-party allegations beneath a headline linking Tang to FortuneGate and then FortuneGate to espionage, money laundering, and human trafficking, Defendants conveyed that Tang and/or FHP itself participated in or knowingly supported those operations. The cited facts do not support that implication.

***Defamatory Statement No. 8: Defendants Use a Fabricated "Paid Murder" Claim to Reinforce Their False Murder-for-Hire Accusation Against Tang and Their Criminal Narrative About FHP***

98. Within the section headed "Hao Tang's Ties to FortuneGate," and after asserting at page 13 that "Hao Tang's numerous connections tie to . . . murder-for-hire," Defendants state on page 23:

> **Liduan Wang was also reportedly tied to the Nine Dynasty Casino junket. In May 2025, Philippines media widely reported that the junket was used to launder ransom payments and the paid murder of Chinese steel magnate Anson Que.**

99. Defendants presented that passage as another link in Tang's supposed network: FHP to a former chairman; the former chairman reportedly to a junket; and the junket allegedly to ransom payments and a paid murder.

100. But the Report's own cited source does not say what Defendants claim it said. The May 2025 reporting cited in the Report concerned the kidnapping of Anson Que and allegations that ransom payments were laundered through the junket. It did not report that Que's death was a "paid murder." It did not allege that the junket, Wang, or anyone associated with either was involved in killing Que, or that the killing was carried out on anyone's orders. The phrase "paid murder"—like the accusation of "murder-for-hire" it echoes—appears nowhere in the cited reporting. Defendants did not merely repeat a third party's accusation of contract killing, irresponsible as that might be; rather, they manufactured one and attributed it to the "Philippines media."

101. Defendants identify no evidence that FHP owned, operated, controlled, financed, or received proceeds from the Nine Dynasty junket; that FHP knew of any ransom or murder scheme; or that anyone acting for FHP participated in one.

102. Defendants likewise identify no evidence that Tang had any relationship with the Nine Dynasty junket or Anson Que; knew about any ransom or murder scheme; authorized or financed one; or even knew of the allegations before publication.

103. Although the quoted sentence names Wang, Defendants deliberately framed it as a link concerning Tang and FHP. They placed it in a section expressly purporting to establish "Hao Tang's Ties to FortuneGate," after asserting that Tang's connections tied him to "murder-for-hire,"

and as part of a Report that treated FHP and its former chairman as components of Tang's supposed network. In that context, Defendants presented the fabricated "paid murder" claim as one of the factual links supporting their broader accusation that Tang and his supposed network were connected to murder-for-hire. Tang and FHP had no involvement in Anson Que's murder, any murder-for-hire scheme, or any laundering of ransom payments, and the resulting implication is false.

***Defamatory Statement No. 9: Defendants Declare That "Tang's Network Is Involved" in Money Laundering and Human Trafficking***

104. The Report ends by declaring on page 29:

> **Tang's network is involved in money laundering, human trafficking, illegal gambling and data-harvesting.**

105. By that point, Defendants had repeatedly described the people and companies discussed in the Report as Tang's associates and "network." A reasonable reader would understand the sentence as Culper's unqualified conclusion concerning Tang and the supposed network it constructed around him.

106. The phrase "is involved" asserts present participation as fact. It does not describe a possibility, a remote association, or an allegation against an unrelated third party. The conclusion confirms the defamatory meaning of the Report's earlier summary, headings, graphic, and juxtapositions.

107. Tang is not involved in money laundering or human trafficking. Nor are any other Plaintiffs. Defendants' unqualified conclusion is false.

## C. <u>Defendants Intended and Endorsed the Report's Defamatory Meaning</u>

108. Defendants presented the Report as the product of their own investigation and its accusations as their own conclusions. Viewed as a whole, the Report conveyed that Tang was knowingly involved in human trafficking, money laundering, organized crime, disappearances, and

murder-for-hire. It further conveyed that the supposed criminal network it constructed around Tang included: (i) FHP and Ho, whom it linked to POGO crimes, human trafficking, money laundering, espionage, and murder-for-hire; and (ii) IEC, Ho, and Cheng, whom it linked to the 14K Triad and organized crime. Defendants selected, arranged, and characterized the cited materials to create that single, entirely false narrative about Plaintiffs.

109. Defendants stated that "our research reveals" Tang's ties to criminal operations, called Tang a "bad actor," described the central graphic as a summary of their "most salient views," and concluded that "Tang's network is involved" in human trafficking, money laundering, organized crime, disappearances, and murder-for-hire.[42] Those formulations affirmatively adopted the accusations as Defendants' own factual conclusions. They were not neutrally reporting allegations made by others or merely offering subjective opinions based on facts fully disclosed to readers. Instead, they falsely represented that Defendants' "research" had uncovered facts substantiating the accusations.

110. The Report's title, headings, summary passages, graphic, red crime labels, and placement of unrelated people and entities within a single supposed network reinforce those accusations. A reasonable reader would understand the Report to convey Defendants' factual findings about Plaintiffs, rather than merely offering a neutral account of allegations made by others or subjective opinions based solely on facts disclosed to readers.

111. Separate from its express accusations, the Report also conveyed false and defamatory implications through its language, structure, sequencing, omissions, and presentation. Those implications arise from the Report as a whole and from the cumulative effect of Defendants'

---

[42] *Id.* at 2, 4, 13, 29.

editorial choices. The literal accuracy of an isolated corporate relationship or historical fact does not negate the false meaning created by its selection, juxtaposition, and presentation.

112. Defendants intended and endorsed those implications. They repeatedly removed qualifiers at the point of accusation, omitted intermediate links and contrary facts, placed unrelated people and entities within a single supposed network, and positioned red crime labels beneath Plaintiffs in the central graphic. Those choices supplied the missing connections that the sources did not make and directed readers to the false conclusions alleged above.

### D. <u>Defendants Knew Their Accusations Were False or Recklessly Disregarded the Truth</u>

113. Defendants published the Report with knowledge of its falsity or reckless disregard for the truth. The Report does not contain isolated or unrelated mistakes. Across different subjects and sources, Lamarco repeatedly converted qualified allegations and remote associations into direct accusations and unqualified factual conclusions against Plaintiffs. This is unsurprising, as Lamarco's business model rests on manufacturing accusations explosive enough to move a stock, and that is what he did here. He began with a preselected storyline that Tang and the people and companies in his orbit formed a Chinese criminal network, then worked backward from that conclusion—selecting, arranging, and mischaracterizing sources to produce the attention-grabbing headline and graphics he wanted. The false claims are not random errors. In each instance, the distortions, misstatements, and false claims point in the same, more sensational direction.

114. *First*, Defendants fabricated an accusation outright. The Report repeatedly ties Tang to "murder-for-hire," but does not cite a single source to support that allegation. It told readers that "Philippines media widely reported" that a casino junket laundered ransom payments and "the paid murder" of Anson Que.[43] The cited reporting did not describe a paid killing or connect the

[43] *Id.* at 23.

junket to Que's death at all. Defendants invented the "paid murder," attributed it to the "Philippines media," and made it the sole foundation for the repeated murder-for-hire accusations. Because Lamarco personally selected, cited, and purported to summarize that reporting, he knew that it did not contain the "paid murder" accusation he attributed to it.

115. *Second*, Defendants misrepresented sources they possessed and claimed to have reviewed. The aircraft records cited in the Report as evidence for the "disappearances" claim showed, at most, that a Goldenway entity operated the aircraft pictured in Fu's photographs.[44] They did not establish that Fu or Qin boarded or traveled on the aircraft, that the aircraft had any connection to either disappearance, or that Tang had any connection to the aircraft or either disappearance. Because Defendants reviewed those records, they knew that the materials supplied no basis for linking Tang to Fu's or Qin's disappearance.

116. The loan records likewise identified JC International Finance Limited—not Tang—as Huang Youlong's lender. Public records further show that Goldenway disposed of Goldenway Finance and its money-lending license before the alleged loan and that the third-party acquirer later renamed the company JC International Finance. The records therefore did not establish that Tang made, directed, approved, or benefited from the loan. Nor did the loan records mention KK Park, human trafficking, Huang's cousin, or any triad. Defendants constructed those later links from separate sources concerning different people and events. Because Lamarco selected and reviewed each source, he knew that no source supplied the missing link between Tang and the alleged trafficking operation. His use of "appears" in the body immediately below the categorical headline "Hao Tang Lent Millions" further shows that he recognized the uncertainty and consciously removed it at the point of accusation.

[44] *Id.* at 16.

117. The Report conflated FHP with separate casino brands, shareholders, former officers, relatives, and POGO operators. Defendants' own cited sources attributed the alleged POGO and trafficking conduct to those separate third parties, not FHP, giving Defendants obvious reasons to doubt any accusation against FHP. The Report also acknowledged the public correction identifying FHP as an independent operator, then dismissed it as an effort to "distance Goldenway" without identifying any evidence that the correction was false, demonstrating that Defendants possessed information undermining their accusation and deliberately rejected it to preserve their preselected narrative.[45] Its espionage accusation rested on nothing but geography: a nightclub owned by FHP's former chairman sits above a spa "being monitored" because it has a similar name to another company owned by a spy.[46]

118. Defendants cited no source connecting IEC to the 14K Triad, and the body of the Report identifies no act by IEC that could support that accusation. They nevertheless placed IEC directly above those labels in the central graphic, Ho and Cheng above IEC, and presented the graphic as a summary of their own conclusions. Because Lamarco wrote both the qualified descriptions and the unqualified accusations, the divergence between them reflects a conscious editorial choice, not an innocent misunderstanding of another person's work.

119. Even accepting every cited source at face value, none supports the defamatory conclusions Defendants drew about Plaintiffs. The sources concern allegations against remote third parties, historical corporate relationships, and qualified or speculative associations. The Report's accusations—including (among other allegations) human trafficking, money laundering, organized crime, disappearances, and murder-for-hire—were created by Defendants' own selection, juxtaposition, and inferential leap, not by the cited evidence. Because Lamarco personally selected

[45] *Id.* at 21.
[46] *Id.* at 24.

and reviewed those sources, he knew that the defamatory meaning was not supplied by the evidence but by his own creation of a fictitious network and false associations.

120. *Third*, Defendants' drafting shows that they identified the limits of their sources but chose to ignore them. In the body of the Report, they described intermediate links as "appears," "reportedly," "linked," and "associated." At the point of accusation, those same tentative, multi-step associations became "extensive direct and indirect ties" to wrongdoing. In the title, headings, graphic, and summary, Defendants convert those tentative associations into definitive claims that Tang has "extensive direct and indirect ties" to criminal operations, that FHP and IEC (and Ho and Cheng) are connected to trafficking and organized crime, and that "Tang's network is involved" in serious criminal activity. Defendants then published those conclusions as fact under the guise of "exhaustive" research.[47]

121. The conspicuous absence of direct evidence was necessarily known to Defendants: they selected every source for a Report they called "exhaustive," and, if evidence directly connecting any Plaintiff to the charged crimes existed, they had every incentive to display it. They did not, because their sources contained no such evidence. The graphic materially exceeded the body of the Report by visually attributing to FHP, IEC, Ho, and Cheng crimes that the text supported only through remote allegations against third parties—or, as to IEC and the 14K Triad, not at all. Defendants discovered and described the limitations of their sources but inverted the significance and published the opposite as Culper's factual conclusion.

122. *Fourth*, Defendants' exclusion of contemporaneous publicly available information inconsistent with their predetermined, defamatory narrative supports the same inference. The Le Monde and ICIJ reports were published only six weeks earlier, focused directly

---

[47] *Id.* at 4, 29.

on Tang's relationship with China, and supplied obvious reasons to doubt both the Chinese government's casino accusation and the Report's portrayal of Tang as connected to the CCP.[48] Given Defendants' self-professed "exhaustive" public-source investigation into Tang, the prominence and direct relevance of that reporting suggest that Defendants knew about and ignored it.

123. *Fifth*, Defendants had a direct financial motive to publish the most sensational, market-moving version of their accusations: their short position increased in value if AppLovin's stock fell, and they themselves conceded that they were likely to transact immediately after publication.[49] They also bypassed every safeguard that could have tested the preconceived narrative or caught the falsehoods before publication—no editor, no fact-checker, no legal or compliance review, and no request for comment to Tang, Ho, Cheng, FHP, or IEC. That economic incentive and deliberate avoidance of verification further support actual malice.

124. *Sixth*, Defendants were on notice. Lamarco had repeatedly been sued over reports built on the same method, and the *Gorilla Technology* action was pending against him when the Report was published. After publication, Tang's counsel sent detailed letters identifying the falsehoods and their source failures and another publisher retracted and apologized when confronted with the same facts. Defendants corrected nothing.

125. Lamarco cannot distance himself from any of this. He alone conducted the purported investigation, selected every cited source, wrote the Report, designed its headings and graphic, and controlled its publication through Shadyside. And he vouched for the work: Culper advertises an "exhaustive, investigative approach," and the Report assures readers that its contents

---

[48] Leplâtre, *supra* note 32; Alecci, *supra* note 32.
[49] Report at 1.

are, "[t]o the best of our ability and belief," "accurate and reliable."[50] The Report itself shows that Lamarco reviewed the sources closely enough to quote them, cite them, and preserve their qualifications when describing intermediate links. He therefore knew what the sources did and did not say. His decision to remove those qualifications, materially overstate the headlines and graphic, and publish the resulting accusations as Culper's own conclusions supports the inference that he knew the accusations were false or consciously disregarded their probable falsity. Lamarco's knowledge and conduct are attributable to Shadyside because he owned and controlled Shadyside, used it to publish the Report, and personally made every relevant investigative and editorial decision.

### E. Tang Notified Defendants of the Falsehoods, but Defendants Refused to Correct Them

126. In December 2025, Tang notified Defendants that the Report contained false and defamatory accusations and demanded that they remove or correct them.

127. On January 8, 2026, Tang sent Defendants a detailed eight-page letter identifying specific falsehoods, explaining why the Report's sources did not support its accusations, and demanding a retraction and correction.

128. Tang renewed that demand on January 22, 2026. Defendants refused to retract or correct the Report.

129. CapitalWatch removed its publication, acknowledged the error, and apologized after receiving notice. Defendants received the same opportunity to correct the record and declined to do so.

---

[50] *About Us*, Culper Research, available at: https://culperresearch.com/about-us/ (last accessed Sept. 9, 2026); Report at 1.

130. Defendants continue to publish the Report and related promotional posts despite receiving detailed notice of the falsehoods. Those materials remain available to investors, financial institutions, regulators, counterparties, and the public.

**F. <u>The Report Has Caused Continuing Harm to Plaintiffs</u>**

131. Defendants published the Report through Culper's website and promoted it to nearly 40,000 followers on X. It remains searchable and readily available to investors, financial institutions, regulators, prospective business partners, diligence providers, and the public.

132. The Report has damaged Tang's personal and professional reputation and impaired his relationships with financial institutions, investors, and business counterparties.

133. The Report has also created ongoing safety and security risks for Tang and those close to him. Those risks persist while Defendants keep the Report and related promotional materials publicly available and cannot be fully remedied by damages.

134. The Report has separately damaged FHP's reputation and goodwill by falsely connecting the company to POGO crimes, human trafficking, money laundering, and murder-for-hire. Those accusations have impaired FHP's relationships with financial institutions, regulators, customers, and counterparties.

135. The Report has separately damaged IEC's reputation and goodwill by falsely connecting it to the 14K Triad and, by extension, organized crime. Those accusations have impaired IEC's business relationships.

136. The Report has separately damaged the personal and professional reputations of Ho and Cheng, businessmen with no connection to the wrongdoing attributed to them.

137. Plaintiffs have also incurred and continue to incur expenses reasonably necessary to counteract the Report and its promotional posts, including undertaking reputation-repair efforts.

Plaintiffs' officers, employees, and advisors have diverted time from ordinary business activities to address Defendants' falsehoods.

138. Defendants accused Plaintiffs of serious crimes and conduct incompatible with the lawful operation of their businesses. The accusations constitute defamation per se. Plaintiffs have also suffered actual reputational and commercial injuries in amounts to be determined at trial. Those injuries continue while Defendants leave the Report and its promotional materials available to the public.

## CAUSE OF ACTION

### Defamation
### By All Plaintiffs Against All Defendants

139. Plaintiffs repeat and reallege each preceding paragraph as if fully set forth herein.

140. Defendants published the Report through Culper's website and promoted it through Culper's account on X, causing the Report and its accusations to be distributed worldwide.

141. The challenged statements and implications identified above were of and concerning the Plaintiff or Plaintiffs identified in each section. The Report expressly named Tang, FHP, IEC, Ho, and Cheng or identified them through language, context, and graphics that would cause readers familiar with Plaintiffs to understand that the accusations referred to them.

142. Each challenged statement and implication was false for the reasons alleged above. Tang was not involved in the criminal and intelligence activities attributed to him. FHP and Ho were not involved in POGO crimes, human trafficking, money laundering, or espionage. IEC, Ho, and Cheng had no connection to the 14K Triad or organized crime.

143. Read in context, the challenged statements would cause a reasonable reader to understand that the Plaintiff identified in each statement-specific section was involved in serious criminal activity and that the accusation reflected the findings of Defendants' investigation.

144. Defendants conveyed those accusations both expressly and by implication through the Report's express statements, headings, summary passages, graphic, red crime labels, sequencing, arrangement of people and entities, removal of qualifications, and omission of facts that contradicted their conclusions. To the extent any individual fact cited in the Report was accurate, Defendants selected, juxtaposed, and presented those facts in a manner that supplied affirmative evidence of their intent to create and endorse the specific false and defamatory implications alleged above. The graphic's material departures from the body of the Report, and the headings' removal of qualifiers used in the text, further demonstrate that those implications were intended rather than accidental.

145. The challenged accusations are assertions of fact capable of being proven true or false. Defendants presented them as conclusions drawn from their purported research and supported them with citations, records, graphics, and descriptions of the investigative steps they claimed to have performed.

146. Defendants published the challenged statements and implications to third parties without privilege or authorization. Each Defendant participated in, approved, or was responsible for the Report's publication and continued distribution.

147. Defendants acted with actual malice. They began with a predetermined, defamatory narrative that Plaintiffs formed part of a fictitious criminal network and selected, arranged, and mischaracterized facts and sources to fit that story. The contradictions and missing links were evident in the very sources Lamarco personally selected, cited, and purported to summarize. Yet he attributed a "paid murder" to reporting that did not describe one; identified Tang as the lender when the cited record named JC International Finance Limited; cited aircraft materials that did not connect Tang or the aircraft to Fu's or Qin's disappearances; dismissed a

correction identifying FHP as independent without identifying any basis for doing so; and drew an IEC-to-14K connection that appeared nowhere in his sources or the body of the Report. Each departure from the cited record made the resulting accusation more direct and sensational.

148. Defendants knew the sources did not support their accusations because the Report Lamarco personally assembled—despite being marketed as "exhaustive"—identifies no direct evidence that any Plaintiff committed, knew of, aided, or benefited from the criminal and other misconduct he described. If such evidence existed, Defendants had every economic incentive to publish it; instead, they distorted sources, removed material qualifications, conflated separate people and entities, and converted speculation and once- and twice-removed allegations into categorical conclusions. Defendants preserved qualifiers such as "appears," "reportedly," "linked," and "associated" in the body, then removed those qualifications when presenting their conclusions in the form of headings, graphic, summary, and conclusory statements. Because Lamarco alone wrote both the qualified descriptions and the categorical accusations, the divergence reflects a deliberate editorial choice, not an innocent misunderstanding or another person's error. And they knew or consciously disregarded that other contemporaneous publicly available facts and sources contradicted their Report. Their short position gave them a direct financial incentive to choose the most inflammatory framing and publish before Plaintiffs could respond. Lamarco's knowledge and conduct are attributable to Culper, which he owned and controlled and through which he published the Report. Defendants therefore knew the accusations were false or subjectively entertained serious doubts about their truth and published them anyway.

149. Defendants' refusal to correct the Report after receiving detailed notice has prolonged Plaintiffs' injuries, confirms the willful nature of their conduct, and further supports Plaintiffs' request for punitive damages.

150. The challenged accusations charge Plaintiffs with serious crimes and conduct incompatible with the lawful operation of their businesses. They therefore constitute defamation per se and entitle Plaintiffs to presumed damages.

151. The Report has also caused Plaintiffs actual reputational and commercial injury, including damage to their goodwill, business relationships, and professional standing, in amounts to be determined at trial.

152. Defendants continue to make the Report and related promotional materials publicly available despite detailed notice of their falsehoods, causing ongoing harm that damages cannot fully remedy. Plaintiffs therefore seek permanent injunctive relief as to any statements adjudicated false and defamatory.

153. Defendants acted with common-law malice and in willful, wanton, and reckless disregard of Plaintiffs' rights. That common-law malice is confirmed by Defendants' public boasts about the stock-price collapses following their reports, their warning that a future target would "also end[] in shambles," and their depiction of Culper as a Grim Reaper eliminating companies.[51] Defendants did not merely foresee harm to their targets; they celebrated that harm and used it to promote the next campaign. They deliberately used accusations against Plaintiffs to intensify a market campaign from which they expected to profit, despite knowing the limitations of the cited sources and the harm those accusations would cause. Plaintiffs are therefore entitled to punitive damages in addition to compensatory and presumed damages.

[51] @CulperResearch, X (Feb. 14, 2024, 4:23 PM), https://x.com/CulperResearch/status/1757878263794327591; @CulperResearch, X (Mar. 20, 2024, 4:38 PM), https://x.com/CulperResearch/status/1770550401412018452.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants and award:

a. compensatory and actual damages in an amount to be determined at trial, but in all events greater than $75,000 for each Plaintiff;

b. presumed, general, and special damages to the fullest extent permitted by law;

c. punitive damages for Defendants' willful, wanton, and malicious conduct in an amount sufficient to punish and deter;

d. pre- and post-judgment interest;

e. costs, disbursements, and attorneys' fees to the extent permitted by law;

f. permanent injunctive relief requiring Defendants to remove, and refrain from republishing, any statements adjudicated false and defamatory; and

g. such other and further relief as the Court deems just and proper.

Dated: September 10, 2026
New York, New York

By:
Roberta A. Kaplan
Timothy S. Martin
Christopher R. Le Coney
KAPLAN MARTIN LLP
1133 Avenue of the Americas
Suite 1500
New York, New York 10036
rkaplan@kaplanmartin.com
tmartin@kaplanmartin.com
cleconey@kaplanmartin.com
Tel.: (212) 316-9500

By: /s/ Benjamin A. Fleming
Benjamin A. Fleming
Kevin Hagey
HOGAN LOVELLS
CADWALADER US LLP
200 Liberty Street
New York, New York 10281
benjamin.fleming@hlc.com
kevin.hagey@hlc.com
212-504-6000

*Counsel for Plaintiffs Wong Meng Ho, Hong Wai Cheng, FortuneGate Holdings Philippines Inc., and International Entertainment Corporation*

By: /s/ Lisa M. Coutu
Libby S. Deshaies
Lisa M. Coutu
WINSTON TAYLOR LLP
200 Park Avenue
New York, New York 10166
Libby.Deshaies@winstontaylor.com
Lisa.Coutu@winstontaylor.com
Tel.: (212) 294-6700

*Counsel for Plaintiff Hao Tang*