IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WONG MENG HO, HONG WAI CHENG, FORTUNEGATE HOLDINGS PHILIPPINES INC., and INTERNATIONAL ENTERTAINMENT CORPORATION;<br><br>*Plaintiffs,*<br><br>v.<br><br>CHRISTIAN LAMARCO and SHADYSIDE PARTNERS, LLC d/b/a CULPER RESEARCH,<br><br>*Defendants.* | CIVIL ACTION NO.: 1:26-cv-04930-JMF |
| HAO TANG;<br><br>*Plaintiff,*<br><br>v.<br><br>SHADYSIDE PARTNERS, LLC (*d/b/a* CULPER RESEARCH) and CHRISTIAN LAMARCO,<br><br>*Defendants.* | |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT, TO STRIKE PORTION OF PLAINTIFFS' AMENDED COMPLAINT, AND FOR DEFENDANTS' ATTORNEYS' FEES AND COSTS**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................**Error! Bookmark not defined.**

FACTUAL BACKGROUND ................................................................................ 3

A. Hao Tang and the Report ................................................................ 3

1. Ties to Money Laundering ................................................................ 5

2. The Disappearance of Fu Xiaotian and Qin Gang .................................... 5

3. Ties to Human Trafficking ................................................................ 6

4. Tang and FHP's Ties to "Murder-for-Hire" ............................................ 7

5. Challenges to the Graphical Summary ................................................ 7

PROCEDURAL HISTORY ................................................................................ 8

LEGAL STANDARD ...................................................................................... 8

ARGUMENT .............................................................................................. 9

1. Plaintiffs Have Not Adequately Pled Defamation ........................................ 9

A. The Challenged Statements Are Opinion .................................................. 10

1. The Specific Statements Raised in the Complaints Are Not Actionable.. 12

2. The Context of Culper's Statements Demonstrates That They Are Protected Opinion ................................................................ 25

B. Plaintiffs Have Not Pled a Claim for Defamation by Implication ....................... 28

C. Plaintiffs Have Not Plausibly Alleged that Culper Published the Statements with Actual Malice ........................................................................ 30

D. Defendants Are Entitled to Attorney's Fees and Costs ....................................... 38

E. Paragraph 12 of Plaintiffs' Amended Complaint Should Be Stricken as Scandalous Pursuant to Fed. R. Civ. P. 12(f) ........................................................ 39

CONCLUSION ............................................................................................ 40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*1st Amendment Praetorian v. N.Y. Times Co.*,
2025 WL 949575 (S.D.N.Y. Mar. 28, 2025) ....................30

*Air Wis. Airlines Corp. v. Hoeper*,
571 U.S. 237 (2014) ....................10

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ....................8

*Baiul v. Disson*,
607 F. App'x 18 (2d Cir. 2015) ....................31

*Bartlett v. Societe Generale De Banque Au Liban SAL*,
2021 WL 8155950 (E.D.N.Y. Aug. 5, 2021) ....................39

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ....................9

*Bellavia Blatt & Crossett, P.C. v. Kel & Partners LLC*,
151 F. Supp. 3d 287 (E.D.N.Y. 2015), *aff'd*, 670 F. App'x 731 (2d Cir. 2016) ....................26, 27

*Biro v. Conde Nast*,
807 F.3d 541 (2d Cir. 2015) ....................8

*Biro v. Conde Nast*,
883 F.Supp. 2d 441 (S.D.N.Y. 2012) ....................28

*Biro v. Conde Nast*,
963 F. Supp. 2d 255 (S.D.N.Y. 2013), *aff'd*, 807 F.3d 541 ....................9, 31, 37, 38

*Bloom v. A360 Media LLC*,
735 F. Supp. 3d 466 (S.D.N.Y. 2024) ....................9, 36

*Bobulinksi v. Tarlov*,
758 F. Supp. 3d 166 (S.D.N.Y. 2024) ....................30, 38

*Bose Corp. v. Consumers Union of United States, Inc.*,
466 U.S. 485 (1984) ....................32

*Brian v. Richardson*,
87 N.Y.2d 46 (1995) ....................11, 15, 26

*BYD Co. Ltd. v. VICE Media LLC*,
531 F. Supp. 3d 810 (S.D.N.Y. 2021)........................................................................ *passim*

*Cassava Sciences, Inc. v. Bredt*,
2024 WL 1347362 (S.D.N.Y. Mar. 28, 2024) ............................................................ *passim*

*Cassava Sciences.*, *Inc. v. Bredt*,
2024 WL 555484 (S.D.N.Y. Jan. 3, 2024) ................................................................. *passim*

*Consortium for Indep. Journalism, Inc. v. United States*,
2025 WL 919504 (S.D.N.Y. Mar. 26, 2025), *appeal dismissed*, 25-1376 (2d Cir. July 21, 2025) ....................................................................................................10, 11, 16

*Cortes v. Twenty-First Century Fox Am., Inc.*,
285 F. Supp. 3d 629 (S.D.N.Y. 2018)..........................................................................................10

*Dfinity Found. v. N.Y. Times Co.*,
702 F. Supp. 3d 167 (S.D.N.Y. 2023), *aff'd*, 2024 WL 3565762 (2d Cir. July 29, 2024) ..................................................................................................................... *passim*

*Dillon v. City of New York*,
261 A.D.2d 34 (1st Dep't 1999) ................................................................................................20

*EEOC v. Green Lantern Inn, Inc.*,
2021 WL 4086148 (W.D.N.Y. Aug. 21, 2021) ...........................................................................39

*Erie R. Co. v. Tompkins*,
304 U.S. 64 (1938)........................................................................................................................38

*Eros Int'l PLC v. Mangrove Partners*,
140 N.Y.S.3d 518 (1st Dep't 2021) ............................................................................................11

*Eros Int'l. PLC v. Mangrove Partners*,
2019 WL 1129196 (Sup. Ct. N.Y. Cnty. Mar. 8, 2019), *aff'd*, 191 A.D.3d 465 (1st Dep't 2021) .............................................................................................................................26

*Galasso v. Saltzman*,
42 A.D.3d 310 (1st Dep't 2007) ................................................................................................25

*Golan v. Daily News, L.P.*,
77 Misc.3d 258 (Sup. Ct. N.Y. Cnty. 2022) ..............................................................................22

*Graham v. UMG Recordings, Inc.*,
806 F. Supp. 3d 454 (S.D.N.Y. 2025)..........................................................................................10

*Gross v. N.Y. Times Co.*,
82 N.Y.2d 146 (1993)...................................................................................................................11

*Hakimi v. Guidant Global*,
2023 WL 8005321 (S.D.N.Y. Nov. 17, 2023)....9

*Harte-Hanks Communications, Inc. v. Connaughton*,
491 U.S. 657 (1989)....36

*Henry v. Fox News Network LLC*,
629 F. Supp. 3d 136 (S.D.N.Y. 2022)....9, 10, 28

*Immuno AG v. Moor-Jankowski*,
77 N.Y.2d 235 (1991)....26

*Kavanagh v. Zwilling*,
578 F. App'x 24 (2d Cir. 2014)....28

*Knatt v. Hosp. Serv. Dist. No. 1 of E. Baton Rouge Parish*,
2003 WL 27384302 (M.D. La. June 30, 2003)....39

*Masson v. New Yorker Magazine, Inc.*,
501 U.S. 496 (1991)....10

*McDougal v. Fox News Network, LLC*,
489 F. Supp. 3d 174 (S.D.N.Y. 2020)....36

*MiMedx Grp., Inc. v. Sparrow Fund Mgmt. LP*,
2018 WL 4735717 (S.D.N.Y. Sept. 29, 2018)....37

*Nanoviricides, Inc. v. Seeking Alpha, Inc.*,
2014 WL 2930753 (Sup. Ct. N.Y. Cnty. June 26, 2014)....26

*Olivet Univ. v. Newsweek Digital LLC*,
2024 WL 1892563 (S.D.N.Y. Apr. 30, 2024)....21

*Parks v. Steinbrenner*,
131 A.D.2d 60 (1st Dep't 1987)....12, 16, 17

*Prince v. Intercept*,
634 F. Supp. 3d 114 (S.D.N.Y. 2022)....30

*Rapaport v. Barstool Sports Inc.*,
2024 WL 88636 (2d Cir. Jan. 9, 2024)....12

*Satanic Temple, Inc. v. Newsweek Magazine LLC*,
661 F. Supp. 3d 159 (S.D.N.Y. 2023), *aff'd*, 177 F.4th 202 (2d Cir. 2026)....29

*Silvercorp Metals Inc. v. Anthion Mgmt. LLC*,
36 Misc.3d 1231(A), (Sup. Ct. N.Y. Cnty. Aug. 12, 2012)....12, 26

*St. Amant v. Thompson*,
390 U.S. 727 (1968).....31

*Steinhilber v. Alphonse*,
68 N.Y.2d 283 (1986).....11, 16

*Stepanov v. Dow Jones & Co.*,
120 A.D.3d 28 (1st Dep't 2014).....28

*SuperCom, Ltd. v. Sabby Volatility Warrant Master Fund Ltd.*,
2022 WL 493600 (S.D.N.Y. Feb. 17, 2022).....9

*Tannerite Sports, LLC v. NBCUniversal News Grp.*,
864 F.3d 236 (2d Cir. 2017).....10, 21

*Udell v. NYP Holdings, Inc.*,
169 A.D.3d 954 (2d Dep't 2019).....22

*Valley Electronics AG v. Polis*,
2022 WL 893674 (2d Cir. Mar. 28, 2022).....15

*Wang v. Sussman*,
Nos. 25-2487-cv, 25-2503-cv.....38

*Winklevoss v. Steinberg*,
170 A.D.3d 618 (1st Dep't 2019).....31

*Yangtze River Port and Logistics Ltd. v. Hindenburg Research*,
2020 WL 905770 (Sup. Ct. N.Y. Cnty. Feb. 25, 2020).....26

**Statutes**

N.Y. Civ. Rights Law § 70-a(1)(a).....38

N.Y. Civ. Rights Law § 76-a(1)(a)(1), (2).....30

N.Y. Civ. Rights Law § 76-a(1)(d).....30

**Other Authorities**

Fed. R. Civ. P. 12(b)(6).....1, 9, 38

Fed. R. Civ. P. 12(f).....39

Scilla Alecci & ICIJ, *Chinese Authorities Exploited Interpol and Strong-Armed One of the World's Richest Men to Pursue a Target*, ICIJ (Apr. 29, 2025).....36

Defendants Shadyside Partners, LLC d/b/a Culper Research and Christian Lamarco (collectively, "**Culper**" or "**Defendants**") hereby respectfully file this memorandum of law in support of their Motion to Dismiss the Consolidated Amended Complaint (the "**Amended Complaint**" or "**AC**") filed by Plaintiffs Hao Tang ("**Tang**"), and Plaintiffs Wong Meng Ho, Hong Wai Cheng, Fortunegate Holdings Philippines Inc., and International Entertainment Corporation (collectively, "**Entity Plaintiffs**" and, with Tang, "**Plaintiffs**"), pursuant to Federal Rule of Civil Procedure 12(b)(6).

## PRELIMINARY STATEMENT

Culper Research is an activist short-seller. It conducts extensive research into publicly traded companies, and based on that research, publishes its resulting views regarding those companies in the form of research reports that are replete with citation to the sources that form the basis of its beliefs. Culper's published opinions are often critical—but that does not make them any less protected under the First Amendment. Neither does the fact that Culper is "short" the companies on which it opines. Culper's short positions, whenever they exist, are prominently disclosed in the first sentences of each report, giving readers the opportunity to evaluate the content of the report with that disclosure in mind.

On June 12, 2025, Culper published a report (the "**Report**")[1] about non-party AppLovin Corporation ("**AppLovin**"). The premise of the Report was simple: AppLovin, in conjunction with its then-attempt to acquire TikTok's ex-China business, made repeated representations that the company had ***zero*** Chinese ownership. Culper challenged those representations. Specifically, the Report disclosed that Plaintiff Hao Tang, a Chinese national, has been a large AppLovin shareholder, owning as much as 28% of the company ahead of its 2021 IPO, and at least 9.8% of

---

[1] The Report was attached as Exhibit A to the Plaintiffs' Amended Complaint. *See* ECF No. 29-1. References to the "Report" are referring to that Exhibit.

AppLovin—then worth over $11 billion—at the time of the Report. The Report also opined that AppLovin's disclosures regarding Hao Tang's continued ownership were "vague if not deliberately obfuscated" and further found that Hao Tang had—then-unbeknownst to AppLovin investors—entered into various undisclosed margin loan agreements and "share forward" transactions against his shareholdings in the company. Report at 2. None of those concerns are contested by Plaintiffs here. The Report then enumerated, based on extensively disclosed public facts, the myriad connections between Tang—his "direct and indirect" ties, *id.* at 4, through his network and affiliates—to unsavory enterprises. Culper expressed its view that these ties were especially relevant to AppLovin shareholders in light of Tang's massive stake in the company—an undisputed fact that was at odds with AppLovin's assurances of zero Chinese ownership. As a result of these disclosures, the Report concluded with the opinion that, "AppLovin's covert Chinese ownership and operations raise not only concerns for shareholders, but for national security and data security." *Id.* at 2.

This consolidated defamation action involves claims brought by several plaintiffs in connection with the Report—but tellingly not AppLovin, the target of the Report.

The Report opined that Tang's network's extensive connections to nefarious activity were problematic. Tang does not dispute his relationship to AppLovin or deny the existence of a single one of the "ties" or "connections" that Culper identified. Instead, Tang simply complains that (despite all those connections) he has not *personally* engaged in any criminal activity. But that is a strawman; the Report never accused ***Tang*** of having directly engaged in any criminal activity, but rather points out that the company he keeps is problematic. Because the Report set forth—replete with citations and hyperlinks—each of the sources on which Culper's opinions are grounded, and because Tang does not allege any of these facts are false, the conclusions constitute

pure opinion and receive full Constitutional protection. The same is true with respect to the Entity Plaintiffs' claims, all of which concern statements or graphics that are set forth alongside the facts on which they are based.

Plaintiffs' claims fail for the additional, independent reason that they fail to allege actual malice, a requirement that is purposefully difficult to meet so that speakers like Culper can participate in public discourse and opine on matters of public interest. Plaintiffs fail to allege any facts that might even give rise to a plausible inference of actual malice.

Finally, should Defendants prevail on this Motion, they are entitled to their attorneys' fees and costs pursuant to New York's anti-SLAPP statute.

For all the reasons set forth herein, the Court should dismiss Plaintiffs' Amended Complaint, with prejudice.

## FACTUAL BACKGROUND

### A. Hao Tang and the Report

Hao Tang is a prominent businessman and investor. AC, ¶ 29. He founded and established the Goldenway group of companies,[2] and his notable investments include a massive stake in non-party AppLovin—as high as 28% historically and 9.8% as of the time of the Report. *Id.* ¶ 10; Report at 2.

Defendant Shadyside Partners, LLC (d.b.a. Culper Research) is an activist short-seller. It profits by taking short positions—or betting against—those companies that it believes to be overvalued based on governance, disclosure, corporate misconduct, or other concerns. AC, ¶ 40. After extensive research, Culper publishes its opinions on such companies in reports that contain

[2] Goldenway's various subsidiaries include (i) Goldenway Precious Metals Limited (HK), (ii) Goldenway Global Investments (UK) Limited, (iii) Goldtop Success Limited (HK), and (iv) Goldenway Financial Holdings Limited (HK). Report at 14 n.26.

extensive and thorough citations to the bases on which Culper has formed its opinions. Defendant Lamarco is Culper's owner. *Id.*

On June 12, 2025,[3] Culper published the Report about AppLovin, an American company that, at the time of the Report, had been attempting to acquire TikTok's ex-China business. Report at 2. As part of that effort, AppLovin appealed to ideals of "national security" and "data security" and explicitly denied having ***any Chinese ownership*** or business operations in China. Report at 2. Culper prominently disclosed that it was short AppLovin stock because, among other reasons, it believed AppLovin had misrepresented the scope of its ties to China—including both AppLovin's undisclosed business in China, AppLovin's "obfuscated disclosures" regarding its major Chinese shareholder (Tang), and Tang's apparent undisclosed margin loan against his AppLovin shareholdings. *See id.*

The Report stated that Culper "believe[d] AppLovin has been backed since at least 2017 by Chinese national Hao Tang, who—through a web of offshore shell companies and aided by AppLovin's vague if not deliberately obfuscated disclosures—controlled up to 28% of AppLovin Class A shares ahead of the Company's 2021 IPO, and continues to control at least 9.8% of Class A shares." *Id.* Over the course of nearly 30 pages, the Report then disclosed, in great detail, facts (including hyperlinks to official reports, embedded photos, and other primary sources) that supported the Report's opinion that Tang had "numerous ties"—both direct and indirect—"to the CCP, money laundering, illegal gambling, and human trafficking operations." *Id.* On the basis of these extensive disclosed facts, the Report opined that Tang was a "bad actor," *id.* at 4, and that "AppLovin's covert Chinese ownership and operations raise not only concerns for shareholders, but for national security and data security." *Id.* at 2.

[3] Culper first published a report on AppLovin in February 2025, detailing other concerns with AppLovin that are not at issue here.

### B. Specific Statements in the Report Tang Challenges

#### *1. Ties to Money Laundering*

Tang challenges the Report's conclusion (reflected in four specific challenged statements) that Tang and his network held "numerous ties to … money laundering." AC, ¶¶ 63, 66, 69, 104. Yet as laid out in the Report—and as Tang expressly concedes—Tang and his network indeed held numerous "ties" to money laundering. *Id.* ¶ 65.

The Report's conclusion that Tang's network had connections to money laundering is supported by extensive disclosed facts and hyperlinked sources. The Report clearly disclosed Tang's apparent control of Goldenway, Inc. and the broader group of Goldenway companies, and then disclosed Goldenway's multiple connections to money laundering, including that a whistleblower was fired for reporting Goldenway to the UK's Financial Conduct Authority ("FCA") on account of money laundering concerns, and that the FCA had previously imposed restrictions on Goldenway, citing money laundering concerns. The Report then enumerates multiple additional facts which tie Tang's network to money laundering, each of which were fully disclosed and hyperlinked in the Report. *See* Report at 14-15.

Tang does not dispute any of these disclosed facts—each of which indeed "connect" Goldenway (and therefore Tang) to money laundering and form the basis of Culper's resulting views.

#### *2. The Disappearance of Fu Xiaotian and Qin Gang*

Tang also challenges the Report's opinions, following the fully disclosed facts that Tang-related entities appeared to be tied to the disappearance of Fu Xiaotian, a Chinese state media journalist, and Qin Gang, a Chinese diplomat. AC, ¶ 79; Report at 16. Indeed, the facts concerning the disappearances were grounds for the Report's conclusion–which ***"suggests"*** that Tang had connections to the CCP. *Id.* And the Report methodically detailed the facts and sources

underlying this opinion about these connections (including far more than just the disappearances of Fu and Qin).

The Report stated that "Fu Xiaotian, a Chinese state media journalist," who had reportedly fallen subject to a CCP investigation after developing a relationship with a high-level CCP official, had disappeared from public view shortly after posing in front of a Gulfstream 650 aircraft that both FAA records and aircraft purchase records (each of which were hyperlinked in the Report) revealed to be owned by Tang's Goldenway Investments Holding Limited. Report at 16 (citing and linking to various articles, as well as FAA and purchase records). Tang does not dispute the photograph of Fu standing in front of an aircraft or on records that Goldenway was identified as the aircraft's operator. *See* AC, ¶ 82.

***3. Ties to Human Trafficking***

Next, Tang challenges the Report's "belie[f] that Tang held "numerous ties to… human trafficking operations," and, in doing so, challenges four distinct statements. AC, ¶¶ 63, 66, 69, 104. As the Report made clear, this conclusion was based, among other things, on Tang's ties to JC International Finance, which was in turn connected to Huang Youlong—an individual infamous for such ties to human trafficking, namely the KK Park, a forced labor hub. *See* Report at 19-20. The Report ***also*** connected Tang to the FortuneGate casino network. Specifically, the Report connected Hao Tang to Hong Wai Cheng via multiple vectors—including his being named as Director of multiple Hao Tang-affiliated entities. As the Report disclosed, Cheng also, however, was CEO of FortuneGate Holdings Philippines ("**FHP**") while FHP's Chairman was Liduan Wang—an individual who has been repeatedly tied to Chinese espionage and human trafficking, among other such activity. *See id.* at 21-23 (citing sources). Tang does not dispute any of these connections, , nor Liduan Wang's own ties to illicit activity.

### *4. Tang and FHP's Ties to "Murder-for-Hire"*

Next, Tang and FHP challenge the Report's linking of Tang's network to "murder-for-hire" operations. *See* AC, ¶¶ 69, 98. In support of this opinion, the Report set forth (with ample support including citations, hyperlinks, and photographs) Tang's links to those involved in the kidnapping, ransom, and murder of Filipino-Chinese businessman Anson Que.. Report at 23. Tang, again, challenges none of the underlying facts. Instead, the complaint merely quibbles over Culper's use of the term "murder-for-hire" to summarize a set of events that, by Tang's own tacit admission, involved kidnapping, ransom, and murder.

### *5. Challenges to the Graphical Summary*

Finally, the Entity Plaintiffs (Ho, Cheng, FHP and IEC) challenge parts of the following summary Graphic:

**Hao Tang's Ties to CCP, Money Laundering, Human Trafficking, and Data Harvesting Operations**

So who is Hao Tang – AppLovin's longtime Chinese backer tied to Angel Pride, Midterm Success, *and* Discovery Key? **<u>In what follows, we detail – using entirely public sources – Hao Tang's numerous connections tie to Chinese espionage, propaganda, data harvesting, human trafficking, money laundering, murder-for-hire, and other such unsavory operations.</u>** The below is a visual summary of a few of our most salient views.




The Graphic, on its face, makes clear that it is a "visual summary" of the "views" expressed elsewhere in the Report. It represented the specific connections between certain entities/individuals and activities that were fully disclosed in the Report. The arrows make this clear: the entities on the fourth level down (Goldenway, Southwind, etc.) each have a vertical

arrow leading to text in a red box. Each of those entities is linked only to the text in the red box immediately below it in the same column under the vertical arrow.

The Entity Plaintiffs propose a convoluted reading of the Graphic, complaining that it somehow ***directly*** accuses Ho Wong Meng and IEC of human trafficking and Meng, Hong Wai Cheng, FHP of ties to organized crime. AC, ¶¶ 73-74. Plaintiffs make these claims while at the same time acknowledging that the Report makes no such accusations. AC, ¶ 77 (conceding their reading "contradicts" the Report).

## PROCEDURAL HISTORY

On June 10, 2026, sixteen entity plaintiffs commenced their action, asserting a single claim for libel *per se* based solely on the Graphic. Entity Compl. ¶¶ 42-53. On June 12, 2026, Tang filed a separate action asserting a single claim for defamation *per se* arising from specific statements in the Report. Tang Compl. ¶¶ 65-80. On July 2, 2026, the Court ordered the actions consolidated. ECF No. 14. Defendants filed their Motion to Dismiss Plaintiffs' Complaints on August 20, 2026. ECF No. 21-1. By Order dated August 21, 2026, the Court gave Plaintiffs the option of filing an amended complaint in response to the Motion to Dismiss or an opposition to the Motion to Dismiss. ECF No. 22. Plaintiffs chose to amend, and on September 10, 2026, some (but not all) of the original Plaintiffs filed a Consolidated Amended Complaint. ECF No. 26. That pleading was re-filed at ECF No. 29 on September 11, 2026.

## LEGAL STANDARD

To survive a motion to dismiss, a complaint must contain "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Plaintiffs must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Biro v. Conde Nast*, 807 F.3d 541, 544 (2d

Cir. 2015) (quoting *Iqbal*, 556 U.S. at 678). Plaintiff must show "more than a sheer possibility that a defendant has acted unlawfully" and may not rely on "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678. "If plaintiff has 'not nudged [her] claims across the line from conceivable to plausible, [her] complaint must be dismissed.'" *Bloom v. A360 Media LLC*, 735 F. Supp. 3d 466, 471 (S.D.N.Y. 2024) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

"[B]ecause a defamation suit may be as chilling to the exercise of First Amendment freedoms as fear of the outcome of the lawsuit itself, courts should, where possible, resolve defamation actions at the pleading stage." *Hakimi v. Guidant Global*, 2023 WL 8005321, at *7 (S.D.N.Y. Nov. 17, 2023) (cleaned up). Thus, Rule 12(b)(6) "not only protects against the costs of meritless litigation, but provides assurance to those exercising their First Amendment rights that doing so will not needlessly become prohibitively expensive." *Biro v. Conde Nast*, 963 F. Supp. 2d 255, 279 (S.D.N.Y. 2013), *aff'd*, 807 F.3d 541; 622 F. App'x 67 (2d Cir. 2015). "[C]ourts in this district have repeatedly concluded that there is 'particular value in resolving defamation claims at the pleading stage, so as not to protract litigation through discovery and trial and thereby chill the exercise of constitutionally protected freedoms.'" *SuperCom, Ltd. v. Sabby Volatility Warrant Master Fund Ltd.*, 2022 WL 493600, at *4 (S.D.N.Y. Feb. 17, 2022) (citation omitted).

## ARGUMENT

### 1. Plaintiffs Have Not Adequately Pled Defamation

To state a claim for defamation, a plaintiff must establish five elements: (1) a defamatory factual statement concerning the plaintiff; (2) publication to a third party; (3) fault; (4) falsity of the defamatory statement; and (5) special damages or per se actionability. *Henry v. Fox News Network LLC*, 629 F. Supp. 3d 136, 144 (S.D.N.Y. 2022).

The first element of a defamation claim is a defamatory statement of *fact*. *Graham v. UMG Recordings, Inc.*, 806 F. Supp. 3d 454, 467 (S.D.N.Y. 2025). "[T]he New York Constitution provides for absolute protection of opinions." *Id.* (citation omitted). Whether a statement is fact or opinion is a question of law for the Court. *Dfinity Found. v. N.Y. Times Co.*, 702 F. Supp. 3d 167, 174 (S.D.N.Y. 2023), *aff'd*, 2024 WL 3565762 (2d Cir. July 29, 2024). Therefore, it is a question "appropriately raised at the motion to dismiss stage." *Consortium for Indep. Journalism, Inc. v. United States*, 2025 WL 919504, at *16 (S.D.N.Y. Mar. 26, 2025), *appeal dismissed*, 25-1376 (2d Cir. July 21, 2025).

Moreover, a defamation plaintiff must plead falsity, which is never presumed. *Tannerite Sports, LLC v. NBCUniversal News Grp.*, 864 F.3d 236, 243-44, 247 (2d Cir. 2017). "Conclusory allegations that the statements were 'false' are insufficient to survive a motion to dismiss because a plaintiff is required 'to plead facts that, if proven, would allow a reasonable person to consider the statement false.'" *Henry*, 629 F. Supp. 3d at 146 (dismissing defamation claim for failure to plausibly allege falsity) (quoting *Tannerite*, 864 F.3d at 247); *Cortes v. Twenty-First Century Fox Am., Inc.*, 285 F. Supp. 3d 629, 642 (S.D.N.Y. 2018) (same). "[M]inor inaccuracies" do not render a statement false; even where a statement contains inaccuracies, it "do[es] not amount to falsity so long as 'the substance, the gist, the sting, of the libelous charge be justified.'" *Air Wis. Airlines Corp. v. Hoeper*, 571 U.S. 237, 247 (2014) (quoting *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 517 (1991)).

**A. The Challenged Statements Are Opinion**

The statements that Plaintiffs challenge in this case are protected opinion and not actionable. "Whether a statement constitutes a protected opinion or actionable fact depends on 'the content of the communication as a whole, its tone and apparent purpose.'" *Dfinity*, 702 F. Supp. 3d at 174. In distinguishing between fact and protected opinion for purposes of a defamation

claim, courts must consider the context of the statements. *Id.* This "context" factor includes not only "the immediate context in which the disputed words appear," but also "the larger context in which the statements were published, including the nature of the particular forum." *Brian v. Richardson*, 87 N.Y.2d 46, 51 (1995).

New York courts have long held that a statement of "pure opinion"—*i.e.*, an opinion "accompanied by a recitation of the facts upon which it is based"—cannot trigger liability. *Steinhilber v. Alphonse*, 68 N.Y.2d 283, 289 (1986); *Gross v. N.Y. Times Co.*, 82 N.Y.2d 146, 153-54 (1993) ("[A] proffered hypothesis that is offered after a full recitation of the facts on which it is based is readily understood by the audience as conjecture."). Indeed, in determining whether a statement is fact or opinion, courts "recognize and utilize the important distinction between a statement of opinion that *implies a basis in facts which are not disclosed* to the reader or listener and a statement of opinion that is *accompanied by a recitation of the facts on which it is based* or one that does not imply the existence of undisclosed underlying facts." *Consortium for Indep. Journalism*, 2025 WL 919504, at *16 (cleaned up) (emphases included). "[T]he latter is not actionable because a statement of opinion offered after a recitation of the facts on which it is based is likely to be understood by the audience as conjecture." *Id.*

In line with this precedent, courts routinely dismiss defamation claims in connection with investment analysis reports where the facts supporting the conclusions reached are fully disclosed. *See, e.g.*, *Cassava Sciences., Inc. v. Bredt*, 2024 WL 555484, at *10 (S.D.N.Y. Jan. 3, 2024) (recommending dismissal of defamation claims against short-sellers where statements were accompanied by recitation of the facts on which they were based), *report and recommendation adopted*, 2024 WL 1347362 (S.D.N.Y. Mar. 28, 2024); *Eros Int'l PLC v. Mangrove Partners*, 140 N.Y.S.3d 518, 519 (1st Dep't 2021) (short-seller's "statements were accompanied by a recitation

of facts on which they were based and therefore were nonactionable opinion"); *Silvercorp Metals Inc. v. Anthion Mgmt. LLC*, 36 Misc.3d 1231(A), at *9-11 (Sup. Ct. N.Y. Cnty. Aug. 12, 2012) (short-seller's statements were non-actionable opinion where underlying facts were disclosed with hyperlinks provided).

Indeed, even opinions that are outright "erroneous" are still constitutionally protected so long as they were "accompanied by the facts upon which they are based." *Rapaport v. Barstool Sports Inc.*, 2024 WL 88636, at *4 (2d Cir. Jan. 9, 2024); *see also* *Parks v. Steinbrenner*, 131 A.D.2d 60, 66 (1st Dep't 1987) ("That one may dispute the conclusions drawn from the specified facts is not, however, the test. So long as the opinion is accompanied by a recitation of the facts upon which it is based it is deemed a 'pure opinion' and is afforded complete immunity even though the facts do not support the opinion.").

**1. The Specific Statements Raised in the Complaints Are Not Actionable**

Analyzing the nine specific statements Plaintiffs challenge confirms that they are not actionable defamation. Every one of the challenged statements was accompanied by thorough disclosures of the facts upon which they were based—and Plaintiffs do not allege that any of these facts are false. They are pure opinion and afforded absolute constitutional protection.

- **Statements Relating to Tang's Ties to Money Laundering (Statements 1, 2, 3, and 9).**

Plaintiff Tang alleges that several statements in the Report relating to Tang's "numerous ties" to money laundering activities are defamatory. AC, ¶¶ 63, 66, 69, 104.

Tang's challenge to these statements is that they are false because he "has not participated in" or "benefited from, or had any involvement in" such conduct." *Id.* ¶ 64; *see also id.* ¶¶ 68, 71. But the Report nowhere accused Tang of personally engaging in or benefitting from money laundering. Rather, the statements concerned Tang's *connections* to individuals and entities who

*have* engaged in such activities. *See* Report at 13. The Report laid out those connections in meticulous detail.

First, the Report detailed Tang's role as founder of Goldenway, Inc., and the broader Goldenway group of companies. The Report disclosed that Tang owned 95% of Goldenway, Inc., based on the latest-available SEC filings, and as a result, opined that the filings, "suggest[ed] that he remained in control of the company." Report at 14 (citing and linking to December 2012 Form 10-K and other SEC Documents). Tang does not dispute his founding, nor his continued control of Goldenway.

The Report then disclosed Goldenway's (***not*** Tang's) multiple connections to money laundering. First, the Report recounted that an employee of Goldenway's UK arm—a "whistleblower"—accused the company (***not*** Tang) of money laundering and fraud, and claimed before a UK Employment Tribunal that he was wrongfully terminated after raising these concerns with the UK's FCA. Report at 14. The Report reiterated that it was reciting what the whistleblower "alleged" and even included a screenshot from the UK Employment Tribunal's Judgment (and a hyperlink), which detailed the substance of the whistleblower's allegations. *Id.* The Report then disclosed that the whistleblower's claims were "validat[ed]" by the UK Employment Tribunal, which ruled in the whistleblower's favor and awarded him £560,000—finding that the whistleblower was improperly fired for making the accusations. *Id.* at 14-15 (citing and linking to the judgment). Tang does not dispute the existence of this whistleblower suit, the allegations made, or the UK Employment Tribunal's ruling—indeed, his Amended Complaint removed all substantive references to Goldenway that were in the prior complaint.

The Report further disclosed that in 2017, the FCA imposed restrictions on Goldenway in connection with money laundering concerns. Report at 14 (citing and linking to FCA Notice).

Specifically, it restricted Goldenway from appointing a particular Money Laundering Reporting Officer, finding him unqualified for the position. *See* FCA Notice at ¶ 2. Tang does not mention or address—let alone dispute—these facts about Goldenway.

The Report also indicated that the whistleblower documents "alleged that Goldenway made fraudulent intercompany loans to Goldenway Japan Co (GWJ), also known as FXTF Holdings." Report at 15; *see also* UK Tribunal Judgment at ¶ 49(f). The Report further detailed—using public sources—that Goldenway Japan's "affiliate cryptocurrency trading platform, BitTrade Co., Ltd." was sold to Huobi Global; that in "[i]n April 2019, Huobi Japan was raided by Japanese authorities, citing oversight, customer protection, **and money laundering concerns**," and that Goldenway's manager Ng Yat Fan ***remained*** named on FXTF's Singapore filings. Report at 15 (citing corporate filings and embedding screenshot). Tang does not dispute any of these disclosed facts—each of which indeed "connect" Goldenway, and therefore Tang, to money laundering and form the basis of Culper's statements.

In addition to Tang's connections to Goldenway, the Report also discussed Tang's connections to Dai Yongge—another individual linked to money laundering.. *See* Report at 25. As set forth in the Report, Tang "appears as director of UK-based Renhe Goldenway Sports Management Co Limited alongside Dai Yongge." *Id.* at 25 (citing UK Government record). The Report then quoted Chinese media which reported that Yongge, among others, "had engaged in illegal fundraising and **money laundering activities**, suspected of laundering more than 100 billion yuan." *Id.* Again, Plaintiffs' Amended Complaint does not even bother to address let alone this connection, despite it forming the basis of Culper's views.

Indeed throughout the Amended Complaint, Tang ***explicitly acknowledges*** that the Report "identif[ies] . . . associations between Tang and third parties, and then identif[ies] connections

between those third parties and alleged wrongdoing." *Id.* ¶ 65; *see also id.* ¶¶ 68, 71. Tang suggests only that these links are "attenuated," *id.* ¶¶ 18-19, 21, 50, 68, "tangential," *id.* ¶ 68, "remote," *id.* ¶ 106, 113, 119, 121, or "incidental," *id.* ¶ 65—but that reasoning—flawed as it is—simply does not render any of Culper's actual statements false. Instead, because the Report laid out the facts supporting Culper's views, readers were fully capable of forming their own views as to the supposedly "tangential" and "remote" nature of every single one of Tang's numerous connections to unsavory activity laid out in the Report. That is why pure opinion—*i.e.*, opinion statements accompanied by the facts on which they are based—are subject to full Constitutional protection. *See Brian*, 87 N.Y.2d at 54-55 ("[A]lthough defendant unquestionably offered his own view that these sources were credible, he also set out the basis for that personal opinion, leaving it to the readers to evaluate it for themselves."); *Valley Electronics AG v. Polis*, 2022 WL 893674, at *2 n.3 (2d Cir. Mar. 28, 2022) ("[Defendant's] disclosure and the inclusion of hyperlinks to other sources also provide the basis for [her] personal opinion, leaving it to the readers to evaluate her claims for themselves.").

Finally, the Amended Complaint makes the outrageous suggestion that the word "network"—a noun used by Culper extensively in the report—really means *Tang himself*, such that the accusations about the network are accusations about Tang himself. AC, ¶¶ 105-06. This is simply an absurdly flawed interpretation of the word "network," and is belied by the entire substance of the Report, in which Culper detailed Tang's numerous "ties" and "connections"—*i.e.*, his network. Plaintiffs' Statement No. 9 has to be read and understood in that context. *See BYD Co. Ltd. v. VICE Media LLC*, 531 F. Supp. 3d 810, 818 (S.D.N.Y. 2021) ("[T]he Court must assess not only ... the meaning of the words as they would be commonly understood ... but also the words considered in the context of their publication.") (cleaned up).

Ultimately, whether Tang disagrees with the Report's view that Tang's connections have ties to money laundering, this view is accompanied by the disclosed facts (none of which are disputed) and is therefore classic protected opinion. *Dfinity*, 702 F. Supp. 3d at 172, 176 (where opinion was "based on [defendant's] analysis of disclosed and publicly available sources," "[i]n substance, [plaintiff] challenges the inferences drawn from the facts cited in the [defendant's] Report, rather than the facts themselves . . . Such statements routinely are held to be non-actionable opinion."); *Consortium for Indep. Journalism*, 2025 WL 919504, at *16-18; *Parks*, 131 A.D.2d at 66.

- **Statements Relating to the Disappearance of Fu Xiaotian and Qin Gang (Statement No. 5).**

Next, Plaintiffs allege that the Report's statement linking Tang's network to the disappearance of Fu Xiaotian and Qin Gang is defamatory. *See* AC, ¶¶ 79-80. Setting aside that the ultimate conclusion reached by this section of the Report was Culper's "suggestion" that "Tang retains high-level connections within the CCP," Report at 16 (which Tang does not challenge as defamatory), any challenge to the "disappearance" point is belied by the disclosed facts in the Report. Specifically, the Report laid out—based on publicly available and hyperlinked FAA and purchase records—that Goldenway owned the aircraft in front of which Fu was last photographed prior to her disappearance. *See* Report at 16. Tang does not dispute the photograph of Fu or the fact that Goldenway operated the aircraft. It is on the basis of these non-disputed facts that Culper reached its conclusion about links to Fu's disappearance, and thus is protected opinion. *See* *Steinhilber*, 68 N.Y.2d at 289.

In the face of these facts, Tang's challenge to the opinion rests on a series of *what ifs*. He alleges that the photograph "do[es] not establish that Fu boarded or traveled on the aircraft, that the aircraft was where she was last seen, or that the flight facilitated her disappearance." AC, ¶ 83.

That may be so, but that is why Culper's conclusion from these facts was its *opinion* drawn from the undisputed facts of the photograph and Goldenway's operation of the aircraft. A different reader may draw a different conclusion or no conclusion at all.

Tang also alleges that these facts do not connect ***Qin*** to the aircraft, *see id.*—but that misreads the Report's opinion, which did not rely on Qin boarding the aircraft in question. Rather, the Report only concluded that Tang was linked to CCP officials because he had a link (through Goldenway) to the disappearance of a couple who share a child. Report at 16 (citing news reports). As the Report detailed, Fu and Qin were in a relationship when the Chinese government began an investigation into Qin regarding national security concerns. *See* Report at 16 (citing several news sources). Both individuals then disappeared around the same time. *See id.* The Report provided all the disclosed facts to support its conclusion that Qin and Fu—who share a child—disappeared together. It is therefore pure opinion, and that Tang would draw a different conclusion does not render this defamatory. *Parks*, 131 A.D.2d at 66.

Again, Tang falls back on the refrain that the Report nowhere connected him, an individual, directly to the flight, to Fu, or to Qin. *See* AC, ¶ 83. But again, the Report never suggests that this was the case, nor does it ever accuse Tang of any misconduct (criminal or otherwise). Instead it fully discloses a series of links between Tang, his company Goldenway, and Goldenway's ownership of an aircraft—in front of which a missing person was reported to have last been seen. Tang's defamation claim fails in light of the undisputed disclosed facts set forth in the Report. *Dfinity*, 702 F. Supp. 3d at 176.

- **Statements Relating to Human Trafficking (Statements 1, 2, 3, 6, and 9).**

Next, Tang complains about five allegedly defamatory statements in which Culper opined that Tang had ties to individuals or entities involved in human trafficking. *See* AC, ¶¶ 63, 66, 69,

86, 104. Once again, each of Tang's ties to the individuals and/or entities engaged in such activities was fully and accurately disclosed, with accompanying links, quotations and citations. Culper's statements were pure, constitutionally-protected opinion.

First, the Report laid out the link between Tang and Huang Youlong, who had been linked to a human trafficking operation. Specifically, Goldenway Investments Holdings (China) Limited (connected to Tang), was listed as one of JC International's shareholders. *See* Report at 19 & n.38. Moreover, the Report explained that one of Tang's known associates, Lewis Ho, was a director of both JC International and Prominence Trust (a Hao Tang vehicle) at the same time that the loan to Youlong was made. *See id.* at 8. With these connections in place, the Report then explained that ***JC International*** loaned Huang Youlong money. *See id.* at 19 (citing news article). On this basis, the Report concluded that Tang, through these entities and the lending relationship, was connected to Youlong. *See id.* at 4.

The Report then detailed the grounds on which it concluded that Youlong is related to human trafficking, citing a Vietnamese news report which details that Youlong's cousin, She Ziajing, invited him to invest in KK Industrial Park. *See id.* at 19-20 (citing news article). The Report also embeds a photograph and headline (as well as a hyperlink) from a Vietnamese news source which reads: "Actress Hao Wei and her ex-husband Huang Youlong were accused of being involved in a human trafficking ring to Myanmar and Thailand." *Id.* at 20. The Report then explains that KK Industrial Park was later raided, and trafficking victims were rescued. *See id.* (citing Vietnamese news article). On the basis of these disclosed facts, the Report opined that Tang (through Goldenway's connection to JC International) had links to Youlong, and therefore to human trafficking. Again, the Report did not accuse Tang *himself* of trafficking, but rather

detailed the publicly reported links between Tang, his business entities, and criminal activity, and drew conclusions therefrom.

The Report also set forth another connection between Tang's network and human trafficking, specifically through FortuneGate. *See* Report at 21. As the Report described, "Hao Tang and his associates are also tied to FortuneGate (aka Frontier Capital Group), a Philippines casino operator tied to Chinese national Liduan Wang, who in turn has been linked to multiple Chinese espionage and human trafficking operations." *Id.* Specifically, the Report tied FortuneGate's operator, FHP, to Tang through numerous vectors: the corrected FCG statement, Tech Innovation Management, StarCap Management Inc, Ho Wong Meng, and IEC. *Id.* at 22-23. Tang does not dispute a single one of these vectors.

Then, the Report found that FHP's Chairman, Liduan Wang, "*has been repeatedly tied to Chinese espionage and POGO-enabled criminal operations.*" Report at 22. This statement was based on numerous disclosed facts, including, for example, public reporting (hyperlinked in the report), that in March 2025, Wang was connected to illegal Philippine Offshore Gaming Operators ("**POGOs**") and found during a raid of a POGO. *Id.* (citing and linking sources) and that, the next month, his pending Filipino citizenship was vetoed on the basis of such concerns. *See id.* And finally, on the basis of cited articles, the Report further revealed that Wang's granddaughter had been arrested for running her own human trafficking ring, which reportedly relied on kidnapping, illegal detention, torture and sex trafficking. *See id.* at 24 & n. 44 (citing and linking to articles). Tang does not dispute these numerous disclosed facts, nor Liduan Wang's own ties to illicit activity.

Tang again merely argues that FHP and Tang "did not participate in, finance, direct, aid, or knowingly associate . . . with espionage, money laundering, or human trafficking." AC, ¶ 97.

But, of course, the Report made no such allegations. Instead, Culper only expressed its "belie[f]," *see* Report at 4, and views that Tang held "ties" based on the connections that were thoroughly disclosed in the Report (none of which Tang disputed).

Indeed, the Report's very statements make clear that "Tang and his associates" were "tied to FortuneGate," which was "tied" to "Wang, who in turn had been linked to . . . human trafficking operations." *Id.* ¶ 93 (quoting Report at 21). Tang does not dispute these facts, the conclusions drawn from those disclosed facts are pure, protected opinion.

Against this backdrop, Plaintiffs offer a strained reading of the Report. The ninth alleged defamatory statement concerns the Report stating "Tang's network is involved" with activities including human trafficking. *Id.* ¶ 104. Plaintiffs incredulously allege that "[t]he phrase 'is involved' asserts present participation as fact" and it "does not describe a possibility, a remote association, or an allegation against an unrelated third party." *Id.* ¶ 106. But that proposed reading would flatly ignore the Report's framing—it concerned Tang's *network*, not Tang *himself*, and it suggested that the word "involved" cannot encompass degrees of participation. Plaintiffs' strained reading cannot give rise to actionable allegation of defamation. *See Dillon v. City of New York*, 261 A.D.2d 34, 38 (1st Dep't 1999) (when a statement is "not actionable," it "cannot be made so by a strained or artificial construction").

- **Statements Relating to Tang and FHP's Ties to "Murder-for-Hire" (Statements 3 and 8).**

Plaintiffs Tang and FHP also claim that statements linking Tang and FHP to operators involved in the kidnapping and killing of Filipino-Chinese businessman Anton Que are defamatory. *See* AC, ¶¶ 69, 98.

Tellingly, Plaintiffs do not dispute the underlying events: Anson Que, a Filipino-Chinese businessman, was kidnapped, held for ransom, and later found dead, with the ransom proceeds

found to have been laundered via the Nine Dynasty Casino junket. *See* Report at 23 (citing multiple news reports). Instead, Plaintiffs quibble over the Report's use of the phrase "murder-for-hire," arguing those undisputed events do not precisely fit that label. *See* AC, ¶ 72. But the Report clearly used that phrase as a shorthand characterization of the reported criminal conduct discussed in the cited sources, not as a technical or legal classification. Whether the underlying events are described (as they *were*, in full, in the body of the Report) as "kidnapping, held for ransom, and subsequent murder with the proceeds laundered through a junket" or more simply "murder-for-hire"—that does not alter their substance. *See, e.g.*, *Olivet Univ. v. Newsweek Digital LLC*, 2024 WL 1892563, at *4 (S.D.N.Y. Apr. 30, 2024) ("[T]echnical inaccuracies, especially in the inherently complicated context of criminal law, cannot be the basis of a defamation claim where the substance of the reported change would 'not have a different effect on the mind of the reader from that which the pleaded truth would have produced.'" (quoting *Tannerite*, 864 F.3d at 243)). Given these disclosed facts and connections, the Report's conclusion is pure opinion and not defamatory.

- **Statement Relating to the Report's "Central Graphic" (Statement 4).**

FHP, Ho Wong Meng, Hong Wai Cheng, and IEC challenge the Report's "Central Graphic," claiming that it purportedly accused FHP and Ho Wong Meng of human trafficking and IEC, Ho Wong Mang, and Hong Wai Cheng of ties to organized crime. AC, ¶¶ 73-74. To be clear, this challenge is simply to these Plaintiffs' placement in the Graphic, not to any actual statements made by Culper.

To that end, the Graphic simply never makes any such accusations. These Plaintiffs' entire claim is based on a hackneyed misreading of a simple Graphic. Culper made clear that the Graphic represented a "visual summary" of its "most salient views" found in the Report. In particular, the

Graphic represented, with arrows, the specific ***connections*** that were described fully in the Report. Report at 13. Thus, in interpreting the Graphic, the Report's contents must be consulted. *Golan v. Daily News, L.P.*, 77 Misc.3d 258, 271 (Sup. Ct. N.Y. Cnty. 2022) ("When looking at a headline the rule is generally that both the headline and the item to which it is attached are to be considered as one document in determining the effect of an article." (cleaned up)), *aff'd*, 214 A.D.3d 558 (1st Dep't 2023); *Udell v. NYP Holdings, Inc.*, 169 A.D.3d 954, 957 (2d Dep't 2019) ("[T]he headline of the article, *when read and evaluated in conjunction with the text it precedes*, was a fair index of the article." (emphasis added)).

Taking this into account, none of the specific challenges to the Graphic are actionable. IEC, Ho Wong Meng, and Hong Wai Cheng complain that the Graphic "connected [them] to the 14K Triad" criminal organization. AC, ¶¶ 75-76. But this reading of the Graphic is absurd. The Graphic did not connect Ho Wong Meng or Cheng to the 14K Triad. Rather, as is plainly evident, the Graphic connected Ho Wong Meng and Hong Wai Cheng to FortuneGate and to IEC. The lines in the Graphic conveyed those limited relationships, and nothing more. Plaintiffs' suggested interpretation, where every person or entity is associated with every bad act, is both a tortured interpretation of the Graphic and plainly contradicted by the full contents of the Report—none of which these Plaintiffs deny. Because Ho Wong Meng and Cheng do not dispute their connections to IEC or FortuneGate, respectively, they have not pled a claim for defamation.

As to IEC, the chain to "14K Triad" accurately summarized the contents of the Report. As described above, Culper disclosed (and Plaintiffs do not dispute) that IEC's CEO, Ho Wong Meng, was also CEO of FHP, and that FHP's Chairman Liduan Wang was tied to the Yatai Spa, which was owned by She Zhijiang—who ran *"Myanmar's infamous KK Industrial Park."* Report at 4, 19-20 (citing and linking sources). Further, the Report disclosed that Youlong appeared to have

taken money from JC International Finance (formerly Goldenway Finance), and that IEC was *also* funded in part by the Goldenway group. *Id.* at 8, 19 (citing sources). None of these facts are disputed or pled to be false. This is fatal to IEC's defamation claim.

FHP's claim with respect to alleged Defamatory Statement 4 fares no better. As to FHP, the Graphic only depicts: FortuneGate → Liduan Wang → POGO Raids → Human Trafficking. This again accurately summarized the disclosed facts in the Report. The Report provided the sources showing that FHP operated the FortuneGate casino, and FHP's Chairman was Liduan Wang. Report at 4, 21-23 (citing various sources including news articles and business records). As previously noted, the connections between Liduan Wang POGO raids/human trafficking were extensively disclosed in the Report and undisputed by Plaintiffs. *Id.* at 4, 21-24 (detailing various allegations and raids against Wang and his entities for suspected POGO operations and human trafficking).

Critically, FHP does not challenge these connections. Instead, its challenge is that it was the third parties *with whom FHP does not contest it is connected to* that engaged in the POGO/trafficking operations. *See* AC, ¶ 77. But once again, that is entirely consistent with the Graphic, which summarized the Report's description of the ***links*** between FHP and these third parties. The Report fully disclosed these connections (and provided sources) and it is up to the reader to decide whether they agree with the conclusions Culper reached as a result of those disclosed facts.

- **FHP's Connections to Espionage, Money Laundering, and Human Trafficking (Statement 7)**

FHP alleges that linking it to espionage, money laundering, and human trafficking is defamatory. The Report provided the sources showing that FHP was linked to Goldenway, whose links to various nefarious conduct is set forth above. The Amended Complaint focuses heavily on

the fact that a press release, which first linked FHP to Goldenway, later issued a correction that "identified FHP as an independent casino operator majority owned by Tech Innovation Management Limited," rather than affiliated with Goldenway. *See* AC, ¶ 94. But the Report disclosed and linked to this "correction." *See* Report at 21. Nevertheless,, the Report opined that the correction "seems to us less like a clerical error and more like an attempt to distance Goldenway from [FHP]." *Id.* Culper conjectured so based on the numerous additional links that Culper uncovered between FHP and Goldenway—all of which were fully disclosed, and none of which Plaintiffs dispute. The Report first noted that one of Frontier Capital Group's major stakeholders was StarCap Management Inc., *see id.* at 21-22, and that Ho Wong Meng—FHP's CEO—also served as a director of StarCap. *See id.* at 22 (hyperlinking source). And the Report noted that Liduan Wang served as FHP's Chairman. *Id.* The Amended Complaint expressly concedes this point. *See* AC, ¶ 94 (acknowledging "Wang's former service as FHP's chairman"). The Amended Complaint therefore fails to undermine the connection between FHP and Goldenway.

The Report also detailed FHP's connections to money laundering, human trafficking, and espionage, through Liduan Wang. First, the Report disclosed that Wang's 25-year-old granddaughter, Cassandra Li Ong, was arrested alongside Alice Guo—who, according to hyperlinked Chinese media reports, faces decades in prison for charges "related to money laundering and human trafficking." Report at 24 & n.44 (citing and linking to several media reports including Filipino news articles). Moreover, the Report linked to sources showing Li Ong's organization, Lucky South 99, was raided by law enforcement for allegedly participating in human trafficking activities, and according to news reports, evidence of such activities was found during the investigation. *See* Report at 24 (hyperlinking to news reports). On the basis of these disclosed facts and sources, the Report arrived at its conclusion that FHP, through its links to

Wang, and thus, Li Ong, had connections to human trafficking and money laundering activity. This is protected opinion.

FHP's link to Chinese espionage too is plainly laid out in the Report. As the Report detailed, and the Amended Complaint concedes, Wang owns Avia International Club, a nightclub located directly above the Yatai Spa, which has been investigated for its links to Yatai, which is run by a self-confessed Chinese spy. *See* Report at 24 (citing and linking to various news reports); AC, ¶ 95. These disclosed facts—none of which are alleged to be false—render the Report's conclusions about FHP pure opinion.

- **Statements Accusing Tang of Being a "Bad Actor" (Statement 2)**

Tang challenges Culper's "belie[f]" that Tang was "a bad actor." *See* AC ¶ 66. The Report's conclusion about Tang's character was unverifiable conjecture. Moreover, it was supported by thirty pages' worth of well-sourced facts detailing the numerous ties between Tang, his network, and various illicit conduct: human trafficking, money laundering, and a host of other misconduct and concerns the Amended Complaint does not even address or challenge. In the Report's own words, "seemingly every piece of Hao Tang's empire we peeled back revealed either CCP interests or nefarious activity." Report at 4. The Report laid out Tang and his network's ties to various illicit activities, and for Defendants to arrive at the conclusion that he is a "bad actor" based on those ties is (not only entirely reasonable) but protected opinion. *See* *Galasso v. Saltzman*, 42 A.D.3d 310, 311 (1st Dep't 2007) (allegedly defamatory statements that plaintiff was "no good" and a "criminal" "constitute[d] opinion and are not actionable as a matter of law."). It is also consistent with the Proverb "you are the company that you keep."

**2. The Context of Culper's Statements Demonstrates That They Are Protected Opinion**

Even a cursory review of the Report makes clear that Culper was offering its opinions.

First, as Culper repeatedly disclosed, the very "purpose" of its Report was to offer its inherently subjective opinion on AppLovin, particularly as it disclosed in the very first sentence that it had a bias as a *short-seller*. *See Immuno AG v. Moor-Jankowski*, 77 N.Y.2d 235, 254 (1991) (noting the communication's apparent purpose is a relevant factor in the analysis as to "whether the reasonable reader would have believed that the challenged statements were conveying facts about the libel plaintiff"). Where authors reveal that a writing has an agenda or a bias, this signals to the reader that the statements cannot be taken as fact but rather as expressions of the author's opinion. *Brian*, 87 N.Y.2d at 53 (the "immediate context in which the challenged statements were made," including author's disclosure that "he was not a disinterested observer," "supports the conclusion that the specific accusations of which plaintiff complains could not have been understood by a reasonable reader as assertions of fact that were proffered for their accuracy"); *Bellavia Blatt & Crossett, P.C. v. Kel & Partners LLC*, 151 F. Supp. 3d 287, 296 (E.D.N.Y. 2015) (same), *aff'd*, 670 F. App'x 731 (Mem) (2d Cir. 2016).

Indeed, courts routinely find that disclosure of a short position in this type of investment analysis is an indicator of opinion. *See Eros Int'l. PLC v. Mangrove Partners*, 2019 WL 1129196, at *8 n.6 (Sup. Ct. N.Y. Cnty. Mar. 8, 2019) (where short position disclosed, "[c]ourts have traditionally viewed an author's announced self-interest as evidence that the author's statements likely constitute opinions, not facts"), *aff'd*, 191 A.D.3d 465 (1st Dep't 2021); *Silvercorp Metals Inc.*, 36 Misc.3d 1231(A), at *10 (disclosure of short position in plaintiff's stock demonstrates ulterior motive "indicat[ing] to the reader that the author is expressing his opinion"); *Yangtze River Port and Logistics Ltd. v. Hindenburg Research*, 2020 WL 905770, at *8 (Sup. Ct. N.Y. Cnty. Feb. 25, 2020) (short-seller's statements were protected "pure opinion" where seller's motive was disclosed); *Nanoviricides, Inc. v. Seeking Alpha, Inc.*, 2014 WL 2930753, at *5 (Sup. Ct. N.Y.

Cnty. June 26, 2014) (finding "the alleged defamatory statements identified in the petition constitute protected opinion and are not actionable as a matter of law").

Second, Culper also made clear that it was offering its "opinions" and "belie[fs]." Report at 1-3. Culper repeatedly cautioned readers ***against*** treating its opinions as factual, insisting that its statements and opinions should not be relied on, could not be guaranteed, might "prove to be substantially inaccurate" and could "change without notice." *Id.* at 1. These clear disclaimers are textbook indicia of opinion.

Finally, the "structure and tone" of the Report, which began with an expression of opinion and included multiple indicia of opinion, hedges, qualifiers, and disclaimers throughout, further confirmed that the Reports' conclusions are Culper's opinions. The Report opened with its opinionated thesis statement, expressing what "[w]e ***believe***." Report at 2, 4. The Report then included a summary of its beliefs, which it so-titled as its "Summary of Culper Research ***Opinions***." *Id.* at 3 (emphasis modified). And in detailing those self-described "[***o***]***pinions***" (*id.*), Culper repeatedly reminded its audience that it is only offering just that—opinions. The Report included a raft of qualifiers, making clear that Culper is only recounting its "***opinions***" (*id.* at 1, 3), "***views***" (*id.* at 3, 6, 12, 29), "***suspicions***" (*id.* at 2), "***beliefs***" (*id.* at 1, 3, 4, 6, 7, 13) or what "***seems***" (*id.* at 4, 6, 21, 25, 27) or "***appears***" (*id.* at 4, 7, 12, 16, 17, 18, 19, 25, 27) to be "***plausible***" or "***suggested***" (*id.* at 3, 4, 5, 9, 10, 13, 14, 16, 28, 29) based on third-party "***allegations***" (*id.* at 2, 14, 15, 17, 19, 22, 26, 27, 28) or the "***apparent***" (*id.* at 22) public record. These qualifiers made clear that Culper was offering its opinions based on the raft of disclosed facts. *See Cassava Sciences, Inc. v. Bredt*, 2024 WL 1347362, at *1 (S.D.N.Y. Mar. 28, 2024) ("[T]his statement signals it is an opinion by using three different qualifiers: 'appears to be,' 'allegedly,' and 'appear to be.'"); *Bellavia Blatt*, 151 F. Supp. 3d at 293-94 ("[T]he use of 'appeared to be,' 'might well

be,' 'could well happen,' and 'should be' ... signal presumptions and predictions rather than facts." As defendant's statement was "full of" such "qualifiers," it "ma[d]e clear that [defendant's] statement [was] one of opinion.") (citation omitted)..

All of this context made clear to readers that Culper was providing opinions based on disclosed facts, and the Report therefore is absolutely protected under both the New York Constitution and the First Amendment.

### B. Plaintiffs Have Not Pled a Claim for Defamation by Implication

Plaintiffs refer throughout their Amended Complaint to the Report's alleged defamatory "implications" that Tang and the other Plaintiffs ***themselves*** were involved in the illicit activities detailed in the Report. *See* AC, ¶¶ 11, 50, 62, 84-85, 97, 103. As an initial matter, this amounts to a concession by Plaintiffs that the Report made no such accusation outright.

While Plaintiffs chose not to plead a separate count for defamation by implication, even had they done so, the claim would fail. Defamation by implication is a "legally distinct cause[] of action" that is "analyzed under [a] different standard[]" than a claim for defamation. *Henry*, 629 F. Supp. 3d at 150 n.6. And it is a tough claim to plead. "To survive a motion to dismiss a claim for defamation by implication under New York law … the plaintiff must make a rigorous showing that the language of the communication as a whole can be reasonably read both to impart a defamatory inference and to affirmatively suggest that the author intended or endorsed that inference." *Kavanagh v. Zwilling*, 578 F. App'x 24, 24-25 (2d Cir. 2014) (quoting *Stepanov v. Dow Jones & Co.*, 120 A.D.3d 28 (1st Dep't 2014)) (cleaned up); *see also* Biro, 883 F. Supp. 2d at 466 (requiring an "especially rigorous showing" to sustain a claim for defamation by implication). Courts have found that this standard is "objective." *Henry*, 629 F. Supp. 3d at 150. Further, "the Constitution protects an author's right to draw an explicit conclusion from fully disclosed facts, then an unstated inference that may arise in a reader's mind after reading such facts

is also protected as an implicit expression of the author's opinion." *Cassava Sciences*, 2024 WL 1347362, at *19 (quoting *Biro*, 883 F. Supp. 2d at 468).

Plaintiffs cannot meet this rigorous pleading burden as to both elements of a defamation by implication claim. Indeed, the purported defamatory "implication" Plaintiffs suggest is directly at odds with the plain language of the Report, which made clear that it was disclosing the Plaintiffs' *ties* and *connections* to those who have engaged in such activities. *See* Report at 2 ("Tang's numerous ***ties*** . . ."); 4 ("Tang Holds Numerous ***Ties*** . . ."); 4 ("Hao Tang is a bad actor with extensive ***direct and indirect ties*** . . .); 13 ("Hao Tang's ***Ties*** to . . ."); 13 ("Tang's numerous connections . . ."); 21 ("Hao Tang's ***Ties*** to . . .") (emphases added). The Report methodically detailed these connections, and drew conjecture based on these disclosed facts. The Report *never* purported to represent or even implicate Tang himself in such activities. Plaintiffs cannot suggest a defamatory "implication" that is belied by the Report itself. *See* *Cassava Sciences*, 2024 WL 1347362, at *19 ("The alleged innuendo may not enlarge upon the meaning of the words so as to convey a meaning that is not expressed.") (citation omitted).

Moreover, Defendants are constitutionally entitled to opine on Plaintiffs' connections to unsavory activities, even when there is no allegation that Plaintiffs engaged in such activities themselves. "[W]here the implication is simply reflective of the author's opinion based on the facts set forth a plaintiff cannot state a claim for defamation by implication." *Id.* Defendants may report on Plaintiffs' links to misconduct, even if Plaintiffs, themselves, have not engaged in the misconduct. In other words, "[t]here is nothing defamatory about accurately reporting signs of smoke even if there is no proof of fire." *Satanic Temple, Inc. v. Newsweek Magazine LLC*, 661 F. Supp. 3d 159, 171 (S.D.N.Y. 2023), *aff'd*, 177 F.4th 202 (2d Cir. 2026).

Plaintiffs also fail to plead that Defendants endorsed or intended any alleged defamatory implication. For example, Plaintiffs allege that Defendants made editorial choices to "direct[] readers to [] false conclusions" including allegations that Defendants' formatting of the Report's graphic so to "position[] red crime labels beneath Plaintiffs," "removed qualifiers at the point of accusation, placed unrelated people and entities within a single supposed network, and omitted intermediate links and contrary facts." AC, ¶ 112. This allegation is belied by the Report, which made clear repeatedly that it was not accusing Tang himself of any wrongdoing. All of the intermediary links between Tang and the wrongdoers are disclosed—and Tang does not allege that any of these links are false. Plaintiffs have therefore not alleged facts sufficient to show that Defendants affirmatively intended that implication.

### C. Plaintiffs Have Not Plausibly Alleged that Culper Published the Statements with Actual Malice

Plaintiffs' claims also fail for another, independent reason: they have not plausibly alleged actual malice. Under New York law, a plaintiff alleging defamation in connection with statements made "in a place open to the public or a public forum in connection with an issue of public interest" is subject to an additional requirement that the statement was made with actual malice. N.Y. Civ. Rights Law § 76-a(1)(a)(1), (2). This requirement applies at the pleading stage. *See 1st Amendment Praetorian v. N.Y. Times Co.*, 2025 WL 949575, at *8 (S.D.N.Y. Mar. 28, 2025) (dismissing complaint for failure to plead actual malice as required by Section 76-a); *Bobulinksi v. Tarlov*, 758 F. Supp. 3d 166, 179-80 (S.D.N.Y. 2024) (same); *Prince v. Intercept*, 634 F. Supp. 3d 114, 139 (S.D.N.Y. 2022) (same). "Public interest" is "construed broadly, and shall mean any subject other than a purely private matter." *Id.* § 76-a(1)(d). The Report—which implicated matters of

international relations, national security, and shareholders concerns for a high-profile publicly traded company—clearly concerns matters of "public interest."[4]

The actual malice standard imposes a steep pleading hurdle that Plaintiffs cannot clear. Plaintiffs needed to allege (plausibly) that Culper published each allegedly defamatory statement "with knowledge of its falsity or with reckless disregard of whether it was false." N.Y. Civ. Rights Law § 76-a(2). This is a subjective standard—it requires Plaintiffs to plead that Culper "actually entertained serious doubts about the veracity" of its statements. *Dfinity*, 702 F. Supp. 3d at 176. It is also a "difficult standard to meet, and quite purposefully so" as "neither the defense of truth nor the standard of ordinary care" adequately "protect[s] against self-censorship and thus adequately implement First Amendment policies." *Biro*, 963 F. Supp. 2d at 277 (citing *St. Amant v. Thompson*, 390 U.S. 727, 731-32 (1968)); *see also Dfinity*, 2024 WL 3565762, at *1 ("The hurdles to plausibly pleading actual malice . . . are significant given the First Amendment interests at stake in defamation cases." (cleaned up)).

Moreover, Plaintiffs must plead actual malice for ***each*** allegedly defamatory statement. *Baiul v. Disson*, 607 F. App'x 18, 20-21 (2d Cir. 2015) (plaintiff "must provide evidence sufficient to permit . . . that [defendant] made *each* of the challenged statements with actual malice." (emphasis added)); *Cassava Sciences*, 2024 WL 1347362, at *23 ("[Plaintiff] must plead that *each* allegedly defamatory statement was made with actual malice." (emphasis added).

None of Plaintiffs' allegations come nowhere close to meeting this demanding standard.

First, Plaintiffs allege that Defendants have "fabricated an accusation" in the Report connecting Tang to "murder-for-hire," *see* AC, at ¶ 114. But that is the same as arguing that the

[4] Tang's claims are also subject to an actual malice standard because he is a limited purpose public figure, as the founder of the Goldenway Group, founder and director of Tier One Investment Management, and a significant investor in numerous companies, including AppLovin. *See* AC, ¶ 29. *See also Winklevoss v. Steinberg*, 170 A.D.3d 618, 618 (1st Dep't 2019).

statement is false—it speaks only to the falsity element of a defamation claim, but it does not demonstrate that the statement was made with *knowledge* of the purported falsity. These are two different elements. *See Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 511 (1984) ("[T]here is a significant difference between proof of actual malice and mere proof of falsity."); *BYD Co.*, 531 F. Supp. 3d 810, 826-27 (S.D.N.Y. 2021) (rejecting argument that "appears to conflate the falsity element of a defamation claim with the actual malice requirement" given that "inaccuracy itself will not demonstrate actual malice in a libel case."). But in any event, this is irrelevant because the allegation supports neither falsity nor actual malice. As noted above, the Report discussed the case of Anson Que who was kidnapped, held for ransom, and subsequently found dead—and the Report cited several news articles detailing this crime—all of which support the Report's conclusions. *See* Report at 23. Further, one need not look beyond the face of the Report to find Plaintiffs' allegation that "[t]he cited reporting did not . . . connect the junket to Que's death at all" to be incredulous. *See* AC, ¶ 114. A screenshot of reporting appears in the Report that clearly stated that the ransom payment paid by Que's family "passed through junket operators 9Dynasty Group." Report at 23. Given these disclosed facts, there is no plausible allegation that the statements were made with actual malice.

Second, Plaintiffs attempt to plead actual malice on the basis that "Defendants misrepresented sources they possessed and claimed to have reviewed." AC, ¶ 115. This allegation, too, is circular. As discussed, Culper cited all the sources supporting its conclusions and opinions in the Report. And neither of the two examples Plaintiffs offer here support a finding of actual malice—they simply try to twist the language of the Report beyond recognition. For example, Plaintiffs suggest that the "aircraft records cited in the Report as evidence for the 'disappearances' claim showed, at most, that a Goldenway entity operated the aircraft pictured in Fu's photographs."

*Id*. But the Report nowhere claimed the aircraft records are "evidence for the disappearances." Rather, the Report set forth the aircraft records, photograph of Fu, and facts surrounding Fu's relationship with Qu—none of which Plaintiff disputes—and concluded that Tang has a link to these incidents. That does not demonstrate actual malice. The same is true for the Report's conclusions about IEC's relationship to the 14K triad, *see id.* at ¶ 118, and Ho and Cheng's relationships to IEC, *id.*, which are supported by disclosed facts as set forth herein.

Plaintiff's argument as to the loan records between JC International Finance and Huan Youlong are similarly insufficient to establish actual malice. *See id.* at ¶ 116. First, the Report never claimed that Tang personally served as Youlong's lender, *cf. id.*—looking at the substance of the Report directly below the headline, it clearly states that this loan was facilitated "via JC International Finance" "previously known as Goldenway Finance Limited." Report at 19. Plaintiffs also argue that the loan records do not mention "KK Park, human trafficking, Huang's cousin, or any triad." The core of Plaintiffs' argument on this point is that "Defendants constructed the later links from separate sources concerning different people and events." AC, ¶ 116. But far from establishing actual malice, this is a concession by Plaintiffs that the Report relies on various sources to make the connections between the parties identified and the misconduct—this undermines any suggestion of actual malice.

Plaintiffs try the same distortion in suggesting that the Report "conflated FHP with separate casino brands, shareholders, former officers, relatives, and POGO operators." AC, ¶ 117. The Report did no such thing—it described the links between Tang and each of these entities and individuals, set forth which of the entities and individuals had engaged in misconduct, and supported each of these with public sources and hyperlinks. *See* Report at 22-24. Plaintiffs then harp on the fact that there was a public correction stating that FHP was not a part of Goldenway

but rather an independent contractor, *see* AC, ¶ 117—but the Report *disclosed this*, and opined that this "correction" was pretextual, an opinion accompanied by multiple additional connections between FHP and Goldenway supporting this view. *See* Report at 21-22. Plaintiffs' argument as to the inadequacy of FHP's ties to espionage is similarly insufficient. *See* AC, ¶ 117 Plaintiffs do not dispute the underlying facts—that Liduan Wang owns a nightclub that is located above a spa that is monitored for espionage activity, *see id.* at ¶¶ 95, 117; that the Report relied on these undisputed, disclosed facts to form a conclusion does not satisfy actual malice, even if Plaintiffs disagree with that conclusion.

Plaintiffs similarly argue that the Report "identifies no direct evidence that any Plaintiff committed, knew of, aided, or benefited from the criminal and other misconduct [Defendants] described." AC, ¶ 148. But as discussed at length, the Report never claimed that Tang engaged in such misconduct *himself*, but rather exhaustively detailed the links between Tang and those that did engage in such misconduct. Plaintiffs cannot plead actual malice on a fabrication of the Report's conclusions.

Ultimately, Plaintiffs suggest that Culper somehow subjectively knew of the alleged falsity of the challenged statements because "none [of the cited sources] supports the defamatory conclusions Defendants drew about Plaintiffs." AC, ¶ 119. This accusation is completely belied by the extensive disclosed support for all of the conclusions in the Report, as discussed at length herein—and therefore has no bearing on actual malice. *See Dfinity*, 702 F. Supp. 3d at 176 (finding no allegation of actual malice where defendants "named their publicly available sources and included links to those sources throughout the Report" and there were no allegations that defendants "had reason to doubt the accuracy of those public sources"); *BYD Co.*, 531 F. Supp. 3d at 826-27 (finding no actual malice where complaint failed to allege that defendant "had 'obvious

reasons' to doubt the veracity of [its source] prior to publishing or that it possessed information that should have put it on notice as to the veracity of the report.").

Third, Plaintiffs attempt to weaponize the Report's pervasive indicia of opinion, such as its use of the terms "appears," "reportedly," "linked," and "associated," arguing that because these qualifiers do not appear in the Report's "headings, graphic, and summary," the more definitive statements were made with knowledge of falsity. AC, ¶ 120. This entirely misconstrues the law. The Report must be read as a whole, as context is necessary to determine whether a statement is defamatory. *See BYD Co.*, 531 F. Supp. 3d at 818 (statements are to be considered "in the context of their publication) (citing cases). Plaintiffs may not cherry-pick these headings, while ignoring the context of the Report as a whole, which elaborates on the headings and summaries and offers its conjecture upon citing publicly disclosed sources. Reading the headings in a vacuum does not support actual malice; but in any event, the headings are not alleged to be false.

Fourth, Plaintiffs allege that some information was not included in the Report—*i.e.*, foreign media reports that, according to Plaintiffs, distance Tang from the CCP. *See* AC, ¶ 59, 122. As an initial matter, the Report did not ignore an article Plaintiffs cite from the International Consortium of Investigative Journalists ("ICIJ")—the Report ***cites to (and hyperlinks) the article***. *See* Report at 19 n.37. Plaintiffs' allegation that Defendants ignored this information to bolster their "predetermined, defamatory narrative," *see* AC, ¶¶ 122, 147, is plainly inaccurate. In any event, the ICIJ article does not contradict Culper's conclusion regarding Tang's ties to the CCP, as Plaintiffs suggest.[5] Rather, it only reported that a French Court found the authenticity of an

[5] Plaintiffs make a throwaway comment that an article from Le Monde purportedly "disprove[s] Lamarco's wholly fictitious, factually unsupported claim that Tang is a CCP instrument or operative." AC, ¶ 59. But none of the nine challenged statements address this point, allege its falsity, or satisfy the other elements of defamation.

arrest warrant for Tang to be "questionable."[6] Culper disclosed this view, as well as the facts supporting its own different view, allowing the reader to draw its own conclusions. That is the essence of pure opinion statements.

In any event, conclusory allegations that a defendant has a "predetermined narrative" do not give rise to a well-pled allegation of actual malice. *See McDougal v. Fox News Network, LLC*, 489 F. Supp. 3d 174, 186 (S.D.N.Y. 2020) (plaintiff's allegations regarding defendant's "pre-determined narrative" was "largely [] conclusory or speculative" and did not "plausibl[y]" give rise to an "inference of actual malice").

Fifth, Plaintiffs make conclusory allegations that Defendants failed to conduct a proper investigation, but that does not give rise to a plausible inference of actual malice. *See BYD Co.*, 531 F. Supp. 3d at 826-27 (finding actual malice was not adequately pled where no showing that "defendant failed to investigate in the face of actual, subjective doubts as to the accuracy of the story." (citation omitted)); *see also Bloom*, 735 F. Supp. 3d at 474 (finding that "allegations [that] plausibly suggest [] a negligent failure to uncover the truth" "is insufficient to raise an inference of actual malice" as there is no indication of "a subjective awareness of falsity.").

Sixth, Plaintiffs attempt to plead actual malice by suggesting that Culper had a profit motive to defame them. *See* AC, ¶ 123. But courts routinely reject purported profit motives as substitutes for actual malice pleading. Indeed, the Supreme Court has made clear that a profit motive does not establish actual malice. *Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 667 (1989) ("[T]he fact that the defendant published the defamatory material in order to increase its profits" cannot "prove actual malice."). This has been routinely reaffirmed in this very

[6] The ICIJ article is cited in the Amended Complaint. *See* AC, ¶ 59 n.32 (citing Scilla Alecci & ICIJ, *Chinese Authorities Exploited Interpol and Strong-Armed One of the World's Richest Men to Pursue a Target*, ICIJ (Apr. 29, 2025).

District in the short-seller context. *Cassava*, 2024 WL 1347362, at *25 (short-seller's supposed "profit motive" "does not lead the Court to infer that they did not subjectively believe those critiques"); *MiMedx Grp., Inc. v. Sparrow Fund Mgmt. LP*, 2018 WL 4735717, at *12 (S.D.N.Y. Sept. 29, 2018) (short-seller's "purported financial motive" "does not support a finding of actual malice").

Seventh, Tang attempts to plead actual malice by pointing to Culper's purported refusal to retract its Report. AC, ¶¶ 126-30. But these self-serving allegations fail to qualify as well-pled actual malice allegations. Culper's alleged refusal to issue a retraction occurred *after* the statements in the Report were made—thus, it says nothing as to Culper's state of mind *at the time of publication*; it therefore has no bearing on the question of actual malice. *Biro*, 963 F. Supp. 2d at 281 (because "a failure to retract occurs, by definition, *after* publication, meaning that its probative value as to a defendant's state of mind at the time of publication is dubious at best," a "defendant's decision not to retract" does not necessarily establish actual malice). Plaintiffs' attempt to rely on the allegation that *another* outlet chose to retract its statements about Tang. *See* AC, at ¶¶ 25, 129. But, by Plaintiffs' own account, the other outlet's statements were not the same as those in the Report, *id.* at ¶ 25, and, in any event, this says nothing about Culper's subjective state of mind when it published its Report.

Finally, Plaintiffs grasp at the fact that Defendants have been parties to other lawsuits alleging defamation arising from their role as activist short-sellers. *See* AC, ¶ 124. These cases concern completely different research reports containing completely different sets of facts and cannot support an inference that Culper published *this* Report with actual knowledge of its alleged falsity or in reckless disregard of its truth. As other courts in this Circuit have held, "defamation

lawsuits are so commonplace that in themselves, they hardly alert the conscientious reporter to the likelihood of error." *Biro*, 963 F. Supp. 2d at 283 (cleaned up)).

In conclusion, Plaintiffs' attempts to plead actual malice are glaringly deficient, and this is a separate, independent ground requiring dismissal of this action.

**D. Defendants Are Entitled to Attorney's Fees and Costs**

If Defendants prevail on their motion to dismiss for any of the reasons set forth above, Defendants should be awarded attorney's fees and costs pursuant to New York's anti-SLAPP statute, which awards fees and costs where "the action involving public petition and participation was commenced or continued without a substantial basis in fact and law." N.Y. Civ. Rights Law § 70-a(1)(a). This action clearly qualifies. In particular, the anti-SLAPP statute's fee-shifting provision is applicable in federal court because "[e]ntitlement to attorney's fees is a substantive right" and does not conflict with any federal procedural rules. *See Bobulinski*, 758 F. Supp. 3d at 186 (citing *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 (1938)), *appeal withdrawn*, 2025 WL 1009663 (2d Cir. Mar. 31, 2025). In *Bobulinski*, Judge Oetken applied fee-shifting where defendants prevailed on their motion to dismiss. *See id.* at 189.

Defendants acknowledge that the question of whether fees pursuant to the anti-SLAPP statute must be sought through a claim, crossclaim, or counterclaim, or whether they can be sought in connection with a Rule 12(b)(6) motion, is in flux, and the question is currently before the Second Circuit. *Wang v. Sussman*, Nos. 25-2487-cv, 25-2503-cv. Defendants therefore reserve all rights and respectfully request that this request for fees pursuant to the anti-SLAPP statute be, at minimum, held in abeyance pending the determination of the *Wang* appeal by the Second Circuit.

### E. Paragraph 12 of Plaintiffs' Amended Complaint Should Be Stricken as Scandalous Pursuant to Fed. R. Civ. P. 12(f).

Finally, pursuant to Fed. R. Civ. P. 12(f), Defendants move to strike paragraph 12 of Plaintiffs' Amended Complaint, which accuses Defendants of relying on "derogatory" and "racially coded" stereotypes, and baselessly alleges that the Report relies on "Tang's ethnicity" in drawing its conclusions. AC, ¶ 12.

Fed. R. Civ. P. 12(f) provides: "The court may strike from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter." Generally, courts have defined "scandalous allegations" as "those which 'impugn the character' of the movant." *Bartlett v. Societe Generale De Banque Au Liban SAL*, 2021 WL 8155950, at *1 (E.D.N.Y. Aug. 5, 2021) (cleaned up). "The striking of impertinent material and scandalous allegations is applicable when the allegation is not responsive to an argument but, rather, constitutes an inappropriate attempt to abuse the Court's process to attach an individual personally." *EEOC v. Green Lantern Inn, Inc.*, 2021 WL 4086148, at *4 (W.D.N.Y. Aug. 21, 2021) (striking allegations as scandalous).

Plaintiffs' accusations of racism against Defendants are unfounded and serve only to impugn Defendants' character. These allegations are inflammatory and have "no bearing on the issues in this case," which concern only whether select statements in the Report are defamatory. *See Bartlett*, 2021 WL 8155950, at *2. Furthermore, none of the elements of Plaintiffs' defamation claims relate in any way to the types of racist allegations they baselessly aim at Defendants. Tellingly, Plaintiffs have never raised any race-based challenges to the Report—either in the three pre-litigation letters they sent, *see* AC, ¶¶ 126-28, or the prior two Complaints, undermining any suggestion that it is part of Plaintiffs' good faith belief about the alleged defamatory statements. Permitting the baseless accusation to stand would prejudice Defendants. *See Knatt v. Hosp. Serv. Dist. No. 1 of E. Baton Rouge Parish*, 2003 WL 27384302, at *2 (M.D. La. June 30, 2003) (striking

allegations of racism that "add nothing to the allegations . . . and have no possible bearing on the subject matter of the litigation."). Plaintiffs' accusation of racism serves no purpose other than to impugn Defendants' character, without any basis whatsoever. Defendants asked Plaintiffs' counsel to strike these allegations, but Plaintiffs' counsel refused. The allegations should be stricken as immaterial and scandalous.

## CONCLUSION

For the foregoing reasons, this Court should dismiss Plaintiffs' Amended Complaint in its entirety, with prejudice.

Respectfully submitted,

**COZEN O'CONNOR**

By: */s/ Michael B. de Leeuw*
Michael B. de Leeuw
Tamar S. Wise
mdeleeuw@cozen.com
twise@cozen.com
3 WTC, 175 Greenwich Street, 55th Floor
New York, New York 10007
Telephone: (212) 908-1331
Fax: (646) 461-2090

*Attorney for Defendants*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that, on October 1, 2026, I caused the foregoing document to be electronically filed with the Clerk of Court using the CM/ECF system which will send notification of such filing to all parties of record.

Dated: October 1, 2026 /s/ *Michael B. de Leeuw*

Michael B. de Leeuw

## CERTIFICATION REGARDING WORD COUNT

I, Michael B. de Leeuw, an attorney at the law firm Cozen O'Connor, counsel for Defendants Shadyside Partners, LLC and Christian Lamarco in the above-captioned consolidated action, certify pursuant to Local Rule 7.1(c) that the Memorandum of Law submitted in support of Defendants' Memorandum of Law in Support of Their Motion to Dismiss Plaintiffs' Consolidated Amended Complaint and Motion to Strike Portion of Plaintiffs' Amended Complaint, not including the case caption, cover page, table of contents, table of authorities, signature block, or certifications, contains 12,450 words, and thus complies with the word count set forth in the Court's Order at ECF No. 33.

Dated: October 1, 2026

*<u>/s/ Michael B. de Leeuw</u>*
Michael B. de Leeuw