**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

WONG MENG HO, HONG WAI CHENG, FORTUNEGATE HOLDINGS PHILIPPINES INC., and INTERNATIONAL ENTERTAINMENT CORPORATION,

*Plaintiffs,*

*v.*

CHRISTIAN LAMARCO and SHADYSIDE PARTNERS, LLC d/b/a CULPER RESEARCH,

*Defendants.*

HAO TANG,

*Plaintiff,*

*v.*

SHADYSIDE PARTNERS, LLC (d/b/a CULPER RESEARCH) and CHRISTIAN LAMARCO,

*Defendants.*

**ORAL ARGUMENT REQUESTED**

Case No. 26 Civ. 4930 (JMF)

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS, TO STRIKE, AND FOR ATTORNEYS' FEES**

## TABLE OF CONTENTS


Page

PRELIMINARY STATEMENT ............................................................................................ 1

RELEVANT BACKGROUND ............................................................................................ 6

A. Lamarco Issues an "Investment Report" Targeting a Passive Minority AppLovin Shareholder and Four Others with No Role in the Company .................. 6

B. The Report Presents False Accusations of Serious Crimes as Research Findings ... 7

C. Lamarco Refuses to Correct His Accusations ......................................................... 8

LEGAL STANDARD ......................................................................................................... 9

I. THE REPORT'S ACCUSATIONS ARE FALSE STATEMENTS OF FACT, NOT PROTECTED OPINION ..................................................................... 11

A. Lamarco Cannot Shield His False Accusations as Opinions by Citing Sources He Misrepresents and Distorts ..................................................................... 11

1. The Report Falsely Accuses Tang of Involvement in Money Laundering (Statements 1, 2, 3, and 9) ........................................................................ 14

2. The Report Invented a "Last Seen" Sighting That Its Sources Do Not Establish (Statement 5) ............................................................................. 16

3. The Report Makes False Human-Trafficking Accusations (Statements 1, 2, 3, 6, and 9) ................................................................... 17

4. Lamarco Invented a "Paid Murder" That His Sources Never Reported (Statements 3 and 8) ............................................................................... 19

5. The "Summary" Chart Makes Criminal Accusations that the Report's Text Cannot Support (Statement 4) ............................................................ 20

6. The Accusations Against FHP Rest on Multiple Degrees of Association (Statement 7) ................................................................................................ 21

7. Calling Tang a "Bad Actor" Does Not Immunize the False Criminal Accusations That Follow (Statement 2) ................................................... 23

B. Lamarco's Cases Do Not Create a Special Rule for Short Sellers ...................... 24

II. PLAINTIFFS PLEAD DEFAMATION BY IMPLICATION .................................... 26

A. The Report's Words, Structure, and Graphics Convey Defamatory Accusations ........ 27

B. The Report Affirmatively Endorses the Defamatory Inferences It Conveys ........ 29

III. PLAINTIFFS PLEAD ACTUAL MALICE ........ 30

A. The Amended Complaint Pleads Actual Malice for Every Statement ........ 30

B. Fabrication Is Evidence of Knowledge, Not Merely Falsity, and Provides a Basis to Plead Actual Malice ........ 31

C. Lamarco Stripped Qualifiers ........ 33

D. Lamarco Omitted Reporting That Contradicted His Narrative ........ 34

E. Lamarco's Remaining Arguments Mischaracterize the Amended Complaint ........ 35

IV. LAMARCO IS NOT ENTITLED TO FEES ........ 36

V. PARAGRAPH 12 OF THE AMENDED COMPLAINT SHOULD NOT BE STRICKEN ........ 38

CONCLUSION ........ 40

## TABLE OF AUTHORITIES

**CASES** *Page(s)*

*16161782 Canada Inc. v. Mogyl'nyy*,
2026 WL 2906125 (S.D.N.Y. Sept. 28, 2026) .... 39

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .... 9

*Baiul v. Disson*,
607 F. App'x 18 (2d Cir. 2015) .... 30

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .... 9

*Biro v. Condé Nast*,
883 F. Supp. 2d 441 (S.D.N.Y. 2012) .... 27

*Biro v. Condé Nast*,
963 F. Supp. 2d 255 (S.D.N.Y. 2013) .... 36

*Biro v. Condé Nast*,
807 F.3d 541 (2d Cir. 2015) .... 30

*Bobulinski v. Tarlov*,
758 F. Supp. 3d 166 (S.D.N.Y. 2024) .... 33

*Brian v. Richardson*,
87 N.Y.2d 46 (1995) .... 29

*BYD Co. Ltd. v. VICE Media LLC*,
531 F. Supp. 3d 810 (S.D.N.Y. 2021) .... 33

*Carroll v. Trump*,
590 F. Supp. 3d 575 (S.D.N.Y. 2022) .... 37

*Cassava Scis., Inc. v. Bredt*,
2024 WL 1347362 (S.D.N.Y. Mar. 28, 2024) .... *passim*

*Celle v. Filipino Reporter Enters. Inc.*,
209 F.3d 163 (2d Cir. 2000) .... 10

*Chalpin v. Amordian Press*,
128 A.D.2d 81 (1st Dep't 1987) .... 11

*Collins v. Pearson Educ., Inc.*,
721 F. Supp. 3d 274 (S.D.N.Y. 2024)........................................................................ 38

*Davis v. Boeheim*,
24 N.Y.3d 262 (2014) ............................................................................................*passim*

*Dfinity Foundation v. New York Times Co.*,
702 F. Supp. 3d 167 (S.D.N.Y. 2023)................................................................... 17, 33

*Eros Int'l PLC v. Mangrove Partners*,
2019 WL 1129196 (Sup. Ct. N.Y. Cnty. Mar. 8, 2019) ............................................. 24, 25, 26

*Galasso v. Saltzman*,
42 A.D.3d 310 (1st Dep't 2007) ............................................................................. 23, 24

*Germain v. M & T Bank Corp.*,
111 F. Supp. 3d 506 (S.D.N.Y. 2015)........................................................................ 24

*Gertz v. Robert Welch, Inc.*,
418 U.S. 323 (1974)................................................................................................... 30

*Giuffre v. Maxwell*,
165 F. Supp.3d 147 (S.D.N.Y. 2016)......................................................................... 14

*Golan v. Daily News, L.P.*,
77 Misc. 3d 258 (Sup. Ct. N.Y. Cnty. 2022) ............................................................. 20

*Goldfarb v. Channel One Russia*,
663 F. Supp. 3d 280 (S.D.N.Y. 2023).................................................................. 16, 21

*Grifols, S.A. v. Yu*,
2025 WL 1826611 (S.D.N.Y. July 2, 2025) ..........................................................*passim*

*Grifols, S.A. v. Yu*,
2026 WL 836657 (S.D.N.Y. Mar. 26, 2026) ................................................................. 37

*Gross v. N.Y. Times Co.*,
82 N.Y.2d 146 (1993) ............................................................................................*passim*

*Harte-Hanks Commc'ns, Inc. v. Connaughton*,
491 U.S. 657 (1989).............................................................................................. 31, 35

*Herbert v. Lando*,
781 F.2d 298 (2d Cir. 1986)....................................................................................... 26

*John's 53-26, Inc. v. Chilton Co.*,
83 A.D.2d 830 (2d Dep't 1981) ........ 10

*Kelly v. Schmidberger*,
806 F.2d 44 (2d Cir. 1986) ........ 10

*Knatt v. Hosp. Serv. Dist.*,
2003 WL 27384302 (M.D. La. June 30, 2003) ........ 39

*LifeMD, Inc. v. Lamarco*,
607 F. Supp. 3d 576 (W.D. Pa. 2022) ........ 3, 35, 36

*Martin v. Hearst Corp.*,
777 F.3d 546 (2d Cir. 2015) ........ 28

*McDougal v. Fox News Network, LLC*,
489 F. Supp. 3d 174 (S.D.N.Y. 2020) ........ 34, 35

*Milkovich v. Lorain J. Co.*,
497 U.S. 1 (1990) ........ 1, 12

*MiMedx Grp., Inc. v. Sparrow Fund Mgmt.*,
2018 WL 4735717 (S.D.N.Y. Sept. 29, 2018) ........ 35

*Nanoviricides, Inc. v. Seeking Alpha, Inc.*,
2014 WL 2930753 (Sup. Ct. N.Y. Cnty. June 26, 2014) ........ 25, 26

*NOVAGOLD Res. Inc. v. J Cap. Rsch. USA LLC*,
2022 WL 900604 (E.D.N.Y. Mar. 28, 2022) ........ 21, 25

*Olivet Univ. v. Newsweek Digital LLC*,
2024 WL 1892563 (S.D.N.Y. Apr. 30, 2024) ........ 19

*Palin v. N.Y. Times Co.*,
940 F.3d 804 (2d Cir. 2019) ........ 10, 36

*Parks v. Steinbrenner*,
131 A.D.2d 60 (1st Dep't 1987) ........ 11

*Partridge v. State*,
173 A.D.3d 86 (3d Dep't 2019) ........ 4, 27, 28, 30

*Prince v. Intercept*,
634 F. Supp. 3d 114 (S.D.N.Y. 2022) ........ 37

*Rapaport v. Finkelman*,
2026 WL 2583071 (S.D.N.Y. Sept. 1, 2026)........................................................ 37, 38

*Roth v. Jennings*,
489 F.3d 499 (2d Cir. 2007)............................................................................... 12

*Satanic Temple, Inc. v. Newsweek Digital LLC*,
177 F.4th 202 (2d Cir. 2026) ............................................................................. 37

*Satanic Temple, Inc. v. Newsweek Magazine LLC*,
661 F. Supp. 3d 159 (S.D.N.Y. 2023).................................................................. 27

*Schermerhorn v. Rosenberg*,
73 A.D.2d 276 (2d Dep’t 1980) ...................................................................... 10, 18

*Silsdorf v. Levine*,
59 N.Y.2d 8 (1983) ...................................................................................... 11, 17, 18

*Silvercorp Metals Inc. v. Anthion Mgmt.*,
2012 WL 3569952 (Sup. Ct. N.Y. Cnty. Aug. 16, 2012) ........................................... 24, 25, 26

*Solstein v. Mirra*,
488 F. Supp. 3d 86 (S.D.N.Y. 2020)..................................................................... 10

*St. Amant v. Thompson*,
390 U.S. 727 (1968)........................................................................... 30, 31, 32, 33

*Steinhilber v. Alphonse*,
68 N.Y.2d 283 (1986) ........................................................................................ 16

*Stepanov v. Dow Jones & Co.*,
120 A.D.3d 28 (1st Dep’t 2014) ..................................................................... 27, 30

*Tannerite Sports, LLC v. NBCUniversal News Grp.*,
864 F.3d 236 (2d Cir. 2017)................................................................................. 19

*Udell v. NYP Holdings*,
169 A.D.3d 954 (2d Dep’t 2019) .......................................................................... 20

*Velez v. Lisi*,
164 F.R.D. 165 (S.D.N.Y. 1995) .......................................................................... 38

*Wang v. Sussman*,
2025 WL 2607155 (S.D.N.Y. Sept. 9, 2025)............................................................. 37

*Wang v. Sussman*,
Nos. 25-2487-cv, 25-2503-cv (2d Cir.) .................... 37

*World Wrestling Fed'n Ent. v. Bozell*,
142 F. Supp. 2d 514 (S.D.N.Y. 2001).................... 5

*Yangtze River Port & Logistics Ltd. v. Hindenburg Rsch.*,
2020 WL 905770 (Sup. Ct. N.Y. Cnty. Feb. 25, 2020) .................... 25, 26

*Zama Cap. Advisors v. Universal Ent. Corp.*,
2025 WL 968783 (S.D.N.Y. Mar. 31, 2025) .................... 38

*Zuckerbrot v. Lande*,
75 Misc. 3d 269 (Sup. Ct. N.Y. Cnty. 2022) .................... 2

**STATUTES**

N.Y. Civ. Rights Law § 70-a(1).................... 5, 36, 37

N.Y. Civ. Rights Law § 76-a .................... 30

**RULES**

Fed. R. Civ. P. 12.................... 9, 37

Fed. R. Civ. P. 56.................... 37

**OTHER AUTHORITIES**

Bradley Hope, *The Tell: Chapters 5 and 6*, Foundry (Sept. 22, 2026),
https://www.thfndry.com/the-tell-chapters-5-and-6/ .................... 9

Lamarco, *GigaCloud Technology Inc. (NASDAQ)* 3 (Sept. 28, 2023),
https://perma.cc/VD3E-52FJ .................... 39

Lamarco, *Gorilla Technology (GRRR)* 6 (Apr. 4, 2025),
https://perma.cc/5VD5-NXJV .................... 39

Lamarco, *NVIDIA (NVDA): The China Problem* 24 (May 13, 2026),
https://perma.cc/KMM5-5W2U.................... 39

*Tie*, Merriam-Webster,
https://www.merriam-webster.com/dictionary/tie (last visited Oct. 22, 2026) .................... 15

Hao Tang ("Tang"), Wong Meng Ho ("Ho"), Hong Wai Cheng ("Cheng"), FortuneGate Holdings Philippines Inc. ("FHP"), and International Entertainment Corporation ("IEC") (collectively, "Plaintiffs") respectfully submit this memorandum of law in opposition to the motions of Christian Lamarco ("Lamarco") and Shadyside Partners, LLC d/b/a Culper Research ("Culper") (collectively, "Defendants" or "Lamarco")[1] to dismiss the Consolidated Amended Complaint (ECF 29) (the "Amended Complaint" or "AC"), to strike paragraph 12 of the Amended Complaint, and for attorneys' fees and costs (ECF 34-35).[2]

## PRELIMINARY STATEMENT

This case has nothing to do with whether Defendant Lamarco, a self-proclaimed short seller, may criticize a public company. It is about holding him responsible when he profits off falsely accusing private individuals and businesses—none of whom has any role in the company he is betting against—of human trafficking, money laundering, organized crime, disappearances, and murder-for-hire, even though his own cited sources say no such thing. He cannot escape liability for this damaging conduct. And his false accusations do not magically vanish, like Harry Potter under his Invisibility Cloak, just because he throws the word "opinion" over them. Calling a tabloid-like compendium of false accusations about people with no role in AppLovin an investment "opinion" does not make it one, and the First Amendment does not provide a "wholesale defamation exemption for anything that might be labeled 'opinion.'" *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 18 (1990).

---

[1] Culper is Lamarco's one-man operation with no other known employees or independent fact-checkers. AC ¶¶ 2-3, 34-35, 40. Because Lamarco alone selected the sources, wrote the Report, designed its headings and Chart (as defined below), and controlled its publication, *id*. ¶¶ 22, 125, this brief refers to both Defendants as "Lamarco."

[2] Citations to "Mot." refer to Defendants' supporting memorandum of law (ECF 35).

Lamarco's June 12, 2025 report on AppLovin (the "Report") was a smear campaign that treated Plaintiffs as collateral damage, and its verdict on Tang was delivered in four words: Tang "is a bad actor." Report at 4. Lamarco did not offer that verdict as an impression. He presented it as a finding of his "research," which he said "reveals Hao Tang's numerous ties to the [Chinese Communist Party], money laundering, illegal gambling, and human trafficking operations"; promised to document Tang's connections to "murder-for-hire"; placed Tang in a red box at the center of a chart (the "Chart") linking Plaintiffs to those crimes, which Lamarco described as "a visual summary of a few of our most salient views"; and concluded that "Tang's network is involved in money laundering, human trafficking, illegal gambling and data-harvesting." Report at 2, 4, 13, 29. Those accusations are false and defamatory per se. AC ¶¶ 142, 150. And Lamarco knew his sources did not support them: he personally selected, reviewed, and quoted the materials on which the Report purported to rely. AC ¶¶ 58, 113-125. He published anyway, because accusing a foreign, passive minority shareholder in AppLovin of human trafficking and murder-for-hire would move a stock he had bet against and was poised to trade the moment the Report went live. AC ¶¶ 4-5, 123. This was not investment research. It was a calculated "short and distort" character assassination in which Lamarco knowingly defamed Plaintiffs for his own financial gain. AC ¶¶ 11, 14.

Having presented the Report's accusations as the findings of his own "research," Lamarco now improperly seeks to recast them as mere opinions. *See Zuckerbrot v. Lande*, 75 Misc. 3d 269, 292 (Sup. Ct. N.Y. Cnty. 2022) (rejecting an opinion defense where the author invoked her journalistic credibility while characterizing her posts as loose and figurative). His motion to dismiss rests on a single premise, repeated throughout his brief: that the Report "disclosed" its sources and simply offered "opinions" about them, rendering everything in it—every headline,

every arrow on the Chart, every accusation—"absolutely protected." Mot. at 2, 12, 28. That premise is false. Lamarco presented his "research" as proven facts and then deliberately misrepresented the sources he cited to fit his own false narrative. Lamarco told readers that his research shows "Hao Tang Lent Millions" to an investor in a human-trafficking hub, when in fact the loan was made by a different lender. He said that "Philippines media widely reported" a "paid murder," when his cited report mentions no such thing. He told readers that Chinese journalist Fu Xiaotian ("Fu") was "last seen" aboard a jet operated by a company associated with Tang. His cited sources—a social-media post from an unverified account called "itweetcatsndogs" and a single media report—establish no such thing. And he told readers that Plaintiff IEC is tied to the "14K Triad," a major organized-crime group, even though the source Lamarco supposedly relied on makes no mention of this group. AC ¶¶ 73-91, 98-103. Each of these misstatements is an actionable factual assertion, not mere opinion drawn from accurately disclosed sources. On the spectrum of defamatory statements, Lamarco's statements fall at the extreme end.

Lamarco's status as a short seller does not change the analysis. Disclosing a short position tells readers that the author stands to profit if the stock falls; it does not convert his factual accusations into protected opinion—as a federal court has already told Lamarco. *See LifeMD, Inc. v. Lamarco*, 607 F. Supp. 3d 576, 594 (W.D. Pa. 2022) ("prefatory disclaimers and exculpatory words are not enough to absolve the communications of defamatory meaning"). While Lamarco is free to publish investment opinions about AppLovin, he stretches that right beyond recognition when he insists that false factual accusations about people with no role in the company are immune from suit simply because a short seller wrote them. No case he cites recognizes such blanket immunity.

The short-seller cases he relies on address a fundamentally different situation: suits by the shorted companies over statements about their own businesses. Here, by contrast, Lamarco has used a report ostensibly about AppLovin to attack a private, passive minority shareholder and four strangers to the company. Lamarco finds it "telling[]" that AppLovin, "the target of the Report," has not sued. Mot. at 2. It is indeed telling, but not in the way he means: the defamatory accusations at issue in this case were never about AppLovin. They were directed at Plaintiffs, and Lamarco cannot escape liability for those accusations simply because he published them in an "investment" report purporting to criticize AppLovin.

Lamarco's fallback—that the Report "never accused Tang of having directly engaged in any criminal activity" and merely observed that "the company he keeps is problematic," Mot. at 2—is not how the Report reads, because it is not how Lamarco wrote it. A Report that calls Tang a "bad actor" citing his "extensive direct and indirect ties" to human trafficking and other crimes, puts his name in a headline about a loan to an alleged trafficker, and announces that his "network" "is involved" in those crimes is a Report accusing him of involvement in those crimes. Report at 4, 19, 29. By so doing, Lamarco falsely told readers that Tang himself was personally and knowingly involved in the alleged criminal misconduct. Lamarco's argument that he was merely "accurately reporting signs of smoke even if there is no proof of fire," Mot. at 29 (citation omitted), fails for the same reason. Lamarco did not report signs of smoke. He summarily announced fires and claimed Tang was involved, when his own sources put Tang nowhere near the scene. And where the Report accuses by implication rather than in plain terms, the Amended Complaint pleads exactly what New York law requires: a publication that reasonably conveys the defamatory inference and affirmatively suggests that its author intended or endorsed it. *Partridge v. State*, 173 A.D.3d 86, 91 (3d Dep't 2019).

The Amended Complaint also pleads actual malice—not through conclusory labels, but through specific facts showing what Lamarco knew when he published. It alleges that Lamarco, who alone selected, read, and quoted every source, attributed to those sources accusations they did not contain; removed his own qualifiers at the moment of accusation; drew a chart tying IEC to a criminal "triad" his text never mentions; and ignored his own source's reporting about Tang's relationship with China that contradicted his "investment" thesis. AC ¶¶ 59, 113-125. The fact that he offered hyperlinks in the Report is not a defense: it underscores that he possessed the very materials that exposed the falsity of his accusations. At the pleading stage, those allegations support a powerful inference of knowledge of falsity or reckless disregard for the truth. *World Wrestling Fed'n Ent. v. Bozell*, 142 F. Supp. 2d 514, 528 (S.D.N.Y. 2001).

Finally, Lamarco seeks two additional forms of relief, neither of which has merit. He asks the Court to strike paragraph 12 of the Amended Complaint, which explains how the Report uses racially coded language and stereotypes to portray Tang's Chinese identity and ordinary business relationships as evidence of involvement in Chinese government operations and criminal activity. Motions to strike are strongly disfavored, and this one is particularly meritless: the challenged allegations bear directly on what the Report means and what Lamarco intended. Indeed, Lamarco's request to excise them cannot be reconciled with his insistence elsewhere that "context is necessary" and the "Report must be read as a whole." Mot. at 35. And his procedurally defective request for attorneys' fees fares no better. An action that identifies fabricated accusations of murder-for-hire and the sources cited by Lamarco himself that expose his claims' falsity plainly has a "substantial basis in fact and law." N.Y. Civ. Rights Law § 70-a(1)(a). For these reasons and those set forth below, Lamarco's motions should be denied in their entirety.

## RELEVANT BACKGROUND

### A. Lamarco Issues an "Investment Report" Targeting a Passive Minority AppLovin Shareholder and Four Others with No Role in the Company

On June 12, 2025, Lamarco published a 30-page Report purporting to expose wrongdoing at AppLovin. AC ¶¶ 8, 35, 54-56. Lamarco promoted the Report to Culper's nearly 40,000 followers, announcing: "We are short AppLovin $APP." *Id.* ¶¶ 54-56. As a short seller, Lamarco stood to profit if AppLovin's stock price fell, and he acknowledged that he was likely to trade immediately upon the Report's publication. *Id.* ¶¶ 4-5, 123.

The Report's focus was not AppLovin's business, finances, or management. Instead, Lamarco devoted much of the Report to Tang, a businessman and investor who is a citizen of Cyprus and resides in Hong Kong. *Id.* ¶¶ 9, 29, 57. Tang is merely a passive minority shareholder in AppLovin—one of more than 2,500 investors—with no management, board, or advisory role and no involvement in the company's operations. *Id.* ¶ 10. Lamarco nonetheless singled him out, purportedly as part of Culper's practice of examining "the backgrounds of the key individuals" at the companies it targets. *Id.* But Tang was not, by any stretch, a "key individual" at AppLovin.

The Report also targeted four other Plaintiffs with no connection to AppLovin whatsoever. FHP is the appointed manager of a licensed Philippine casino, and IEC is a Cayman Islands company based in Hong Kong. *Id.* ¶¶ 32-33. When the Report was published, Ho was IEC's chairman and CEO. *Id.* ¶¶ 30-31. FHP, IEC, Ho, and Cheng had no involvement in AppLovin's business. *Id.* ¶¶ 15, 17.

Lamarco alone was responsible for what the Report said. Despite its institutional-sounding name, Culper is a one-man operation that Lamarco runs without research staff, an editor, a fact-checker, or legal review. *Id.* ¶¶ 3, 22, 43-45, 125. He personally selects his targets and sources, writes the reports and headlines, designs the graphics, and controls publication. *Id.* Culper

advertises an "exhaustive, investigative approach" and assures readers that "all information contained herein is accurate and reliable." *Id.* ¶¶ 2, 4, 46, 58.

**B. The Report Presents False Accusations of Serious Crimes as Research Findings**

The Report did not just describe Tang's business interests or relationships, as Lamarco suggests. It portrayed him and the other Plaintiffs as participants in a sprawling network of criminal activity. Its opening pages announce, in bold, underlined text, that "our research reveals Hao Tang's numerous ties to the CCP, money laundering, illegal gambling, and human trafficking operations." Report at 2; AC ¶ 63. Two pages later, Lamarco brands Tang "a bad actor with extensive direct and indirect ties to Chinese espionage, CCP state-sponsored propaganda, human trafficking, and money laundering operations," asserting that "seemingly every piece of Hao Tang's empire we peeled back revealed either CCP interests or nefarious activity." Report at 4; AC ¶ 66.

Lamarco then promised to detail, "using entirely public sources," how Tang's "numerous connections tie to Chinese espionage, propaganda, data harvesting, human trafficking, money laundering, murder-for-hire, and other such unsavory operations." Report at 13; AC ¶¶ 69-72. The pages that follow purport to link Tang and the other Plaintiffs to specific crimes, including a journalist's disappearance, financing an alleged human trafficker, espionage, and a "paid murder." AC ¶¶ 79-103. The Report concludes with an unqualified accusation: "Tang's network is involved in money laundering, human trafficking, illegal gambling and data-harvesting." Report at 29; AC ¶¶ 104-107.

Lamarco reinforces these accusations through both the Report's language and its graphics. Throughout the Report, he invokes racially coded language and stereotypes—including "Behind the Red Curtain," "Chinese national," "covert Chinese ownership," and the "China Hustle"—portraying Tang's Chinese identity and ordinary business relationships with Chinese companies

as evidence of allegiance to the CCP and involvement in criminal conduct. Report at 2-3, 14; AC ¶¶ 12, 57.

Central to the Report is a Chart that Lamarco expressly describes as "a visual summary of a few of our most salient views":




Report at 13; AC ¶¶ 18, 73.

The Chart places Tang in a single bright-red box at the center of an apparent criminal network, with lines connecting him to FHP, IEC, and others. Arrows connect Ho to FHP and IEC, and Cheng to IEC. At the bottom of the Chart, in red text, another single red box levels a string of false and incendiary allegations, including "POGO Raids," "Human Trafficking," "CCP Espionage," "Money Laundering," "Disappearances," and "14K Triad" (as well as other allegations of misconduct for which a connection is implied). *Id.* ¶¶ 16-17, 74-76. The Chart thus presents Plaintiffs' supposed connections to human trafficking and organized crime as among the Report's principal findings. But Lamarco's own sources do not substantiate those accusations.

### C. Lamarco Refuses to Correct His Accusations

Lamarco did not contact any Plaintiff for comment before publishing the Report. AC ¶¶ 22, 123. After publication, Tang demanded corrections in December 2025 and again in detailed letters

dated January 8 and January 22, 2026, identifying the Report's false statements and explaining why Lamarco's own sources did not support them. *Id.* ¶¶ 24, 126-128. Lamarco refused to correct or retract a single statement. *Id.* ¶ 24.

His refusal stands in stark contrast to the response of CapitalWatch, another short seller that published similarly false accusations about Tang. CapitalWatch retracted its report, publicly apologized, and acknowledged that its "[d]escriptions asserting direct connections" to Tang had been inaccurate. *Id.* ¶¶ 25, 129. More recently, investigative journalist and former *Wall Street Journal* correspondent Bradley Hope, who interviewed Tang and "spent months checking allegations about Tang against court records, corporate filings and correspondence," reported that he "found nothing in that material to substantiate the [Report's] central allegations against Tang."[3] Lamarco, by contrast, has left his Report online, where its accusations continue to damage Plaintiffs' reputations and business relationships and create ongoing safety risks for Tang and those close to him. *Id.* ¶¶ 26-27, 130-138.

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a complaint need only allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible when the alleged facts permit the Court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Lamarco invokes decisions recognizing the "particular value" of resolving defamation claims at the pleading stage. Mot. at 9. But that does not create a different pleading standard, much less require the Court to resolve factual disputes or credit Lamarco's competing

[3] Bradley Hope, *The Tell: Chapters 5 and 6*, Foundry (Sept. 22, 2026), https://www.thfndry.com/the-tell-chapters-5-and-6/. Hope observed that "[s]hort sellers cherry-picked allegations against Tang to build a case against AppLovin," and that "[v]ersions of Culper's allegations have circulated online ever since." *Id.*

explanations over Plaintiffs' well-pled allegations. The question on this motion remains "whether the complaint is plausible, not whether it is less plausible than an alternative explanation." *Palin v. N.Y. Times Co.*, 940 F.3d 804, 815 (2d Cir. 2019) (vacating dismissal of defamation complaint).

**ARGUMENT**

A defamation claim under New York law has five elements: (1) a defamatory statement of fact concerning the plaintiff; (2) publication to a third party; (3) fault; (4) falsity; and (5) special damages or actionability per se. *Celle v. Filipino Reporter Enters.*, 209 F.3d 163, 176 (2d Cir. 2000). "On a motion to dismiss . . . the issue is not whether the court regards the language as libelous, but whether it is reasonably susceptible of such a construction." *Kelly v. Schmidberger*, 806 F.2d 44, 46 (2d Cir. 1986).

Usually, the defamatory statement is read in context and considered relative to the whole publication. *E.g.*, *Celle*, 209 F.3d at 177. Headlines and pictures can be an exception to that rule. *Schermerhorn v. Rosenberg*, 73 A.D.2d 276 (2d Dep't 1980). "If the headline is a fair index of an accurate article, it is not actionable [separately from the article]. If it is not a fair index, then the headline must be examined independently [*i.e.*, separated from the rest of the article] to determine whether it is actionable under general principles of libel." *Id.* at 287; *see also* *John's 53-26, Inc. v. Chilton Co.*, 83 A.D.2d 830, 831 (2d Dep't 1981) (extending *Schermerhorn* to pictures and captions).

Lamarco does not dispute that he published the Report, that it names each Plaintiff, or that accusations of human trafficking, money laundering, organized crime, and murder-for-hire are defamatory per se. *See* *Solstein v. Mirra*, 488 F. Supp. 3d 86, 102 (S.D.N.Y. 2020). His challenge is limited to whether his false accusations are fact or opinion and whether Plaintiffs adequately

pled falsity, defamation by implication, and actual malice. Mot. at 10-12, 21, 25-38. Each argument fails.

## I. THE REPORT'S ACCUSATIONS ARE FALSE STATEMENTS OF FACT, NOT PROTECTED OPINION

### A. Lamarco Cannot Shield His False Accusations as Opinions by Citing Sources He Misrepresents and Distorts

Lamarco's principal argument is that each challenged statement is protected "pure opinion" because he disclosed the sources on which they rested. Mot. at 12. But "accusations of criminality" couched as opinions are only protected where an author "fully and accurately set[s] forth" the underlying facts and offers a conclusion readers can recognize as "personal surmise." *Gross v. N.Y. Times Co.*, 82 N.Y.2d 146, 155 (1993); *see Grifols, S.A. v. Yu*, 2025 WL 1826611, at *14 n.7 (S.D.N.Y. July 2, 2025) ("a factual statement . . . does not become an opinion simply because [defendant] explains or provides a 'basis' for how it discovered the fact").

Nor does the law protect opinions based on misreported facts. *See Silsdorf v. Levine*, 59 N.Y.2d 8, 14-16 (1983). Where an opinion misstates the facts it purportedly relies on, it is considered "mixed" and is "actionable . . . consistent with the recognition that there is no constitutional value in false statements of fact." *Chalpin v. Amordian Press*, 128 A.D.2d 81, 85 (1st Dep't 1987). Indeed, while an opinion may be protected "even though the facts do not support" the conclusion, *Parks v. Steinbrenner*, 131 A.D.2d 60, 66 (1st Dep't 1987), opinions that rely on "falsely misrepresented or grossly distorted" facts are actionable, *id.* at 62-63.

That is exactly what the Amended Complaint alleges, statement by statement. AC ¶¶ 63-107. The nine challenged statements include facts that Plaintiffs allege are false and, as the table

below identifies, depart from the sources on which Lamarco purports to rely.[4] The opinion defense is accordingly unavailable. *See Gross*, 82 N.Y.2d at 155; *Milkovich*, 497 U.S. at 18-19.

| False and Defamatory "Finding" | What the Source Actually Says | Citations |
|---|---|---|
| 1. "[O]ur research reveals Hao Tang's numerous ties to the CCP, money laundering, illegal gambling, and human trafficking operations" (emphasis omitted). | The only hyperlink leads to an AppLovin blog post about TikTok—not a source identifying Tang's asserted criminal ties. | Report at 2; AC ¶¶ 63-65 |
| 2. "We believe Hao Tang is a bad actor with extensive direct and indirect ties to Chinese espionage, CCP state-sponsored propaganda, human trafficking, and money laundering operations." "[S]eemingly every piece of Hao Tang's empire we peeled back revealed either CCP interests or nefarious activity." | The cited materials describe relationships running through third parties, not "extensive direct" ties to criminal operations. | Report at 4, 19, 21-24; AC ¶¶ 66-68, 86-91, 94-97 |
| 3. "Hao Tang's numerous connections tie to Chinese espionage, propaganda, data harvesting, human trafficking, money laundering, murder-for-hire, and other such unsavory operations." | The cited materials do not mention "murder-for-hire" or "paid murder" and only describe historical corporate relationships and accusations against people steps removed from Tang—not Tang's own involvement in criminal activities. | Report at 13, 23; AC ¶¶ 69-72, 98-103 |
| 4. The Chart places Tang in a bright-red box and connects FHP and Ho to "POGO Raids" and "Human Trafficking," and IEC, Ho, and Cheng to "14K Triad." | The cited materials attribute POGO and trafficking conduct to separate people and companies—not FHP or Ho. "14K" appears nowhere in the Report's text. Its only reference to a triad is in a sentence about Huang Youlong's cousin—not Tang, IEC, Ho, or Cheng. | Report at 13, 21-24; AC ¶¶ 73-78, 118 |

[4] Plaintiffs challenge all nine statements in the table, AC ¶¶ 63-107, and the Report's overall accusation that Tang and his "network"—including the other Plaintiffs—were involved in the crimes described, *id.* ¶¶ 108-112. The Report's hyperlinked sources are part of the Report, which is incorporated in the Amended Complaint, and Lamarco relies on them throughout his brief, *e.g.*, Mot. at 13-14, 18-19, 32; Plaintiffs cite them for what they say, not for their truth, *see Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007).

| False and Defamatory "Finding" | What the Source Actually Says | Citations |
|---|---|---|
| 5. "Goldenway Operated the Jet on which Now Disappeared CCP Journalist Fu Xiaotian was Last Seen." "Hao Tang also appears to be linked to the 2023 disappearance of former CCP state journalist Fu Xiaotian and State Councilor Qin Gang, suggesting he retains high-level CCP connections." | The cited sources are an unverified account called "itweetcatsndogs" claiming to have identified a jet Fu "used twice," and a single media report claiming she boarded a private jet in April 2023 and supposedly stopped responding to contacts two months later. Neither of these "sources" establishes that Fu was "last seen" aboard the jet. | Report at 16; AC ¶¶ 79-85, 115 |
| 6. "Hao Tang Lent Millions to Huang Youlong, an Investor in Myanmar's Infamous 'KK Park' Human Trafficking Hub Raided in February 2025."<br><br>"Hao Tang also appears to have lent money to Huang Youlong, who was reportedly involved with the infamous 'KK Park' human trafficking operation in Myanmar." | The linked loan account identifies JC International Finance—not Tang—as the creditor and says nothing about KK Park, trafficking, Huang's cousin, or a triad. | Report at 19; AC ¶¶ 86-91, 116 |
| 7. "Hao Tang's Ties to FortuneGate: Linked to CCP Espionage, Money Laundering, and Human Trafficking Operations." The accompanying text alleges "multiple Chinese espionage and human trafficking operations." | The supposed espionage link is to a spa downstairs from a club owned by a third party that "Philippine undercover informants have been monitoring."<br><br>The trafficking and money-laundering allegations concern separate people and companies. | Report at 21-24; AC ¶¶ 92-97, 117 |
| 8. "Liduan Wang was also reportedly tied to the Nine Dynasty Casino junket. In May 2025, Philippines media widely reported that the junket was used to launder ransom payments and the paid murder of Chinese steel magnate Anson Que." | The cited accounts describe kidnapping, killing, and ransom laundering. None reports a paid killing. | Report at 13, 21, 23; AC ¶¶ 98-103, 114 |
| 9. "Tang's network is involved in money laundering, human trafficking, illegal gambling and data-harvesting." | There is no cited factual support. This accusation simply repeats the preceding accusations with qualifications removed, presenting the disputed connections in Statements 1-8 as established criminal involvement by "Tang's network." | Report at 29; AC ¶¶ 104-112 |

As the table demonstrates, Lamarco's supposed "disclosed facts" consist largely of remote associations and qualified allegations against third parties, not accusations of criminal wrongdoing

by Plaintiffs. Some of his gravest accusations have no support in the cited sources at all.[5] AC ¶¶ 63-112, 114-121. His statement-by-statement defenses only underscore the problem.

**1. The Report Falsely Accuses Tang of Involvement in Money Laundering (Statements 1, 2, 3, and 9)**

***Whether Tang is involved in money laundering is a factual question, not an opinion.*** The Report accuses Tang of being involved in money laundering, but "does not identify a single instance in which Tang participated in, supported, had any direct or incidental involvement in, or had knowledge of any money laundering, illegal gambling, or human trafficking operation." AC ¶ 65. By Lamarco's own account, his cited sources concern a former employee's accusations against a Goldenway subsidiary and a ruling that the employee was improperly terminated; a 2017 determination involving the appointment of a compliance officer; a raid on a Japanese cryptocurrency exchange that had acquired a platform formerly affiliated with Goldenway Japan; and a Chinese media report about a man who once served on a board with Tang. Mot. at 13-14. But that did not stop Lamarco from presenting Tang's purported involvement in alleged money laundering as the result of his supposedly "exhaustive, investigative approach," AC ¶ 125—a framing that conveyed factual accusations, not mere "personal surmise." *Gross*, 82 N.Y.2d at 155.

Lamarco insists that the Report "nowhere accused Tang of personally engaging in or benefitting from money laundering" and merely disclosed Goldenway's regulatory history and Tang's corporate relationships. Mot. at 12-15. But that is not what he wrote. The Report announces that Lamarco's "research reveals" Tang's "numerous ties to . . . money laundering . . . operations," that those ties are "extensive" and "direct," and that "Tang's network is involved in money

[5] Lamarco claims in passing that "falsity . . . is never presumed," Mot. at 10, but it need not be here: the Amended Complaint identifies how Lamarco's statements were false as to each of the nine challenged statements, *see infra* Parts I.A.1-7. That is all that is required at this stage. *Giuffre v. Maxwell*, 165 F. Supp. 3d 147, 156 n.5 (S.D.N.Y. 2016) ("The matter of falsity is for the fact-finder and not appropriate for resolution at the pleading stage.").

laundering." Report at 2, 4, 29. "A reasonable reader could have concluded" these were factual statements, *Davis v. Boeheim*, 24 N.Y.3d 262, 269-270 (2014), and Lamarco's insistence that he meant something milder than he wrote is an admission that his words outran his sources. To the extent Lamarco disclosed "facts" here, he distorted them and left readers believing that he had additional, undisclosed information that supported his false assertion. Either way, the statement is not protected as an opinion.

Additionally, Lamarco cannot recast his repeated assertions that Tang has "ties" to human trafficking, money laundering, murder-for-hire, and illegal gambling as neutral summaries. *See* Report at 2, 4, 13, 21. Merriam-Webster defines a "tie" as "something that serves as a connecting link," including "a moral or legal obligation" or "a bond of kinship or affection." *Tie*, Merriam-Webster, https://www.merriam-webster.com/dictionary/tie (last visited Oct. 22, 2026). Throughout the Report, Lamarco uses the term to affirmatively link Tang to criminal actors and allege wrongdoing, not to describe remote or incidental associations. In context, those statements assert that Tang is bound to criminal actors and involved in their crimes.

***Plaintiffs adequately allege Lamarco's money laundering accusations are false.*** Lamarco argues that Tang "expressly concedes" the very ties he disputes. Mot. at 5, 24. That turns the Amended Complaint on its head. AC ¶¶ 64, 67-68, 71, 107. Plaintiffs describe Lamarco's method of assembling attenuated associations and presenting them as direct criminal connections; they do not concede the truth of the invented connections.

Nor can Lamarco escape liability by insisting that he referred to "Tang's network," rather than Tang himself. Mot. at 15. The Report identifies Tang as its central subject, places him at the center of the Chart, describes the people and companies around him as "Tang's network" and "Tang's empire," and concludes that this network "is involved" in money laundering. Report at 2,

4, 13, 29. Those formulations attribute the alleged criminal activity to an enterprise identified with Tang, not to unrelated third parties. Lamarco calls it an "outrageous suggestion" to understand these accusations as implicating Tang. Mot. at 15. But his own Report identifies Tang's supposed criminal connections as grounds for concluding that "Tang's background disqualifies" AppLovin from doing business. Report at 29. At minimum, a reasonable reader could understand Lamarco's accusations against "Tang's network" as accusations of Tang's own involvement. *See Davis*, 24 N.Y.3d at 272-273; *Goldfarb v. Channel One Russia*, 663 F. Supp. 3d 280, 297-298 (S.D.N.Y. 2023).

### 2. The Report Invented a "Last Seen" Sighting That Its Sources Do Not Establish (Statement 5)

***Whether Tang assisted the CCP in disappearing Fu is a factual question, not an opinion.*** Lamarco argues the accusation is an opinion, such that a different reader could draw a different conclusion from the facts disclosed. Mot. at 16-17. But the challenged statements do not merely offer a conclusion about an aircraft's possible connection to Fu. They assert a specific, verifiable fact: that "Fu was last seen boarding a jet to Beijing." Report at 4, 16. The cited sources do not support that assertion.

Lamarco's "sources" consist of a social-media post by an unverified account, "itweetcatsndogs," and a news article Lamarco links to that does not identify the aircraft at all and notes Fu boarded a private jet bound for Beijing in April—*two months* before Fu stopped communicating with her contacts, according to Lamarco's own sources. AC ¶¶ 82-83, 115. Nothing establishes that Fu was last seen aboard the plane or that it had any connection to her disappearance or Qin Gang's. *Id.* ¶ 83. Lamarco's statement to the contrary is a false factual accusation, not a difference of opinion about disclosed evidence. And the authorities he invokes, *Steinhilber v. Alphonse*, 68 N.Y.2d 283, 289-290 (1986), and *Dfinity Foundation v. New York*

*Times Co.*, 702 F. Supp. 3d 167, 175-176 (S.D.N.Y. 2023), do not protect an author who affirmatively misstates the facts on which his supposed opinion rests. *See Silsdorf*, 59 N.Y.2d at 14-16.

The Report also uses the rhetoric of concealment and discovery, further reinforcing the factual nature of Lamarco's allegations. It says the aircraft was registered to a Utah trust, supposedly "obscuring its ownership," and that Lamarco "uncovered FAA records" identifying Goldenway as its "operator." Report at 16. That framing suggests investigation and concrete factual revelations, not mere surmise or subjective opinion.

***Plaintiffs adequately allege these statements are false.*** Tang had nothing to do with either disappearance. AC ¶ 85. Fu was not "last seen" aboard the jet, as the Report's own text concedes by describing her "last public postings" as "in front of" the jet, and the cited sources say this post was made in April, two months before Fu "disappeared" in June. *Id.* ¶¶ 82-83, 115; Report at 16. Lamarco does not contend otherwise. He admits Fu was merely "last photographed" "in front of" the aircraft and that the Report "concluded" Tang had "a link (through Goldenway) to the disappearance." Mot. at 16-17. His only response is that readers could have drawn a different conclusion, *id.* at 17—that is an opinion argument that fails for the reasons above.

#### 3. The Report Makes False Human-Trafficking Accusations (Statements 1, 2, 3, 6, and 9)

***Whether Tang knowingly lent money to support human trafficking is a factual question, not an opinion.*** Lamarco defends his human trafficking accusations by reciting a chain of supposed connections between Tang and Huang Youlong: a Goldenway entity was listed as a shareholder of JC International; a Tang associate served as a director; JC International lent money to Huang; and Huang was later linked to the notorious KK Park trafficking operation. Mot. at 17-19. But the Report did not just describe those alleged corporate connections. Its bold headline

declared: "Hao Tang Lent Millions to Huang Youlong, an Investor in Myanmar's Infamous 'KK Park' Human Trafficking Hub." Report at 19. That is a provable assertion that Tang made the loan, not an opinion about attenuated corporate relationships. *Davis*, 24 N.Y.3d at 269-270; AC ¶ 89. Disclosing the loan records does not change that, *Grifols*, 2025 WL 1826611, at *14 n.7, particularly where the records—which say nothing about KK Park, human trafficking, Huang's cousin, or any triad—contradict the headline rather than support it, *see Silsdorf*, 59 N.Y.2d at 14-16; AC ¶ 89. And by placing Tang's name beside "Myanmar's Infamous 'KK Park' Human Trafficking Hub" in a bold headline, the Report conveyed a researched finding that Tang financed a human trafficker—not "personal surmise." *Gross*, 82 N.Y.2d at 155; AC ¶ 91.

Lamarco's response only underscores the misrepresentation. He insists that "the Report never claimed that Tang personally served as Youlong's lender," because the body text identified JC International Finance as the creditor entity. Mot. at 33. But the headline says exactly what Lamarco now denies having claimed: "Hao Tang Lent Millions." Report at 19. He thereby concedes that the headline is not a "fair index" and is independently actionable. *Schermerhorn*, 73 A.D.2d at 286-287.

***Plaintiffs adequately allege Lamarco's human-trafficking allegations are false.*** The loan records identify JC International Finance Limited—not Tang—as the creditor. Goldenway had sold Goldenway Finance and its money-lending license years before the loan was made, and the acquiring company subsequently adopted the JC International Finance name. As the Amended Complaint explains, Tang neither made nor approved the loan and had no knowledge of it—and, crucially, has no connection to human trafficking. AC ¶¶ 88-90, 116.

#### 4. Lamarco Invented a "Paid Murder" That His Sources Never Reported (Statements 3 and 8)

***Whether Tang's connections extend to a "paid murder" is a factual question, not an opinion.*** Lamarco claims this damning accusation was "widely reported" by "Philippines media." Report at 23. But the critical assertion—that someone paid for a murder—appears nowhere in the cited reporting. Lamarco tries to dismiss that disconnect as "quibbl[ing]" over a "shorthand characterization" of an actual kidnapping, ransom, and killing. Mot. at 7, 20-21. But a kidnapping followed by a killing is not necessarily a murder-for-hire. Lamarco invented the "paid murder" allegation out of thin air.

That is why *Olivet* and *Tannerite* do not help him. Both involved the use of imprecise labels for conduct that had actually occurred—"money laundering" for a conspiracy to launder money, "bombs" for rifle targets that explode. *Olivet Univ. v. Newsweek Digital LLC*, 2024 WL 1892563, at *4-5 (S.D.N.Y. Apr. 30, 2024); *Tannerite Sports, LLC v. NBCUniversal News Grp.*, 864 F.3d 236, 248-249 (2d Cir. 2017). Lamarco added conduct his sources never reported—payment for a killing—and used it to tie Tang to "murder-for-hire." The difference between laundering ransom money and financing a murder is not "technical," Mot. at 21; no reasonable reader would react to the two the same way. *Tannerite*, 864 F.3d at 242-243. This accusation thus is not an opinion based on accurately disclosed facts; it is a false factual assertion.

***Plaintiffs adequately allege Lamarco's murder-for-hire statements are false.*** As alleged in the Amended Complaint, neither Tang nor FHP had any involvement in Que's murder, any murder-for-hire scheme, or the laundering of ransom payments. AC ¶ 103. Lamarco does not contend otherwise. He argues only that "murder-for-hire" was harmless "shorthand," Mot. at 20-21. For the reasons just explained, it was not.

### 5. The "Summary" Chart Makes Criminal Accusations That the Report's Text Cannot Support (Statement 4)

***Whether Plaintiffs are connected to human trafficking and the 14K Triad is a factual question, not an opinion.*** Lamarco argues that the Chart contains no actionable statements because Plaintiffs challenge only their "placement" in a graphic, rather than "any actual statements made by Culper." Mot. at 7-8, 21-23. But the Chart is itself a statement: Lamarco placed Tang at the center of an apparent criminal network, drew lines and arrows connecting the other Plaintiffs, and placed unmistakable criminal labels beneath them—"Human Trafficking," "POGO Raids," and "14K Triad." Report at 13; AC ¶¶ 73-76. He introduced the Chart immediately after promising to expose Tang's connections to serious crimes and expressly described it as "a visual summary of a few of our most salient views." Report at 13. A reasonable reader could understand it as asserting that FHP and Ho were connected to human trafficking and that IEC, Ho, and Cheng were connected to organized crime. AC ¶¶ 74-78; *see Davis*, 24 N.Y.3d at 269-270.

Lamarco responds that the Chart merely summarizes the Report's text and therefore must be read together with it. Mot. at 21-23. He is wrong; the Chart must be considered on its own because it is not a fair index of the Report. Lamarco's own sources, *Golan v. Daily News, L.P.*, 77 Misc. 3d 258, 271 (Sup. Ct. N.Y. Cnty. 2022), and *Udell v. NYP Holdings*, 169 A.D.3d 954, 957 (2d Dep't 2019), recognize that rule.

The Chart repeatedly outruns the Report. Though the Report's text never mentions the "14K Triad," only referring tangentially to a triad in connection with Huang Youlong's cousin, the Chart connects Cheng and Ho, through IEC, to the 14K Triad, and places the "Cheng family," referring (according to Lamarco) to Plaintiff Cheng (*see* ECF 21-1 at 33), directly above "14K Triad." Report at 13; AC ¶¶ 77, 118. Lamarco attempts to justify the Chart's connection to the 14K Triad through a chain running from IEC to FHP, from FHP to Wang, from Wang to a spa allegedly

associated with She Zhijiang, and from She Zhijiang to KK Park. Mot. at 22-23. But that chain never reaches the 14K Triad. As for FHP, the cited materials attribute the alleged POGO and trafficking conduct to Wang's relatives, separate companies, and third-party operators—not FHP itself (nor Ho, whose name appears immediately above FHP's in the Chart). Report at 21-24; AC ¶¶ 77, 94-96. Yet the Chart discards those intermediate distinctions and places "Human Trafficking" directly beneath FHP's name. At minimum, a reasonable reader could understand the unexplained connections as resting on additional facts Lamarco possessed but did not disclose. *Davis*, 24 N.Y.3d at 272-273; *NOVAGOLD Res. Inc. v. J Cap. Rsch. USA LLC*, 2022 WL 900604, at *6 & n.5 (E.D.N.Y. Mar. 28, 2022).

***Plaintiffs adequately allege that the Chart's accusations are false.*** FHP and Ho did not participate in or knowingly support the POGO crimes or human trafficking described in the Report; IEC, Ho, and Cheng have no connection to the 14K Triad; and the Report identifies no evidence that Tang participated in or knowingly supported any of the crimes it displays. AC ¶ 78. Lamarco does not contend otherwise. He argues only that Plaintiffs "do not dispute" their connections to one another—Ho and Cheng to IEC and FHP, and FHP to its former chairman, Wang. Mot. at 22-23. But Plaintiffs do not challenge those lines; they challenge the criminal labels at the end of them and the criminal connections implied by them, which nothing in the Report's text or sources supports. AC ¶¶ 77-78, 118. Having chosen to publish those labels, Lamarco cannot resolve their defamatory meaning on a motion to dismiss. *Goldfarb*, 663 F. Supp. 3d at 297-298.

#### 6. The Accusations Against FHP Rest on Multiple Degrees of Association (Statement 7)

***Whether FHP participated in, supported, or had knowledge of CCP espionage, money laundering, and human trafficking operations is a factual question, not an opinion.*** Lamarco defends his accusation that FHP is "Linked to CCP Espionage, Money Laundering, and Human

Trafficking Operations" by insisting that the Report disclosed the supposed connections. Mot. at 23-25; AC ¶ 92. But the connections he identifies—resting on geography and genealogy—only demonstrate how far removed FHP is from the alleged misconduct. By Lamarco's own account, the human-trafficking allegations concern the granddaughter of FHP's former chairman, while the espionage allegation involves a spa located beneath that chairman's nightclub. Mot. at 24-25; Report at 24; AC ¶¶ 95-96. Neither establishes that FHP participated in, supported, or had any knowledge of the alleged crimes. Lamarco's own cited article quotes a Philippine senator warning that "[g]uilt cannot be inferred solely by association." Report at 24.

Yet Lamarco's heading does not describe a former chairman's relative or a neighboring spa. It declares that FHP is "Linked to CCP Espionage, Money Laundering, and Human Trafficking Operations," and the accompanying text asserts "multiple" such connections. Report at 21. That categorical accusation conveys provable criminal involvement by FHP itself, not merely the existence of distant associations with third parties. Moreover, by claiming "multiple" espionage connections while disclosing only an attenuated association involving a spa, Lamarco suggests knowledge of additional undisclosed incriminating facts. *Davis*, 24 N.Y.3d at 269-270; AC ¶ 95.

Nor can Lamarco dismiss the public correction identifying FHP as an independent casino operator. The Report acknowledges that Frontier Capital Group identified FHP as majority owned by Tech Innovation Management Limited, but dismisses the correction (without any evidence) as an effort to "distance Goldenway." Report at 21; AC ¶ 94. The additional "links" Lamarco identifies in his brief—a shareholder of Frontier Capital Group and Ho's directorship at that shareholder—are ordinary corporate relationships with no demonstrated connection to espionage,

money laundering, or trafficking. Mot. at 24. Disclosing such "links" does not convert Lamarco's actionable false factual assertions into opinion.

***Plaintiffs adequately allege that Lamarco's allegations about FHP are false.*** Plaintiffs do not dispute that Wang previously chaired FHP. They dispute Lamarco's assertion that Wang's former position makes FHP or Tang participants in crimes allegedly committed by his relatives and acquaintances, or that it is accurate to describe them as such. AC ¶¶ 96-97. The Report asserts that connection as fact, and the Amended Complaint alleges that it is false. *Id.*

#### 7. Calling Tang a "Bad Actor" Does Not Immunize the False Criminal Accusations That Follow (Statement 2)

***Whether Tang has "extensive direct and indirect ties" to espionage, human trafficking, and money laundering operations is a factual question, not an opinion.*** Lamarco characterizes his description of Tang as a "bad actor" as "unverifiable conjecture," invoking *Galasso v. Saltzman*, 42 A.D.3d 310, 311 (1st Dep't 2007), and the proverb "you are the company that you keep." Mot. at 25. But Plaintiffs do not contend that "bad actor," standing alone, is actionable. The epithet is accompanied by a specific assertion of fact: "We believe Hao Tang is a bad actor *with extensive direct and indirect ties to Chinese espionage, CCP state-sponsored propaganda, human trafficking, and money laundering operations*." Report at 4 (emphasis added). The character judgment is the conclusion; the asserted "extensive direct" connections to criminal operations are the purported facts supporting it. By calling Tang a "bad actor" in connection with these accusations, Lamarco told readers that Tang was personally involved in that criminal conduct. The preface "we believe" does not change that: read in context, it introduces Lamarco's claimed investigative finding—one he says "every piece of Hao Tang's empire we peeled back" confirmed—not his personal surmise. Report at 4; AC ¶ 67; *Gross*, 82 N.Y.2d at 155; *Davis*, 24 N.Y.3d at 272-273.

*Galasso* is inapposite: it involved generalized epithets—"no good," "a criminal"—that conveyed the speaker's opinion about conduct already known to his audience. 42 A.D.3d at 311. Here, the Report names the particular criminals and criminal operations to which Tang is supposedly tied and presents those ties as the product of research. *See Germain v. M & T Bank Corp.*, 111 F. Supp. 3d 506, 536 (S.D.N.Y. 2015) (treating supposed Albanian mob ties supporting a "no good" characterization as "a statement of fact that may be proven or disproven"). Such factual accusations do not become protected conjecture merely because they accompany a disparaging characterization. *Gross*, 82 N.Y.2d at 155. And as for the proverb: there is no saying that "you are the company your company's company keeps."

***Plaintiffs adequately allege that this statement is false.*** Tang has no ties—"direct," "indirect," or otherwise—to human trafficking or money laundering operations, and the Report identifies none: it offers only highly attenuated associations with third parties and no evidence that Tang engaged in, assisted, knew of, or profited from any such crime. Nor is Tang an agent of the CCP; he is one of its targets. AC ¶¶ 64-65, 67-68, 71. Lamarco does not argue the contrary statement is true, but that it is "unverifiable," and also, somehow, that "thirty pages" of disclosed facts support it. Mot. at 25. As shown above, those disclosed facts provide no such tie, nor any basis to say that Tang is a "bad actor" involved in criminal activity. AC ¶¶ 66-68.

**B. Lamarco's Cases Do Not Create a Special Rule for Short Sellers**

Lamarco invokes a string of inapplicable short-seller decisions for the proposition that "courts routinely dismiss defamation claims in connection with investment analysis reports where the facts supporting the conclusions reached are fully disclosed." Mot. at 11-12, 26-27 (citing *Cassava Scis., Inc. v. Bredt*, 2024 WL 1347362 (S.D.N.Y. Mar. 28, 2024); *Eros Int'l PLC v. Mangrove Partners*, 2019 WL 1129196 (Sup. Ct. N.Y. Cnty. Mar. 8, 2019); *Silvercorp Metals Inc. v. Anthion Mgmt.*, 2012 WL 3569952 (Sup. Ct. N.Y. Cnty. Aug. 16, 2012); *Yangtze River Port &*

*Logistics Ltd. v. Hindenburg Rsch.*, 2020 WL 905770 (Sup. Ct. N.Y. Cnty. Feb. 25, 2020); *Nanoviricides, Inc. v. Seeking Alpha, Inc.*, 2014 WL 2930753 (Sup. Ct. N.Y. Cnty. June 26, 2014)). None provides any special immunity for short sellers, much less protects false factual accusations merely because the author cites public sources. In fact, the court in *Eros* expressly cautioned that its dismissal of a defamation claim should not be understood to immunize a "short and distort" scheme simply because the defamatory accusation is "cloaked in the form of an opinion." *Eros*, 2019 WL 1129196, at *11 n.7.

Each of Lamarco's cases turned on the distinction he ignores: the difference between opinions drawn from accurately disclosed facts and false assertions of fact. In *Eros* and *Yangtze*, the companies disputed the short sellers' conclusions without alleging that the underlying filings and records had been falsified or misrepresented. *Eros*, 2019 WL 1129196, at *8-9; *Yangtze*, 2020 WL 905770, at *8. Here, by contrast, the Amended Complaint details how Lamarco misrepresented the underlying "sources." *See supra* Part I.A; AC ¶¶ 114-119. In *Silvercorp*, the company challenged accusations that the authors expressly qualified and invited readers to investigate. 2012 WL 3569952, at *9-11. Here, Lamarco told his readers to rely on his conclusions to make financial decisions. And *Cassava* actually undermines Lamarco's position: the court held that an accusation that a drug study was "NOT BLINDED" was a statement of fact notwithstanding the disclosure of supporting emails, dismissing the claim for insufficient allegations of actual malice—not because the accusation was protected opinion. 2024 WL 1347362, at *17-18, *24-28.

More recent short-seller decisions confirm the distinction. In *NOVAGOLD*, the court denied a short seller's motion to dismiss, rejecting the suggestion that citations to public documents necessarily render a report's accusations protected opinion, particularly where the report implies knowledge of additional, undisclosed facts. 2022 WL 900604, at *5-6 & nn.4-5 (distinguishing

*Eros*, 2019 WL 1129196; *Silvercorp*, 2012 WL 3569952; *Yangtze*, 2020 WL 905770; and *Nanoviricides*, 2014 WL 2930753).[6] And in *Grifols*, Judge Liman sustained a defamation claim based on a short seller's assertion that a loan had not been disclosed, holding that the accusation was "factual, even in the context of a report consisting largely of opinion," because its accuracy could be tested against the company's filings. 2025 WL 1826611, at *13-14 & n.7. The same reasoning applies here. Whether Tang made a loan, whether journalists reported a paid murder, whether Fu was last seen aboard a particular aircraft, and whether IEC has ties to the 14K Triad are all objectively verifiable. Lamarco answered them falsely. That he did so in service of an investment thesis about AppLovin does not transform his false statements of fact into protected opinion.

## II. PLAINTIFFS PLEAD DEFAMATION BY IMPLICATION

Lamarco incorrectly characterizes Plaintiffs' reliance on the Report's defamatory "implications" as "a concession by Plaintiffs that the Report made no such accusation outright." Mot. at 28. It is nothing of the kind. As explained above, the Report expressly accuses Plaintiffs of involvement in serious criminal activity. But even where individual statements stop short of explicit accusations, the Report conveys the same defamatory message through its deliberate sequencing, juxtaposition, and omission of facts. *See Herbert v. Lando*, 781 F.2d 298, 307 (2d Cir. 1986) ("a combination of individual statements which in themselves may not be defamatory" may "lead the reader to draw an inference that is damaging to the plaintiff"). Plaintiffs plead defamation by implication as a separate and alternative theory, as New York law permits. AC ¶¶ 108-112; *see Grifols*, 2025 WL 1826611, at *16 n.10. To sustain that claim, Plaintiffs must allege that the

[6] *Cassava* likewise treated certain accusations as factual despite disclosure of supporting sources. 2024 WL 1347362, at *17-18.

Report, read as a whole, reasonably conveys the defamatory inference and "contextually suggests that the declarant either intended or endorsed the inference." *Partridge*, 173 A.D.3d at 92 (citing *Stepanov v. Dow Jones & Co.*, 120 A.D.3d 28, 37-38 (1st Dep't 2014)). Both requirements are satisfied here.

### A. The Report's Words, Structure, and Graphics Convey Defamatory Accusations

Contrary to Lamarco's assertion, the Report does not neutrally present a collection of facts and leave readers to decide what they mean. Mot. at 28-29. It assembles allegations against remote third parties, attributes their misconduct to Plaintiffs through a series of purported connections, and then presents the resulting accusations as the findings of Lamarco's own investigation. The cases Lamarco cites do not protect that conduct. *Cassava* and *Biro* concern inferences readers may independently draw from accurately presented facts, not defamatory implications manufactured through misstatements, selective juxtaposition, and omission. *See Cassava*, 2024 WL 1347362, at *19; *Biro v. Condé Nast*, 883 F. Supp. 2d 441, 468 (S.D.N.Y. 2012). And Lamarco's reliance on the proposition that "[t]here is nothing defamatory about accurately reporting signs of smoke even if there is no proof of fire," Mot. at 29 (quoting *Satanic Temple, Inc. v. Newsweek Magazine LLC*, 661 F. Supp. 3d 159, 171 (S.D.N.Y. 2023)), ignores the critical word "accurately." Indeed, *Satanic Temple* allowed the article's most serious allegations, involving sexual abuse, to survive dismissal. *Id.* at 171-172.

***The disappearances.*** The Report states that Qin Gang was investigated for "potential national security compromises," that "Fu and Qin both disappeared shortly thereafter," and that Fu was "last seen" aboard a plane Goldenway operated, whose ownership was supposedly "obscur[ed]." Report at 16. It presents these assertions as evidence that Tang "retains high-level CCP connections," immediately after promising to expose his connections to "murder-for-hire." *Id.* at 13, 16. The Chart reinforces the accusation by connecting "Hao Tang's Goldenway Group"

to "Disappearances," in red type. *Id.* at 13-14. Taken together, these statements convey that Tang or his businesses were implicated in the disappearances, not merely that Goldenway once operated an aircraft. That is precisely the sort of "strategic[] juxtapos[ition]" that can constitute defamation by implication. *Partridge*, 173 A.D.3d at 90-91 (quoting *Martin v. Hearst Corp.*, 777 F.3d 546, 552 (2d Cir. 2015)).

***Human trafficking, money laundering, and espionage.*** Lamarco similarly insists that the Report "never purported to represent or even implicate Tang himself in such activities." Mot. at 29 (emphasis omitted). But the Report is structured to convey precisely that accusation. Under the heading "Hao Tang's Ties to FortuneGate: Linked to CCP Espionage, Money Laundering, and Human Trafficking Operations," Lamarco assembles allegations involving distant relatives, former business associates, and unrelated companies, then presents those associations as evidence of criminal activity by Tang and FHP. Report at 21-24. The Chart reinforces the accusation by placing Tang at the center of the supposed network and displaying "Human Trafficking" and "14K Triad" beneath Plaintiffs and related companies. *Id.* at 13. And the Report concludes that "Tang's network is involved" in the very crimes it describes. *Id.* at 29. Taken together, these statements convey—expressly, but at least implicitly—that Tang and the other Plaintiffs participated in or knowingly supported the stated criminal activities. AC ¶¶ 97, 108.

***Murder-for-hire.*** The same technique appears in the Report's gravest accusation. After promising to document Tang's connections to "murder-for-hire," Lamarco recounts a supposedly "paid murder" in the section titled "Hao Tang's Ties to FortuneGate." Report at 13, 21, 23. The placement is no accident: the account is offered as evidence that Tang has connections to murder-for-hire. Lamarco now insists that he was merely describing "the company [Tang] keeps," Mot. at 2, but the Report does not present the purported killing as an unrelated episode involving strangers.

It incorporates the accusation into its account of Tang's criminal "network," thereby conveying that Tang was involved in or connected to the supposed murder-for-hire scheme. AC ¶¶ 99, 103, 108-112.[7]

### B. The Report Affirmatively Endorses the Defamatory Inferences It Conveys

Lamarco separately argues that Plaintiffs "fail to plead that Defendants endorsed or intended any alleged defamatory implication," because the Report "made clear repeatedly that it was not accusing Tang himself of any wrongdoing" and "[a]ll of the intermediary links . . . are disclosed." Mot. at 30.

Nowhere in the Report's 30 pages does Lamarco tell his 40,000 readers that he is not accusing Tang of wrongdoing; that assurance appears for the first time in his brief. What the Report says is that "our research reveals" Tang's criminal ties, that Tang is a "bad actor," that the Chart summarizes Lamarco's "most salient views," and that "Tang's network is involved" in crime—formulations that adopt the accusations as the author's own conclusions, unlike the qualified, unresolved allegations the author urged the government to investigate in *Brian v. Richardson*, 87 N.Y.2d 46, 53 (1995). Report at 2, 4, 13, 29; AC ¶ 109. And the Amended Complaint pleads the affirmative suggestion that *Partridge* and *Stepanov* require with particularity: Lamarco "repeatedly removed qualifiers at the point of accusation, omitted intermediate links and contrary facts, placed unrelated people and entities within a single supposed network, and positioned red crime labels beneath Plaintiffs in the central graphic." AC ¶ 112. Lamarco dismisses that allegation as "belied by the Report." Mot. at 30. But each of those choices is visible on the Report's face: the FortuneGate heading omits every qualifier and every intermediate step that the text beneath it

[7] In addition to the defamatory statements discussed in this section, Plaintiffs plausibly allege defamation by implication in the alternative for the other challenged statements to the extent the Court determines they are not express misstatements of fact. *See* AC ¶¶ 84-85, 97, 103, 111-112.

recites, Report at 21; the Chart draws its line to "Disappearances" and places "Human Trafficking" beneath FHP, *id.* at 13; and the "paid murder" is placed where it will do the most damage, *id.* at 23. In *Partridge*, placing the plaintiff's photograph in an array associated with crimes against children "strongly suggested" that the State "intended and endorsed" the false accusation against him. 173 A.D.3d at 95. Lamarco's placement of Plaintiffs' names alongside criminal labels in the Chart does the same thing here. A publication that strips its own hedges, draws its own lines, colors its own boxes, and announces its own "salient views" "affirmatively suggest[s]" that its author intended the inference. *Stepanov*, 120 A.D.3d at 37-38.

## III. PLAINTIFFS PLEAD ACTUAL MALICE

### A. The Amended Complaint Pleads Actual Malice for Every Statement

Lamarco argues that New York's anti-SLAPP statute requires Plaintiffs to plead actual malice; that the standard is "difficult" and must be satisfied for "each" statement; and that "[n]one of Plaintiffs' allegations come nowhere [*sic*] close." Mot. at 30-31 (citing N.Y. Civ. Rights Law § 76-a; *Baiul v. Disson*, 607 F. App'x 18, 20-21 (2d Cir. 2015)).[8]

The standard is demanding, but it is a pleading standard: Plaintiffs must plead facts that make the inference plausible, not prove it. *Biro v. Condé Nast*, 807 F.3d 541, 545-546 (2d Cir. 2015). Because a defendant rarely admits his state of mind, knowledge and reckless disregard are inferred from objective circumstances—among them that a story was "fabricated by the defendant"; that it rested on "an unverified anonymous" source; or that there were "obvious reasons to doubt" the accuracy of a source, *see St. Amant v. Thompson*, 390 U.S. 727, 732 (1968); or that he purposefully avoided information that would have undermined his story, *Harte-Hanks*

[8] Lamarco asserts in a footnote that Tang is a limited-purpose public figure. Mot. at 31 n.4. He is not, and neither is any other Plaintiff. Plaintiffs are at most passive minority shareholders with no role in AppLovin's management or operations, AC ¶ 10, who never voluntarily injected themselves into any public controversy. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351 (1974).

*Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 692 (1989). The Amended Complaint pleads actual malice statement by statement, identifying for each the source Lamarco cited, what it says, and how his statement departs from it. AC ¶¶ 113-121; *see supra* Part I.A. Lamarco responds in eight numbered points, which Plaintiffs take in turn.

### B. Fabrication Is Evidence of Knowledge, Not Merely Falsity, and Provides a Basis to Plead Actual Malice

Lamarco's first and second points both argue that Plaintiffs cannot plead actual malice by pointing to Lamarco's misrepresentations of his source material. That is wrong.

Lamarco first argues that allegations of fabrication "speak[] only to the falsity element" and "do[] not demonstrate that the statement was made with knowledge of the purported falsity." Mot. at 31-32. But fabrication supports both falsity and knowledge. Indeed, the Supreme Court identified the paradigm case of actual malice as one in which "a story is fabricated by the defendant [or] is the product of his imagination." *St. Amant*, 390 U.S. at 732.

Lamarco next contends that the allegation that he "misrepresented sources [he] possessed and claimed to have reviewed" is "circular," because he "cited all the sources supporting [his] conclusions." Mot. at 32. But citing a source and misdescribing it are different acts, and it is the second that connotes knowledge. The Amended Complaint does not allege that Lamarco relied on sources that turned out to be wrong; it alleges that his sources said one thing, and he said another. Plaintiffs describe concrete ways in which each challenged statement departs from its disclosed source material, each departure creating an inference of actual malice. *See Grifols*, 2025 WL 1826611, at *20-21.

***Paid murder***. Lamarco attributed a "paid murder" to a source that never made such an allegation. Report at 23; *see supra* Part I.A.4. That gap is the knowledge. *See Grifols*, 2025 WL

1826611, at *20 (actual malice plausibly alleged where author "saw the disclosure and . . . stated precisely the opposite").

***The loan.*** Lamarco attributes a loan to Tang while admitting that his sources only establish a loan made by JC International Finance. *Compare* Mot. at 33 ("loan was facilitated 'via JC International Finance'"), *with* Report at 19 ("Hao Tang Lent Millions."); *see also supra* Part I.A.3. His observation that Plaintiffs concede that he "constructed the later links from separate sources," Mot. at 33, is itself an admission that the KK Park links appear in none of the loan materials, AC ¶ 89. Both show actual malice.

***The aircraft.*** Lamarco claims, without support, that "Goldenway Operated the Jet on which Now Disappeared CCP Journalist Fu Xiaotian was Last Seen." Report at 16; *see also supra* Part I.A.2. His supposed source for that claim was an anonymous social-media account—the "unverified anonymous" source that *St. Amant* identifies as a basis for finding reckless disregard. 390 U.S. at 732; AC ¶¶ 82-83, 115.

***The Chart.*** Lamarco's decision to connect Plaintiffs (specifically IEC, Ho, and Cheng) to the 14K Triad in the Chart is unsupported by anything in the Report, which never mentions the 14K Triad. The same goes for the Chart's connections of Ho/FHP to "POGO Raids" and "Human Trafficking." *See supra* Part I.A.5. Lamarco drew the Chart himself, AC ¶¶ 118, 125, and because he wrote both the qualified descriptions in the text and the unqualified labels in the Chart, the divergence between them "reflects a conscious editorial choice, not an innocent misunderstanding of another person's work," *id.* ¶ 118.

***FHP.*** Though Lamarco's heading accuses FHP of being "Linked to CCP Espionage, Money Laundering, and Human Trafficking Operations," the text beneath it attributes every alleged crime to Wang's relatives, separate companies, and third-party POGO operators. Report

at 21-24; *see also supra* Part I.A.6. Lamarco's sources thus gave him "obvious reasons to doubt any accusation against FHP," and he published it anyway—just as he rejected without evidence the public correction identifying FHP as an independent operator. AC ¶ 117; *St. Amant*, 390 U.S. at 732.

Lamarco's cited cases do not help him. *Dfinity*, 702 F. Supp. 3d at 176, found no plausible allegations that the authors doubted their sources or reporting. *BYD Co. Ltd. v. VICE Media LLC*, 531 F. Supp. 3d 810, 822-825 (S.D.N.Y. 2021), found no plausible inference of knowing misrepresentation where the article's wording paralleled its source. And *Bobulinski v. Tarlov*, 758 F. Supp. 3d 166, 179-180 (S.D.N.Y. 2024), rejected an allegation that the defendant could have consulted public information where the plaintiffs did not allege that she actually did. Here, the Amended Complaint identifies Lamarco as the author, alleges that he did consult the sources—he cited and quoted them—and specifies how his factual assertions materially misrepresent their contents. AC ¶¶ 100, 114-119, 125. Lamarco calls that a "fabrication of the Report's conclusions." Mot. at 34. The Report's conclusions are quoted in the Amended Complaint, and the sources are hyperlinked in the Report. The disconnect between them is self-evident, as made clear by the table above. *See supra* Part I.A.

**C. Lamarco Stripped Qualifiers**

Lamarco argues that Plaintiffs "weaponize the Report's pervasive indicia of opinion" by pointing out that the qualifiers in the body disappear from the headings, Chart, and summary; that the Report "must be read as a whole"; that Plaintiffs "cherry-pick" the headings; and that "in any event, the headings are not alleged to be false." Mot. at 35.

The headings are alleged to be false: Statements 5, 6, and 7 are headlines and the text beneath them, and Statement 4 is the Chart. AC ¶¶ 73-97. Reading the Report "as a whole" does not help Lamarco; it exposes the pattern. Read as a whole, the Report hedges every intermediate

link—"appears," "reportedly," "linked," "associated"—and then states the conclusion against Plaintiffs flat. AC ¶¶ 60, 120. That is not an accident of drafting. It shows that Lamarco "identified the limits of [his] sources but chose to ignore them," *id.* ¶ 120: he knew the sources supported only a tentative, multi-step association, because that is how he described them, and he published a categorical accusation anyway. His use of "appears" in the body directly beneath the headline "Hao Tang Lent Millions" "shows that he recognized the uncertainty and consciously removed it at the point of accusation." *Id.* ¶ 116.

**D. Lamarco Omitted Reporting That Contradicted His Narrative**

Lamarco argues that he did not "ignore" the Le Monde and ICIJ reporting on Tang's relationship with China because "the Report cites to (and hyperlinks) the [ICIJ] article," that the article "only reported that a French Court found the authenticity of an arrest warrant for Tang to be 'questionable,'" and that allegations of a "predetermined narrative" are "conclusory." Mot. at 35-36 (emphasis omitted) (citing *McDougal v. Fox News Network, LLC*, 489 F. Supp. 3d 174, 186 (S.D.N.Y. 2020)).

Again, Lamarco's citation of the ICIJ article is the problem, not the answer. He cited it in a footnote, in his discussion of Huang Youlong, for the proposition that China "weaponizes [Interpol] for political ends." Report at 19 n.37. The same article reported that Chinese authorities had pursued Tang through Interpol, that a French court had refused China's extradition request and questioned the authenticity of the underlying warrant, and that Tang had alleged the pursuit was retaliation for his refusal to pay off a provincial security official. AC ¶ 59. The one recent, independent investigation of Tang's relationship with the Chinese state that Lamarco had in hand thus described Tang as a target of that state—the opposite of a man with "high-level CCP connections"—and Lamarco used it for its generic point while omitting what it said about Tang. That is not a failure to investigate; it is "purposeful avoidance of the truth," which "is in a different

category." *Harte-Hanks*, 491 U.S. at 692. Nor is the allegation "conclusory": unlike the generalized "narrative" allegations in *McDougal*, 489 F. Supp. 3d at 186-187, the Amended Complaint identifies the article, its date, its contents, and how it disproves Lamarco's claims. AC ¶¶ 59, 122; *see also* Report at 19 n.37. Lamarco's suggestion that the reporting is irrelevant because none of the nine statements "address this point," Mot. at 35 n.5, misses the point: it is pleaded not as a defamatory statement but as evidence of scienter.

**E. Lamarco's Remaining Arguments Mischaracterize the Amended Complaint**

Lamarco's final four points—that failure to investigate, profit motive, refusal to retract, and prior lawsuits do not establish actual malice—attack strawmen. Mot. at 36-38. Plaintiffs do not allege that Lamarco failed to investigate; they allege that he investigated, read his sources, and published accusations he knew they did not support. AC ¶¶ 113-121, 125. The absence of any editor, fact-checker, or legal review, *id.* ¶ 123, is not the claim; it is the reason no one stopped Lamarco from publishing his fabrications. *See LifeMD*, 607 F. Supp. 3d at 595 (knowledge or reckless disregard plausibly alleged where Lamarco published accusations of fraud, lies, and potential criminal liability without disclosing supporting authority).

Nor do Plaintiffs offer Lamarco's profit motive as a substitute for knowledge. *Harte-Hanks*, which Lamarco cites, holds that motive alone cannot prove actual malice; it also holds that "it cannot be said that evidence concerning motive or care never bears any relation to the actual malice inquiry." 491 U.S. at 668. A short seller who conceded that he was likely to trade immediately upon publication, AC ¶ 123, and who alone controlled every word, had every incentive to publish the most sensational version of his accusations. That context makes the fabrications more plausible as deliberate choices, not less. *Cassava*, 2024 WL 1347362, at *25, and *MiMedx Grp., Inc. v. Sparrow Fund Mgmt.*, 2018 WL 4735717, at *12 (S.D.N.Y. Sept. 29,

2018), rejected profit motive offered on its own; neither involved the additional allegation that the author misstated the sources he cited.

Lamarco's refusal to retract likewise corroborates, rather than supplies, the allegations pleading actual malice. In January 2026, Tang's counsel sent Lamarco a detailed letter explaining, source by source, why his citations did not support his accusations; Lamarco corrected nothing. AC ¶¶ 126-130. *Biro* observed that a failure to retract has "dubious" probative value because it postdates publication, *Biro v. Condé Nast*, 963 F. Supp. 2d 255, 281 (S.D.N.Y. 2013), but a publisher who is shown that his sources say the opposite of what he attributed to them, and leaves the accusations standing, has made clear that his commitment to them does not depend on their truth—as the contrast with CapitalWatch, which retracted and apologized to Tang when confronted with the same record, confirms. AC ¶¶ 25, 129. *LifeMD* specifically rejected Lamarco's opinion defense and held actual malice adequately pled on the trade-libel claim. 607 F. Supp. 3d at 593-595. The allegations here go further: Lamarco personally reviewed sources and then materially misstated their contents. AC ¶¶ 114-119, 125.

The Amended Complaint identifies the author, the sources he read, and the specific respects in which what he published departs from them—the showing that supported an inference of actual malice in *Grifols* and *LifeMD,* and more than enough to make it plausible here. *Palin*, 940 F.3d at 815.

## IV. LAMARCO IS NOT ENTITLED TO FEES

Lamarco asks for attorneys' fees and costs under New York's anti-SLAPP statute, which authorizes fees where an action "was commenced or continued without a substantial basis in fact and law." Mot. at 38 (quoting N.Y. Civ. Rights Law § 70-a(1)(a)). He acknowledges that whether such fees may be sought by motion "is in flux" and pending before the Second Circuit in *Wang v.*

*Sussman*, Nos. 25-2487-cv, 25-2503-cv (2d Cir.), and asks that the request be held in abeyance. Mot. at 38. His request fails on both the procedure and the merits.

Procedurally, Section 70-a provides for recovery through an "action, claim, cross claim or counterclaim." N.Y. Civ. Rights Law § 70-a(1). Lamarco has asserted none, and the statute's plain language "precludes a Section 70-a fees application brought by motion in federal court." *Rapaport v. Finkelman*, 2026 WL 2583071, at *3 (S.D.N.Y. Sept. 1, 2026); *accord Wang v. Sussman*, 2025 WL 2607155, at *4-6 (S.D.N.Y. Sept. 9, 2025). *Bobulinski*, on which Lamarco relies, does not fix the problem; *Rapaport* considered that decision and still denied fees sought by motion after dismissing the complaint with prejudice. 2026 WL 2583071, at *1, *3. Even assuming Section 70-a creates an enforceable right to fees in federal court, Lamarco must pursue that right through a pleaded counterclaim rather than a motion. *See Rapaport*, 2026 WL 2583071, at *3; *Wang*, 2025 WL 2607155, at *4-6.[9]

As for the merits of his request, an action that identifies a fabricated murder-for-hire accusation, a loan attributed to a man who did not make it, and a chart tying a company to a criminal triad the text never mentions has a substantial basis in fact and law. Even if some claims were dismissed, Section 70-a addresses the action as a whole, and *Grifols* denied fees where the factual loan claim survived even though most other challenges to the short-seller report did not. 2025 WL 1826611, at *23 & n.20.[10]

---

[9] Plaintiffs reserve the argument that Section 70-a's fee-shifting provision is inapplicable in federal court because its heightened "substantial basis" standard conflicts with Federal Rules of Civil Procedure 12 and 56. *See Carroll v. Trump*, 590 F. Supp. 3d 575, 582-585 (S.D.N.Y. 2022); *Prince v. Intercept*, 634 F. Supp. 3d 114, 142 (S.D.N.Y. 2022). *But see Grifols, S.A. v. Yu*, 2026 WL 836657, at *5-6 (S.D.N.Y. Mar. 26, 2026). Though the Second Circuit has held that Section 76-a's actual-malice standard applies in diversity, it expressly declined to decide whether the statute's other provisions apply. *Satanic Temple, Inc. v. Newsweek Digital LLC*, 177 F.4th 202, 211-212 & n.7 (2d Cir. 2026).

[10] The Court can deny fees on these grounds without awaiting the *Wang* appeal. Any abeyance should concern fees alone and should not delay the merits or discovery.

## V. PARAGRAPH 12 OF THE AMENDED COMPLAINT SHOULD NOT BE STRICKEN

Motions to strike are "viewed with disfavor and infrequently granted." *Collins v. Pearson Educ., Inc.*, 721 F. Supp. 3d 274, 289 (S.D.N.Y. 2024). Lamarco must show that the challenged allegations have no bearing on the issues, that no supporting evidence would be admissible, and that retaining them would cause prejudice, *Zama Cap. Advisors v. Universal Ent. Corp.*, 2025 WL 968783, at *30 (S.D.N.Y. Mar. 31, 2025); allegations with any "possible bearing on the subject matter of plaintiff's claim" remain, *Velez v. Lisi*, 164 F.R.D. 165, 167 (S.D.N.Y. 1995).

Paragraph 12 of the Amended Complaint bears on a central issue in the case: what the Report means. Lamarco's repeated invocation of Tang's ethnicity—"Chinese national," "Behind the Red Curtain," the "China Hustle"—treats ordinary relationships with Chinese individuals and businesses as evidence of nefarious state influence and criminality. AC ¶ 12; Report at 2-4, 14, 21, 24. Lamarco's Chart also places Tang at the center of a network, above a box reciting a series of criminal and other misdeeds—and both Tang and the misconduct are highlighted, as it happens, using the color red. Those devices are how the Report supplies the connections its sources lack, and they bear on how a reasonable reader would understand its accusations, on whether Lamarco intended its implications, and on his scienter. AC ¶¶ 12-13, 57, 110-112. Lamarco cannot insist that the Report "must be read as a whole," Mot. at 35, and also that the Court must excise the allegations describing that whole.

Indeed, this is a classic page from Lamarco's playbook. He routinely exploits Chinese identity and ethnic stereotypes to transform ordinary business associations into insinuations of fraud, smuggling, and money laundering. His NVIDIA Report cites the "fact that [the CEO] appears to remain close with the Chinese" as purported evidence that the company knew of chip diversion to China. It also links a corporate secretary to a money-laundering case involving "10

Chinese-origin suspects" merely because a firm associated with one suspect had used her services—even while acknowledging that she held similar positions at more than 3,500 firms. *See* Lamarco, *NVIDIA (NVDA): The China Problem* 24, 37 n.29 (May 13, 2026).[11] His GigaCloud Report treats an auditor's being "based in China" as a hallmark of a "China Hustle" stock, while his Gorilla Report invokes a "'China Hustle' fraud" based on a former CFO's prior employment. *See* Lamarco, *GigaCloud Technology Inc. (NASDAQ)* 3 (Sept. 28, 2023);[12] Lamarco, *Gorilla Technology (GRRR)* 6 (Apr. 4, 2025).[13]

Far from being irrelevant or scandalous, paragraph 12 identifies precisely the same tactic: exploiting Tang's ethnicity and tenuous associations to manufacture an appearance of criminality that Lamarco's cited sources do not support. Allegations of racial bias withstand a motion to strike where, as here, "it is plausible that the alleged bias and animus bear on at least some of Plaintiffs' claims." *16161782 Canada Inc. v. Mogyl'nyy*, 2026 WL 2906125, at *9 (S.D.N.Y. Sept. 28, 2026). *Knatt v. Hosp. Serv. Dist.*, 2003 WL 27384302, at *2 (M.D. La. June 30, 2003), by contrast, Mot. at 39-40, struck allegations of racism that "add[ed] nothing to the allegations"; here they explain Lamarco's method. Nor is the paragraph "scandalous": it describes, in measured terms and with quotations, what Lamarco chose to publish. AC ¶ 12. That Plaintiffs did not raise the point in pre-suit correspondence says nothing about its relevance, and Lamarco identifies no prejudice beyond disagreement with the characterization, which he is free to contest on the merits. The motion should be denied.

---

[11] https://perma.cc/KMM5-5W2U.

[12] http://perma.cc/VD3E-52FJ.

[13] https://perma.cc/5VD5-NXJV.

## CONCLUSION

For all of the reasons above, the Court should deny Defendants' motions in their entirety. If the Court finds a curable pleading defect, Plaintiffs respectfully request leave to amend to address it.

Dated: October 22, 2026
New York, New York

By: /s/ Roberta A. Kaplan
Roberta A. Kaplan
Timothy S. Martin
Christopher R. Le Coney
KAPLAN MARTIN LLP
1133 Avenue of the Americas
New York, New York 10036
Tel.: (212) 316-9500
rkaplan@kaplanmartin.com
tmartin@kaplanmartin.com
cleconey@kaplanmartin.com

*Counsel for Plaintiff Hao Tang*

By: /s/ Benjamin A. Fleming
Benjamin A. Fleming
Kevin Hagey
HOGAN LOVELLS CADWALADER LLP
200 Liberty Street
New York, New York 10281
Tel.: (212) 504-6000
benjamin.fleming@hlc.com
kevin.hagey@hlc.com

*Counsel for Plaintiffs Wong Meng Ho, Hong Wai Cheng, FortuneGate Holdings Philippines Inc., and International Entertainment Corporation*

By: /s/ Lisa M. Coutu
Libby S. Deshaies
Lisa M. Coutu
WINSTON TAYLOR LLP
200 Park Avenue
New York, New York 10166
Tel.: (212) 294-6700
libby.deshaies@winstontaylor.com
lisa.coutu@winstontaylor.com

*Counsel for Plaintiff Hao Tang*

## CERTIFICATE OF COMPLIANCE

I, Roberta A. Kaplan, hereby certify that this brief complies with the page and type-volume limitations in Your Honor's Individual Rules of Practice and Local Rule 7.1(c). Exclusive of the exempted portions of the brief, the brief contains 12,495 words, which complies with the limit set forth in the Court's Order at ECF No. 41. This brief has been prepared in proportionally spaced typeface using Microsoft Word in 12-point Times New Roman font.

Dated: October 22, 2026
New York, New York

*<u>/s/ Roberta A. Kaplan</u>*
Roberta A. Kaplan